1        **UNITED STATES DISTRICT COURT**

2        **CENTRAL DISTRICT OF CALIFORNIA**

3     **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4              - - - - - - -

5  JANE DOE, et al.,                    )
                                        )        **CERTIFIED**
6            Plaintiff,                  )
                                        )
7       vs.                             ) No. 8:19-CV-2105-DOC
                                        )        Volume I
8  *XAVIER BECERRA, in his Official*    )
   *Capacity as Attorney General of*    )
9  *California, et al.,*                 )
                                        )    [Simultaneous with
10          Defendant.                  )     8:19-CV-2130-DOC]
   _____)

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14        Motions for Preliminary Injunction

15             Santa Ana, California

16          Monday, December 16, 2019

17

18

19

20

21  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
22  United States District Court
    411 West 4th Street, Room 1-053
23  Santa Ana, California 92701
    (714) 558-8141

24

25

1  **APPEARANCES OF COUNSEL:**

2  **FOR CASE 8:19-CV-2105-DOC: Jane Doe, et al. V Xavier
   Becerra, et al.**

3

4  FOR PLAINTIFFS JANE DOE, *et al.*:

5      Bobby R. Burchfield (pro hac vice)
       KING & SPALDING LLP
6      1700 Pennsylvania Avenue NW
       Suite 200
7      Washington, D.C. 20006
       202-373-0500
8      bburchfield@kslaw.com

9      Joseph N. Akrotirianakis
       KING & SPALDING LLP
10     633 West Fifth Street
       Suite 1600
11     Los Angeles, California 90071
       213-443-4355
12     jakro@kslaw.com

13

14 FOR DEFENDANTS XAVIER BECERRA, *in his Official Capacity as
   Attorney General of California, et al.*:

15     Amie L. Medley
16     OFFICE OF ATTORNEY GENERAL
       CALIFORNIA DEPARTMENT OF JUSTICE
17     300 South Spring Street
       Suite 1702
18     Los Angeles, California 90013
       213-269-6226
19     amie.medley@doj.ca.gov

20

21 ALSO PRESENT:

22 Plaintiff Stephen Albright
   Mark Beckington, Supervising Deputy Attorney General
23

24

25

1    **APPEARANCES OF COUNSEL:**

2    **FOR CASE 8:19-CV-2130-DOC: Fresenius Medical Care Orange**
     **County LLC, et al. v. Xavier Becerra, et al.**

3

4    FOR PLAINTIFF FRESENIUS MEDICAL CARE ORANGE COUNTY, LLC:

5         Kelsi B. Corkran (pro hac vice)
          ORRICK HERRINGTON & SUTCLIFFE LLP
6         Columbia Center
          1152 Fifteenth Street NW
7         Washington, D.C. 20005
          202-339-8400
8         kcorkran@orrick.com

9

     FOR PLAINTIFF DAVITA, INC.:

10

          Kelly P. Dunbar (pro hac vice)
11        WILMER CUTLER PICKERING HALE & DORR LLP
          1875 Pennsylvania Avenue NW
12        Washington, D.C. 20009
          202-663-6000
13        kelly.dunbar@wilmerhale.com

14        David W. Ogden (pro hac vice)
          WILMER CUTLER PICKERING HALE & DORR LLP
15        1875 Pennsylvania Avenue NW
          Washington, D.C. 20006
16        202-663-6000
          david.ogden@wilmerhale.com

17

18   FOR PLAINTIFF U.S. RENAL CARE, INC.:

19        Michael E. Bern (pro hac vice)
          Latham & Watkins LLP
20        555 Eleventh Street NW
          Suite 1000
21        Washington, D.C. 20004
          202-637-1021
22        michael.bern@lw.com

23

24

25

```
 1  APPEARANCES OF COUNSEL:

 2  FOR CASE 8:19-CV-2130-DOC: Fresenius Medical Care Orange
    County LLC, et al. v. Xavier Becerra, et al.
 3

 4  FOR DEFENDANTS XAVIER BECERRA, in his Official Capacity as
    Attorney General of California, et al.:
 5

 6        Amie L. Medley
          OFFICE OF ATTORNEY GENERAL
          CALIFORNIA DEPARTMENT OF JUSTICE
 7        300 South Spring Street
          Suite 1702
 8        Los Angeles, California 90013
          213-269-6226
 9        amie.medley@doj.ca.gov

10
    ALSO PRESENT:
11
    Plaintiff Stephen Albright
12  Mark Beckington, Supervising Deputy Attorney General

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

**<u>I N D E X</u>**

2  **PROCEEDINGS**                                              **PAGE**

3  Hearing on Motion for Preliminary Injunction [28]

4  <u>Hearing on Motion for  Preliminary Injunction [30]</u>

5  Appearances                                                  6

6  Initial remarks by the Court                                 9

7  Plaintiffs' Argument (Mr. Burchfield)                       15

8  Plaintiffs' Argument (Mr. Dunbar)                           36

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | **SANTA ANA, CALIFORNIA, MONDAY, DECEMBER 17, 2019** |
| | 2 | **Items 22 & 23** |
| | 3 | (4:38 p.m.) |
| 04:38 | 4 | THE COURT:  Concerning Fresenius Medical Care |
| | 5 | Orange County v. Xavier Beccerra.  If you folks would like |
| | 6 | to come forward. |
| 04:38 | 7 | And if I could also call Jane Doe v. |
| | 8 | Xavier Beccerra. |
| 04:38 | 9 | **APPEARANCES** |
| 04:38 | 10 | MR. AKROTIRIANAKIS:  Joe Akrotirianakis on behalf |
| | 11 | of the Doe plaintiffs. |
| 04:38 | 12 | THE COURT:  Pleasure to see you again.  How are |
| | 13 | you? |
| 04:38 | 14 | MR. AKROTIRIANAKIS:  Always a pleasure, |
| | 15 | Your Honor. |
| 04:39 | 16 | THE COURT:  Good. |
| 04:39 | 17 | MS. MEDLEY:  Good evening, Your Honor.  Deputy |
| | 18 | Attorney General Amie Medley on behalf of defendants. |
| 04:39 | 19 | THE COURT:  Nice seeing you.  Pleasure. |
| 04:39 | 20 | MR. DUNBAR:  Good evening, Your Honor.  Kelly |
| | 21 | Dunbar on behalf of DaVita.  And I'll be speaking on behalf |
| | 22 | of all the plaintiffs. |
| 04:39 | 23 | THE COURT:  Just a little slower. |
| 04:39 | 24 | MR. DUNBAR:  Kelly Dunbar for DaVita.  I'll be |
| | 25 | speaking, with Court's permission, on behalf of all the |

|  |  |  |
|---|---|---|
|  | 1 | plaintiffs in Fresenius Medical Care. |
| 04:39 | 2 | THE COURT:  Who else is at the table, just so we |
|  | 3 | have a record?  I don't know this gentleman who's seated, |
|  | 4 | and I apologize.  If you'd come to the lectern, sir, I'd |
|  | 5 | appreciate it. |
| 04:39 | 6 | MR. OGDEN:  Your Honor, I'm David Ogden, |
|  | 7 | co-counsel in the case with Mr. Dunbar. |
| 04:39 | 8 | THE COURT:  It's nice having you here. |
| 04:39 | 9 | MR. BURCHFIELD:  Your Honor, I'm Bobby Burchfield |
|  | 10 | representing the Doe plaintiffs. |
| 04:39 | 11 | THE COURT:  Okay. |
| 04:39 | 12 | SPEAKER-2: |
| 04:39 | 13 | MS. CORKRAN:  Kelsi Corkran.  I'm here on behalf |
|  | 14 | of Fresenius Medical Care North America and also Fresenius |
|  | 15 | Medical Care Orange County. |
| 04:40 | 16 | THE COURT:  Thank you very much.  Nice having your |
|  | 17 | here. |
| 04:40 | 18 | MR. BERN:  Michael Bern for U.S. Renal Care. |
| 04:40 | 19 | THE COURT:  Okay.  Thank you. |
| 04:40 | 20 | MS. MEDLEY:  Your Honor, my supervising Deputy |
|  | 21 | Attorney General, Mark Beckington, will be joining me, but |
|  | 22 | he stepped out for a moment. |
| 04:40 | 23 | THE COURT:  That's okay.  Once again, one more |
|  | 24 | time, your appearance. |
| 04:40 | 25 | MS. MEDLEY:  Yes, Your Honor.  Deputy Attorney |

|   |   |   |
|---|---|---|
|        | 1  | General, Amie Medley. |
| 04:40  | 2  | THE COURT:  And the gentleman came in this morning |
|        | 3  | I think to try to set up some of the equipment, and he's |
|        | 4  | your audio-video person.  Is that correct? |
| 04:40  | 5  | THE CLERK:  Your Honor, that was for the bench |
|        | 6  | trial. |
| 04:40  | 7  | THE COURT:  Oh, another matter.  Okay.  And then |
|        | 8  | you have another person with you who is? |
| 04:40  | 9  | MS. MEDLEY:  We have a couple more people in the |
|        | 10 | courtroom, Your Honor, but it will just be me and |
|        | 11 | Mr. Beckington. |
| 04:41  | 12 | THE COURT:  And the other gentleman is just |
|        | 13 | outside? |
| 04:41  | 14 | MS. MEDLEY:  Yes.  I think he understood you to be |
|        | 15 | calling the other case.  Apologies. |
| 04:41  | 16 | THE COURT:  Okay. |
| 04:41  | 17 | MS. MEDLEY:  Your Honor, in the interest of time, |
|        | 18 | I would be willing to start without Mr. Beckington, if you'd |
|        | 19 | like. |
| 04:41  | 20 | THE COURT:  No. |
| 04:45  | 21 | *(Pause in the proceedings at 4:45 p.m.)* |
| 04:46  | 22 | *(Proceedings resumed at 4:46 p.m.)* |
| 04:46  | 23 | MR. BECKINGTON:  Good afternoon, Your Honor.  Mark |
|        | 24 | Beckington, also with Ms. Medley on this matter.  I |
|        | 25 | apologize.  I stepped out. |

04:46  1          THE COURT:  No, that's fine.  There's no rush.

04:46  2              **INITIAL REMARKS BY THE COURT**

04:46  3          THE COURT:  First let me start laying the

4    background as I understand it.  You're before the Court for

5    a hearing regarding plaintiff's motion for a preliminary

6    injunction in both of these matters, which you are entitled:

7    Jane Doe v. Xavier Beccerra, et al., which is

8    Case Number 19-2105, and Fresenius Medical Care

9    Orange County, which is Case Number -- or v.

10   Xavier Beccerra, which is 19-2310.  The lawsuit centers on

11   California Assembly Bill Number 290, quote, the health care

12   services plans and health insurance third-party payments

13   AB-290, which was signed by Governor Newsom on October 14 of

14   2019.  AB-290 is designed to regulate the way healthcare is

15   provided and funded for dialysis patients in the State of

16   California.

04:47  17         The American Kidney Fund, Inc., often referred to

18   as AKF, a plaintiff in the Jane Doe action, is a nonprofit

19   that helps dialysis patients meet their insurance payments.

20   It receives approximately 80 percent of its funding from

21   Fresenius and DaVita, the two largest dialysis providers in

22   the country.

04:47  23         The primary concern animating AB-290 in the

24   California legislature is that dialysis providers could use

25   this payment structure to steer dialysis patients into

1    private health insurance plans, which generate significantly

2    higher reimbursement rates for dialysis than public plans

3    like Medicare.

04:48    4           The potential problem here is readily apparent:

5    Dialysis providers who want the higher reimbursements from

6    private insurance might donate to the AKF and steer patients

7    towards private insurance, knowing that AKF will help

8    patients make their premium payments.

04:48    9           The California legislature for its part found that

10    the system of third-party healthcare premium assistance

11    could result in unjust enrichment for dialysis providers

12    while shifting higher out-of-pocket costs to patients and

13    subjecting them to disruptions in treatment.  The

14    legislature was also concerned that this system could lead

15    to distortions in the insurance risk pool and higher

16    premiums for patients.

04:49    17          Concerning the provisions at issue, the plaintiffs

18    in these cases pose seven challenges to AB-290 with respect

19    to both individual provisions and the entire law in their

20    motions for preliminary injunction.

04:49    21          First, entities who provide third-party premium

22    payment assistance are required to disclose to insurance

23    companies the names of the enrollees receiving such

24    assistance.  Plaintiffs argue that this conflicts with the

25    Federal Beneficiary Inducement Statute and Advisory Opinion

| | | |
|---|---|---|
| | 1 | No. 97-1 issued by the Department of Health and Human |
| | 2 | Services. |
| 04:49 | 3 | Plaintiffs also argue that this provision compels |
| | 4 | speech in contravention of the First Amendment. |
| 04:49 | 5 | Second, AB-290 caps the private insurance |
| | 6 | reimbursement rate at the Medicare rate when a patient |
| | 7 | receives premium payment assistance from an entity funded by |
| | 8 | their dialysis provider.  Plaintiffs characterize this |
| | 9 | provision as a penalty leveled against dialysis providers |
| | 10 | for financially supporting and thus associating with |
| | 11 | entities like AKF in violation of the First Amendment. |
| 04:50 | 12 | Third, AB-290 requires entities like AKF to inform |
| | 13 | the patients it assists, quote: |
| 04:50 | 14 | "Of all available health coverage |
| | 15 | options including but not limited to |
| | 16 | Medicare, Medicaid, individual market |
| | 17 | plans, and employer plans, if |
| | 18 | applicable," end of quote. |
| 04:50 | 19 | Plaintiffs argue that this is compelled speech, |
| | 20 | vague, and overbroad and thus contrary to the First |
| | 21 | Amendment. |
| 04:50 | 22 | Fourth, AB-290 prohibits both dialysis providers |
| | 23 | and entities like AKF from, quote: |
| 04:50 | 24 | "Steering, directing, or advising, end |
| | 25 | of quote, patients, quote, into or away |

1          from a specific coverage program

2          option," end of quote.

04:51    3          Plaintiffs argue this restriction of their speech

4    is invalid under the first amendment as well as vague and

5    overbroad.

04:51    6          Fifth, plaintiffs argue that AB-290, by

7    prohibiting entities like AKF from conditioning assistance

8    on eligibility for or receipt of any transplant or

9    procedure, the law curtails their First Amendment right of

10   association to serve as a charity for the dialysis patients

11   of their choosing.

04:51    12         Sixth, patients allege that the provision allowing

13   entities like AKF to seek an updated Advisory Opinion from

14   the Department of Health and Human Services forces them to

15   file a petition seeking such an opinion, thereby violating

16   their First Amendment rights.

04:51    17         And, seventh, plaintiffs argue that AB-290 poses

18   an obstacle to the alleged federal policies of helping

19   dialysis patients access health care allowing patients to

20   choose their insurance and spreading costs between public

21   and private insurance.

04:52    22         I'm going to hear argument from the parties in

23   particular, but I'd ask the parties to respond to a number

24   of questions, which I'll read into the record now, and that

25   way, when you address the question, just tell me which

1    question.  You're not tied to a particular order.

04:52    2         But the first question:  If AB-290 goes into

3    effect on January 1st and AKF pulls out of California, what

4    happens to the patients who depend on AKF?

04:52    5         Conversely, what is the benefit to patients and

6    especially patients who depend on AKF if the law goes into

7    effect?

04:52    8         And finally, can the state guaranty that patients

9    who depend on AKF will be able to switch to public health

10   coverage in time so that their dialysis and transplant

11   waiting lists will go uninterrupted?  And that was a

12   substantial question raised in the briefing, and that is,

13   I'm going to have you explain how they lose their place in

14   line, *et cetera*, and educate me a little bit about how

15   you're going to guaranty that this displacement doesn't

16   cause loss of life, quite frankly, or a -- well...

04:53   17         The second question is, it appears to the Court

18   that the prohibition on steering, directing, or advising

19   patients is a content-based restriction on speech subject to

20   strict scrutiny.  What are the real harms that the State has

21   a compelling interest in preventing with this prohibition,

22   and what is the State's argument that this prohibition is

23   narrowly tailored?

04:53   24         Now, you may argue it's strict scrutiny, but

25   tentatively it appears to be -- to the Court to be held to

the standard of strict scrutiny.  But you can push back on
that.

04:53    It seems that the provision in AB-290 capping
reimbursement at the Medicare rate already removes the
nefarious incentive to steer patients to private insurance;
thus why would the State also need this restriction on
speech to achieve its substantive goals?

04:54    The third question is that the Court tentatively
believes that the prohibition on steering, directing, and
advising under California's severability law is both
grammatically and functionally severable.  This may be
enough to support an inference that the prohibition is also
volitionally severable, but is there any evidence in the
legislative record to that effect or any evidence to the
contrary?

04:54    The fourth question is that plaintiffs in the Doe
case in a -- albeit in a footnote -- argue that the
requirement that AKF and similar entities inform their
beneficiaries of, quote, all available health coverage
options, end of quote, is vague and overbroad.  How does the
State respond?

04:55    And question five, AB-290 allows entities covered
by the Department of Health and Human Services Advisory
Opinion Number 97-1, like AKF, to seek a new Advisory
Opinion and, if a new opinion is requested, forestalls the

1    enforcement of AB-290 while the new opinion is pending;

2    however, if the new opinion finds that a provision of AB-290

3    conflicts with federal law, that provision will not go into

4    effect.  How then does or could AB-290 conflict with the

5    federal law, and why would AKF need to withdraw from

6    California if it went into effect?

04:55   7         Now, you're not limited to those questions, of

8    course.  If you have a preprepared presentation, for

9    goodness sake.  Time means nothing to me.  But at some point

10   I'm going to hear argument on a matter pending tomorrow, and

11   I've got Judge Olguin calling down, hopefully, in another

12   matter in a case next door.

04:56   13        So, Counsel, lectern's yours.

04:56   14        **PLAINTIFFS' ARGUMENT (MR. BURCHFIELD)**

04:56   15        MR. BURCHFIELD:  Good afternoon, Your Honor, Bobby

16   Burchfield representing the individual plaintiffs Jane Doe,

17   Stephen Albright, the American Kidney Fund and dialysis

18   patient citizens.  Mr. Dunbar will be speaking on behalf of

19   the provider plaintiffs.  We will try to avoid duplication

20   in our arguments.

04:56   21        Let me note first of all that Mr. Albright,

22   Plaintiff Stephen Albright, has been here all day, and he

23   remains here.  He is very interested in this case,

24   obviously, and he is a plaintiff in this case.  I'll be

25   referring to him in particular with regard to your

|       |    |                                                      |
|-------|----|------------------------------------------------------|
|       | 1  | Question Number 1.                                   |
| 04:56 | 2  | Before I begin, Your Honor, I put together a         |
|       | 3  | booklet of materials that may be helpful to the Court that |
|       | 4  | I'd like to pass out to you and your law clerks.     |
| 04:56 | 5  | THE COURT:  Please.  Just put them on the desk and   |
|       | 6  | I'll reach down.  But I want to pay attention to what you're |
|       | 7  | saying initially.                                    |
| 04:56 | 8  | MR. BURCHFIELD:  I've provided --                    |
| 04:56 | 9  | THE COURT:  You can put those up on the ELMO.        |
|       | 10 | What I don't wanna do is look down and lose what you're |
|       | 11 | saying.                                              |
| 04:57 | 12 | MR. BURCHFIELD:  Very well.  Thank you,              |
|       | 13 | Your Honor.                                          |
| 04:57 | 14 | THE COURT:  ELMO's open to you.  Screens are open    |
|       | 15 | to you.  Just put them over on the desk.  Use the ELMO. |
|       | 16 | That's fine.  But I'm not going to start thumbing through |
|       | 17 | pages.                                               |
| 04:57 | 18 | MR. BURCHFIELD:  All right.  Your Honor, that's      |
|       | 19 | fine.  I may refer to particular pages of the booklet if you |
|       | 20 | are so inclined to look at it with me.               |
| 04:57 | 21 | THE COURT:  I would prefer that it go up on the      |
|       | 22 | ELMO.                                                |
| 04:57 | 23 | So, Deb, if we can turn on the screens.  That way    |
|       | 24 | we can all see what you're talking about.            |
| 04:57 | 25 | THE CLERK:  Yes, Your Honor.                         |

04:57  1        MR. BURCHFIELD:  Great.  Great and, actually, if I

       2  may, Your Honor.

04:57  3        THE COURT:  I'll need this one up too.

04:58  4        MR. BURCHFIELD:  Your Honor, if I may.  Since

       5  1971, the United States Congress has recognized the

       6  importance of treating end stage renal disease.  It did so

       7  by extending Medicare benefits to ESRD patients regardless

       8  of their age.  Later, Congress amended Medicare so that

       9  private insurers would share the financial burden of

      10  treating ESRD.  And in 1997, the HHS Inspector General

      11  carefully considered and approved the program at issue here,

      12  which for over two decades has provided charitable --

      13  critical --

04:59 14        *(Court reporter requests clarification for the*

      15        *record.)*

04:59 16        THE COURT:  Has provided critical financial

      17  support for indigent --

04:59 18        MR. BURCHFIELD:  ESRD patients.

04:59 19        THE COURT:  ESRD patients.

04:59 20        MR. BURCHFIELD:  You have proved you're listening.

      21  Thank you, Your Honor.

04:59 22        That program is the health insurance premium

      23  program operated by the American Kidney Fund.

04:59 24        In response to your first question, Your Honor,

      25  and I think this question is at the very heart of this case.

           1    When the California legislature implemented AP -- AB-290, it
           2    cut at the very foundations of this carefully constructed
           3    federal mosaic for funding critical kidney care.  And it did
           4    so by eliminating -- by effectively eliminating in the state
           5    of California the ability -- the ability of AKF to continue
           6    its HIPP program.  AKF, as I will attempt to demonstrate,
           7    cannot continue the HIPP program in California -- cannot
           8    continue HIPP in California, because to do so would bring it
           9    into direct conflict with the Inspector General's opinion
          10    97-1 and threaten the program, not only in California, but
          11    throughout the United States.

05:00     12            Loss -- loss of the protections of the safe
          13    harbors of that opinion would put AKF in a situation where
          14    it simply could not continue the program.

05:00     15            Mr. Albright well demonstrates this issue.  He
          16    lives in Costa Mesa and suffers from ESRD.  He dialyzes each
          17    night at home and takes over 30 medications a day.  He is
          18    one of the very few ESRD patients who has been able to
          19    continue working part-time as he fights this disease.  As
          20    with Ms. Doe, AKF pays the premiums for his Medicare and for
          21    the insurance his significant other receives through her
          22    employer.  Again, his commercial insurance is critical to
          23    fill the gaps in Medicare.

05:01     24            Your Honor, Question 1 asks what will happen to
          25    these patients if AKF is forced from California, and the

```
 1    answer is, number one, they will lose their commercial

 2    insurance because they cannot afford it.  Many of them will

 3    also be unable to afford the premium for Medicare or the

 4    co-insurance for Medicare.

 5            Third, many HIPP beneficiaries are ineligible for

 6    Medicare because they're -- they're undocumented or they

 7    don't have the employment credits to participate in

 8    Medicare.  And those patients will be left largely out in

 9    the cold.

10            Fourth, many HIPP beneficiaries will lose their

11    place on the transplant lists, and as -- as we pointed out

12    in the -- the affidavit of AKF's chief financial officer,

13    Donald Roy, he states, quote:

14               "HIPP assistance is often essential

15               for ESRD patients to maintain the

16               insurance that keeps them on transplant

17               lists, and he explains that even dental

18               insurance is important to remain on the

19               transplant list because the risk of

20               dental infections are a risk that kidney

21               transplants will not tolerate."

22            Indeed, in 2018, over 1,000 HIPP beneficiaries

23    across the nation received kidney transplants.  So far in

24    2019, at least 50 patients in California, 50 HIPP

25    beneficiaries here in California, have received kidney
```

05:01 (line 5)
05:01 (line 10)
05:02 (line 14)
05:02 (line 22)

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | transplants.                                             |
| 05:02 | 2  | After the HIPP -- after the transplant, HIPP             |
|       | 3  | coverage continues for at least the remainder of the policy |
|       | 4  | year.  As Ms. Doe states in her declaration, Medicare alone |
|       | 5  | would not cover all the costs associated with a kidney   |
|       | 6  | transplant.                                              |
| 05:03 | 7  | The result, Your Honor, as Mr. -- as Mr. Roy sets       |
|       | 8  | forth, is that loss of the coverage would move the HIPP  |
|       | 9  | beneficiaries from their current status on the transplant |
|       | 10 | list to the -- to the end.  They would have to start over |
|       | 11 | once -- once they get other coverage, if they're able to get |
|       | 12 | other coverage that the transplant -- that would be     |
|       | 13 | sufficient for the transplant, and that may very well not be |
|       | 14 | Medicare, as Ms. Doe's affidavit sets forth.            |
| 05:03 | 15 | THE COURT:  I want to repeat something that you         |
|       | 16 | said, and this will slow it down a little bit.  If -- if you |
|       | 17 | either move your coverage -- well, lets just confine it to |
|       | 18 | moving your coverage.  Do you go to the bottom of the list |
|       | 19 | of the new entity supplying your coverage, or is there a -- |
|       | 20 | in other words, is it just by time, or is there another  |
|       | 21 | criteria in which I might rise on that list, let's say   |
|       | 22 | because of some more critical state that I'm in, other than |
|       | 23 | the next person seeking a transplant?                    |
| 05:04 | 24 | MR. BURCHFIELD:  Your Honor, as with many issues,       |
|       | 25 | this is not -- this is not very simple, but my understanding |

1    in direct response is if you change your coverage -- well,

2    let me step back.  As I understand the kidney transplant

3    list, they are not provider or insurance policy specific.

4    There is a general list in the state of California for

5    kidney transplants, and it is years long.  In Ms. Doe's

6    affidavit, she talks about how the list in California is so

7    long she has also applied to the list in Arizona, which is

8    only three or four years long.  It's not as long as the one

9    in California.

05:05   10        THE COURT:  So I'm gonna repeat because I don't

11   understand, so humbly I'm gonna reask.  Is this -- if I

12   change coverage or a person changes coverage, are they

13   automatically placed on the bottom of the list of the new

14   entity supplying coverage, or is there another criteria

15   wherein I could change coverage, but I might, let's say, be

16   in the middle echelon of those who are able to or seeking a

17   transplant?

05:05   18        MR. BURCHFIELD:  Your Honor, the record in this

19   case reflects that you would go to the bottom of the

20   transplant list.  You would start over.

05:06   21        THE COURT:  The reason I'm gonna tell you that is

22   because I have no -- little experience, but in 1985 in

23   juvenile court, one of the things that juvenile court judges

24   do is they have parental issues, and I'm going to say Jane

25   Doe had a mother who was -- bless her soul, was of rather

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
|       | 1  | low IQ, in the 60s, and although she could have her child, |
|       | 2  | briefly, through the Department of Social Services, she was |
|       | 3  | on a transplant list.  But the mother didn't realize that |
|       | 4  | there was even a signal or a phone call coming in, and so, |
|       | 5  | therefore, the child had lost, at least one occasion, the |
|       | 6  | kidney transplant from a donor. |
| 05:06 | 7  | That put the Department of Social Services in a |
|       | 8  | very difficult position of literally coming to the Court and |
|       | 9  | asking for a complete denial of parenting even on a limited |
|       | 10 | basis other than a monitor. |
| 05:07 | 11 | I don't know much about what's ensued since, but I |
|       | 12 | do know there was a discussion, which was never clear to the |
|       | 13 | Court at the time, or this Court anyway, about what that |
|       | 14 | criteria was.  So I warn both of you it was unclear then; |
|       | 15 | it's still unclear to me.  I don't know if I adopt -- but |
|       | 16 | I'll turn to the State for an answer also; and that is, if I |
|       | 17 | change coverage, do I immediately go to the bottom of the |
|       | 18 | list? |
| 05:07 | 19 | MR. BURCHFIELD:  That -- that is my understanding, |
|       | 20 | Your Honor, is that -- is that you -- you -- is that you do. |
|       | 21 | Is that you do. |
| 05:07 | 22 | THE COURT:  Okay. |
| 05:07 | 23 | MR. BURCHFIELD:  Your Honor, the -- the, uh, |
|       | 24 | second question you asked I think goes directly into the -- |
|       | 25 | into the many First Amendment issues presented by this case. |

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

23

```
 1    And I think the Court is exactly right that the steering,
 2    directing, and advising patients provision is a
 3    content-based restriction on free speech subject to strict
 4    scrutiny.  That is the NIFLA precedent the Supreme Court
 5    decided in 2018, that came out of the Ninth Circuit, in
 6    which the Court reversed the Ninth Circuit's affirmance of
 7    denial of a preliminary --
 8        (Court reporter requests clarification for the
 9        record.)
10        MR. BURCHFIELD:  In which the Supreme Court
11    reversed the Ninth Circuit's denial of a preliminary
12    injunction, uh, against those provisions.  So I think the
13    Court is exactly right.
14        But I would go further on Question 2 and say that
15    Question 2 focuses only on the provision in the statute
16    relating to -- that -- that regulate the providers.  It does
17    not -- the Question 2 doesn't seem to encompass --
18        (Court reporter requests clarification for the
19        record.)
20        MR. BURCHFIELD:  And I would respectfully submit
21    for the Court --
22        THE COURT:  Question 2 encompassed.
23        MR. BURCHFIELD:  And I respectfully submit that it
24    should encompass the many restrictions imposed by AB-290 on
25    AKF as well, and those restrictions are found in Section 3B
```

|       |    |                                                         |
|-------|----|---------------------------------------------------------|
|       | 1  | of the statute.  And if I may put that --               |
| 05:09 | 2  | *(Document displayed.)*                                 |
| 05:09 | 3  | THE COURT:  And you can blow that up if you want.        |
|       | 4  | We'll show you how to do that.                           |
| 05:09 | 5  | MR. BURCHFIELD:  There it comes.                         |
| 05:09 | 6  | Your Honor, in this Provision B, it contains            |
|       | 7  | several restrictions.  One of the restrictions is in -- is |
|       | 8  | the restriction you alluded to in one of your questions, |
|       | 9  | which is Number 2:  "It shall agree not to condition    |
|       | 10 | financial assistance on eligibility for, or receipt of, any |
|       | 11 | surgery, transplant, procedure, drug, or device."       |
| 05:10 | 12 | In other words, AKF could no longer focus its           |
|       | 13 | charitable assistance on ESRD patients who need dialysis, a |
|       | 14 | procedure, or a kidney transplant.  It would have to make |
|       | 15 | its assistance available, as we read this provision -- and I |
|       | 16 | believe that's the only way to read it.  It would have to |
|       | 17 | make -- make its assistance available to all patients who |
|       | 18 | need some sort of health assistance.  It would undermine  |
|       | 19 | AKF's First Amendment right to pursue its associational  |
|       | 20 | mission of fighting -- of fighting kidney disease.  That's |
|       | 21 | the first.                                               |
| 05:10 | 22 | The second, Your Honor, paragraphs 1 and 3 are the      |
|       | 23 | ones that you refer to in your -- in one'a your other    |
|       | 24 | questions, in which it requires AKF to inform patients of |
|       | 25 | their healthcare options, and that is problematical for two |

1    reasons:  Number one, it's compelled speech.  Under the

2    First Amendment that is subject to strict scrutiny and must

3    be narrowly tailored to serve a compelling government

4    interest.  And the State has not met that burden.

05:11    5        But more importantly, Your Honor, AKF does not

6    currently engage in those discussions with patients.  The

7    record in this case, I believe, is undisputed that AKF

8    grants assistance when patients come to it with their policy

9    already chosen.  AKF does not assist them in choosing the

10   policy, and it does not -- it does not advise them about

11   policies.  So this provision would require AKF to engage in

12   speech that it does not currently engage in.  Fundamentally,

13   that undermines the entire structure of this program,

14   Your Honor, because AKF -- AKF places its -- funds the

15   policies when the patients come to it without that

16   discussion.  This would require the patients to await having

17   that discussion with AKF until they choose their policy.

18   That would -- that would alter -- as I said, that would

19   alter the very way this program works, and that would put it

20   fully at odds with Advisory Opinion 97-1, which states that

21   AKF does not participate in the selection of policies, and

22   it typically funds the policies when the patient comes to it

23   with the policy in hand.

05:13   24        The fourth provision, Your Honor, is the "steer,

25   direct, or advise the patient" provision, which is parallel

```
  1   to the one imposed by Section 2 on the providers.  And, as I
  2   said, I agree with the Court -- AKF agrees with the Court
  3   that that provision is subject to strict scrutiny, but so
  4   are all these others.
05:13  5           In paragraph C, Your Honor, which I'm putting up
  6   on the screen now, 3(c), more compelled speech.  And (c)(1),
  7   AKF must certify annually -- provide a statement to the
  8   health care service plan that -- that it meets the
  9   requirements set forth in the provisions that we've just
 10   looked at.  So, in other words, it has to certify that it's
 11   complying with these speech codes.
05:13 12           In provision 2, AKF is required against its --
 13   against its policy and against its wishes to disclose the
 14   names of all of its beneficiaries to the health insurance
 15   plans -- to any health insurance plans that it is -- it
 16   is -- it is seeking -- it is paying for coverage.
05:14 17           Let me step back for a moment, Your Honor.
 18   Section 3'a the statute deals with health -- with health
 19   insurance plan's managed care plans.  Section 5 is a
 20   parallel and almost identical provision that relates to
 21   health insurance policies.  So I will address primarily
 22   Section 3, but the same arguments, the same observations
 23   apply also to Section 5.
05:14 24           If you take all of those provisions that I've just
 25   discussed together, Your Honor, all of them are sub --
```

| | | |
|---|---|---|
| | 1 | are -- are offensive to the First Amendment because they're |
| | 2 | either compelled speech or restrictions on the content of |
| | 3 | speech if -- and if one were to strike all of those from the |
| | 4 | statute, there is -- there would not be much left. |
| 05:15 | 5 | So severability is not -- I would -- I would -- |
| 05:15 | 6 | *(Court reporter requests clarification for the* |
| | 7 | *record.)* |
| 05:15 | 8 | MR. BURCHFIELD:  I would -- |
| 05:15 | 9 | *(Court reporter requests clarification for the* |
| | 10 | *record.)* |
| 05:15 | 11 | MR. BURCHFIELD:  Severability, I would |
| | 12 | respectfully submit, is not an option to deal with these |
| | 13 | First Amendment issues.  They are fundamental to and |
| | 14 | throughout AB-290.  And that -- and that, Your Honor, |
| | 15 | addresses, uh, Question Number 3 about severability, and I |
| | 16 | think Mr. Dunbar may have some other -- some additional |
| | 17 | comments to make on that. |
| 05:15 | 18 | Number 4, Your Honor, you asked about -- you asked |
| | 19 | about, uh, the footnote in our case, in which you -- in |
| | 20 | which we say that the statute requires AKF to inform |
| | 21 | patients of all coverage oppositions.  As we say in that |
| | 22 | footnote, I don't know AKF can possibly do that.  All |
| | 23 | coverage oppositions -- so it's vague and it's |
| | 24 | unconstitutional, but it's also compelled speech for the |
| | 25 | reasons that I've stated before. |

05:16    1          And in -- and in Question Number 5, Your Honor,

          2    you -- you asked about the Advisory Opinion.  And there are

          3    several -- there are several issues, uh, there.  The first

          4    issue is that Section 7, and I'll put it on the screen.

05:16    5      *(Document displayed.)*

05:16    6          MR. BURCHFIELD:  Section 7, Your Honor, is a

          7    recognition by the state legislature that this statute is

          8    inconsistent with Advisory Opinion 97-1.  So what the state

          9    legislature tried to do to cure that problem is it tried to

        10    pressure AKF to go back to the Inspector General and seek a

        11    new Advisory Opinion.

05:17   12          Number one, that's compelled speech.  The State

        13    doesn't specifically tell AKF to do it, but it imposes a

        14    significant burden on AKF if it doesn't do it.

05:17   15          The statute goes into effect with all these

        16    restrictions on July 1 unless AKF does what the State wants

        17    and goes to the Inspector General.  That's compelled speech,

        18    Your Honor.  That's compelled petition.  That's -- that's

        19    offensive to the First Amendment.

05:18   20          Second, it doesn't stalve [sic] the preemption

        21    problem, and it doesn't stall the preemption problem,

        22    Your Honor, because the Supreme Court made clear in the

        23    *Pliva* case that preemption has to be evaluated on the basis

        24    of the law as it stands now, not on the basis of what the

        25    federal government or an agency of the federal government

|  | 1 | might do to conform federal law to the state law. |

05:18   2        If you look at the *Pliva* decision, which I have
        3   included in the booklet behind Tab 6 -- and this is at
        4   page 620, the Court rejected the very argument being made by
        5   the plaintiffs here -- by the plaintiffs in that case.  It
        6   rejected it.  The plaintiffs in that case argued that all
        7   the -- all the drug manufacturer had to do was go back to
        8   the FDA and ask for permission to change the label, and the
        9   Court rejected that argument.  It said there on page 620 --
       10   it's highlighted:  "The question for impossibility is
       11   whether the private party could independently do under
       12   federal law what state law requires of it."

05:19  13        And the state is essentially admitting that AKF
       14   can't do that by trying to push it to change the advisory.

05:19  15        The Court concluded, in the following paragraph
       16   there, that if -- if the -- if a state could tell -- if a
       17   state could tell someone affected by a new state statute to
       18   go to the federal government and seek help, "impossibility
       19   preemption" would be a dead letter, because any state at any
       20   time could tell a person or a company just go to the federal
       21   government, ask the federal government to change the federal
       22   law so you can comply with the state law.  That's not --
       23   that -- that's exactly what impossibility preemption tries
       24   to prevent.  So this does not solve impossibility
       25   prevention [sic].

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

30

| | | |
|---|---|---|
| 05:20 | 1 | Then the final problem with Section 7, Your Honor, |
| | 2 | as we put forth -- set forth in our brief. |
| 05:20 | 3 | *(Court reporter requests clarification for the* |
| | 4 | *record.)* |
| 05:20 | 5 | THE COURT:  Just a moment. |
| 05:20 | 6 | Just a moment, Counsel. |
| 05:21 | 7 | I'm going to put up realtime.  I was listening.  I |
| | 8 | want to see where you're dropping off.  I'm not seeing it |
| | 9 | fast enough. |
| 05:22 | 10 | *(Pause in the proceedings at 5:22 p.m.)* |
| 05:33 | 11 | *(Proceedings resumed at 5:33 p.m.)* |
| 05:33 | 12 | THE COURT:  So, Counsel, you can pick up wherever |
| | 13 | you'd like.  You can start over.  You can retrace so you're |
| | 14 | comfortable with your argument. |
| 05:34 | 15 | MR. BURCHFIELD:  Your Honor, we were discussing |
| | 16 | Question 5, and I -- it probably isn't necessary for me to |
| | 17 | repeat everything I said, but let me go back and just hit |
| | 18 | some'a the main points, because there were two other points |
| | 19 | I did want to make. |
| 05:34 | 20 | In Question 5 you asked about Advisory |
| | 21 | Opinion 97-1 and the provision in AB-290, Section 7, that we |
| | 22 | believe attempts to coerce AKF into seeking a revised |
| | 23 | advisory opinion. |
| 05:34 | 24 | I had made the following points about that.  The |
| | 25 | first is that that provision recognizes the preemptive |

1      effect of the advisory opinion by making it -- by

2      essentially trying to coerce AKF to get it changed so the

3      law can go into effect.

05:35  4              Number 2, that that provision is compelled speech.

5      It imposes a significant burden on AKF; that is, the

6      immediate effectiveness on July 1 of the statute if AKF does

7      not do what the State wants it to do.  That is compelled

8      speech.  It violates the First Amendment, freedom of speech

9      and the freedom of petition.

05:35  10             Third, I had said that the statute Section 7

11     doesn't solve the preemption issue anyway, as the Supreme

12     Court said in the *Pliva* case, preemption, impossibility

13     preemption, depends on whether the person affected by the

14     state statute can independently do what the State instructs

15     him to do without permission from the federal government to

16     do it.

05:35  17             And I was referring to, I think, when we were

18     interrupted -- I was referring to page 620 of the Pliva

19     case, which I have on the projector.  And the Supreme Court

20     there said, "The question for impossibility is whether the

21     private party could independently do under federal law what

22     state law requires of it."

05:36  23             The rest of that quotation, Your Honor, I think is

24     also pivotal.  We quote it in our brief.  It is -- and I

25     would -- I would refer the -- Your Honor to it.  And the

1    Court concludes, "If these conjectures" -- that is to say

2    conjectures about what a federal agency might do if the

3    affected party were to ask permission:

05:36    4              "If these conjectures suffice to

5              prevent federal and state law from

6              conflicting for supremacy clause

7              purposes, it is unclear what -- when,

8              outside of express preemption, the

9              supremacy clause would have any force."

05:37   10         That's the law, Your Honor, and AB-290 runs

11   headlong into it.  And, in fact, Section 7 is a pretty stark

12   admission that the California legislature recognized without

13   a change in Advisory Opinion 97-1 this statute is preempted.

05:37   14         The final thing I would say, Your Honor -- two

15   final things, and that is, we have set forth in our brief

16   that AKF cannot go back to the Inspector General and seek a

17   revised advisory opinion, because it cannot certify its

18   intention to comply with the statute, with AB-290, in that

19   opinion.  It can't do so because, if it certified an intent

20   to comply with AB-290 in California, it would have to change

21   the advisory opinion nationwide, and that is something AKF

22   is neither willing, nor would it be prudent for AKF to do.

05:38   23         And the final point, Your Honor, is if AKF were to

24   do exactly what California wants it to do and go back to the

25   Inspector General and get a revised advisory opinion that

| | | |
|---|---|---|
| | 1 | completely rewrote 97-1 to conform to AB-290, that would |
| | 2 | jeopardize AKF's program in the 49 other states and |
| | 3 | territories. |
| 05:38 | 4 | So California is trying to completely revise a |
| | 5 | nationwide program that has been approved by the federal |
| | 6 | government, run to the great benefit of hundreds of |
| | 7 | thousands of patients over the last 20 years, to suit the |
| | 8 | many as yet unexplained means of -- reasons for California. |
| 05:39 | 9 | Your Honor, let me spend -- let me spend a few |
| | 10 | minutes, and then I'll turn it over to Mr. Dunbar, talking |
| | 11 | about the imminence of the irreparable harm here. |
| 05:39 | 12 | As of January 1, this statute puts AKF in a -- in |
| | 13 | a very difficult position. |
| 05:39 | 14 | Behind my chart behind -- in my booklet, behind |
| | 15 | Tab 5 is a timeline of all the specific times set forth in |
| | 16 | the statute, uh -- the deadlines in the statute.  October 1, |
| | 17 | 2019, policies in effect before that date are not -- are |
| | 18 | grandfathered and are not affected by AB-290.  January 1, |
| | 19 | 2020, that is the date on which the constitution says newly |
| | 20 | passed statutes go into effect in California.  That is also |
| | 21 | the date the State concedes the anti-steering provision goes |
| | 22 | into effect against the providers. |
| 05:40 | 23 | March 1, 2020, any grandfathered patient that |
| | 24 | changes his or her policy after that date is subject to the |
| | 25 | Act.  And then July 1, 2020, that is the date that the |

1    provisions affecting AKF explicitly go into effect.  That's

2    Sections 3 through 6.

05:40    3            Now, AKF's quandary is this:  What do these

4    October 1, March 1 dates mean if the statute doesn't go into

5    effect until July 1?  The statute is poorly written.  It is

6    not a model of clarity, and AKF simply cannot take the risk

7    of continuing the program in California after January 1 when

8    it simply does not know what the effect of the statute is,

9    and, Your Honor, when it is clear that any policy that is in

10   effect as of July 1, that was -- that would have been placed

11   after October 1, is going to be affected by AB-290.  So

12   AB-290 is already having an effect, and AKF has already had

13   to step back and stop issuing new policies to new patients

14   after October 1, because those policies seem to be covered

15   by eight -- by AB-290 once the provisions kick in this July.

05:41   16           The -- the -- so the problem is immediate.  The

17   irreparable harm is severe.  3,756 patients in California

18   received HIPP benefits for their policies during the past

19   year.  Fifty received transplants as a result of HIPP

20   assistance.  Many of these patients are ineligible for

21   Medicare or other government assistance.  Many of them --

22   most of them cannot afford to pay the gaps in Medicare, the

23   premium for Medicare, the coinsurance for Medicare, or the

24   other expenses associated with being on Medicare.  HIPP

25   is -- HIPP benefits are indispensable for these patients.

05:42    1            And I think, to circle back to Question 1
         2    Your Honor asked, which is, What is the State's plan for
         3    dealing with this situation when AKF leaves the state on
         4    January 1?  There is no plan.  There is no plan.
05:42    5            The balance of equities, Your Honor, weighs
         6    heavily in favor of the preliminary injunction here.
05:43    7            The State admits that it has no interest in this
         8    statute until July 1, 2020, when it says the provisions
         9    begin going into effect.  But AKF has to act now for the
        10    reasons I've set forth to you.  Some of the policies it is
        11    issuing -- that it would issue before July 1 would become
        12    immediately subject to those provisions when -- as'a July 1,
        13    so it's in the position that it can't win.  It can't issue
        14    new policies.  So to avoid endangering this program in the
        15    rest'a the country, AKF is having to withdraw from
        16    California as of January 1.
05:43   17            The state has no countervailing equities to
        18    balance against the harm to the patients there are being --
        19    that's being inflicted by AB-290.  And accordingly,
        20    Your Honor, we urge that a preliminary injunction be issued.
        21    We believe AKF and the provider plaintiffs have at least
        22    raised serious questions about the merits, and we have at
        23    least raised serious issues about the prom -- prospect of
        24    imminent irreparable harm to some of society's most
        25    vulnerable patients.

```
05:44    1              Unless you have questions, I'll turn it over to
         2     Mr. Dunbar.
05:44    3              THE COURT:  Not now.  Maybe in the next round.
05:44    4              MR. BURCHFIELD:  Thank you.
05:44    5              PLAINTIFFS' ARGUMENT (MR. DUNBAR)
05:44    6              THE COURT:  And I certainly know who you are, but
         7     reintroduce yourself to the record.
05:44    8              MR. DUNBAR:  Absolutely, Your Honor.  Kelly Dunbar
         9     on behalf of DaVita, and I'll be speaking for the provider
        10     plaintiffs.
05:44   11              Your Honor, thank you for hearing the motion for
        12     preliminary injunction on a -- I know a tight schedule for
        13     the Court, and thank you also for the questions that the
        14     Court provided.
05:45   15              I'd like to structure my presentation around a
        16     response to your questions and will begin with Question 1 --
        17     which I agree with Mr. Burchfield is perhaps the most
        18     important -- turn to Question 5, and then return to Question
        19     2 and 3.
05:45   20              THE COURT:  Okay.
05:45   21              MR. DUNBAR:  Question 1, Your Honor, asks the
        22     question of what will happen as of January 1 to the
        23     thousands of patients in California for whom AKF has
        24     provided charitable premium assistance, and we agree
        25     emphatically with Mr. Burchfield that the State has no plan
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | and no solution to address those patients.                   |
| 05:45 | 2  | As reflected in our papers as well as *amicus*               |
|       | 3  | briefs from a leading California medical organization and    |
|       | 4  | the state chapter of the NAACP, although many AB-290         |
|       | 5  | masquerades as helping painters, if the law is allowed to    |
|       | 6  | take effect on January 1, it will inflict deep and lasting   |
|       | 7  | harm on ESRD patients --                                     |
| 05:45 | 8  | THE COURT:  Just a little slower.                            |
| 05:45 | 9  | MR. DUNBAR:  -- plaintiffs and the ESRD care                 |
|       | 10 | system in California.  And this is, Your Honor, we would     |
|       | 11 | respectfully submit, a paradigmatic case in which an         |
|       | 12 | injunction to preserve the status quote and to avert those   |
|       | 13 | certain harms is necessary.                                  |
| 05:46 | 14 | Your Honor recited very succinctly and correctly a           |
|       | 15 | series of seven claims between the Doe plaintiffs and the    |
|       | 16 | provider plaintiffs.  We believe that we've established a    |
|       | 17 | very high likelihood of success on those claims, but at a    |
|       | 18 | minimum, those claims present serious questions on the       |
|       | 19 | merits, and there is certain, uh -- certain irreparable harm |
|       | 20 | that will follow on January 1.  And with Your Honor's        |
|       | 21 | indulgence, I think a little context here on the harm in     |
|       | 22 | response to Question 1 is important.                         |
| 05:46 | 23 | ESRD patients are the sickest of the sick.                   |
| 05:46 | 24 | *(Court reporter requests clarification for the*             |
|       | 25 | *record.)*                                                   |

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

38

05:46  1          THE COURT:  Counsel, we've lost you.

05:47  2          MR. DUNBAR:  The ESRD patients are the sickest of

3      the sick and some of the state's most vulnerable residents.

4      The fifth stage of chronic kidney disease, ESRD is a point

5      at which kidneys function at only 10 to 15 percent of their

6      capacity.  At this point, dialysis, the treatment that

7      provider plaintiffs offer, is a literal necessity to save

8      lives.

05:47  9          Worse, ESRD disproportionately afflicts low income

10     and minority communities, and an additional cruel

11     consequence of the disease, Your Honor, is that the time,

12     psychological demands, and health effects of dialysis often

13     make it impossible to work.  The result, uh -- that fact,

14     Your Honor, when combined with the fact that dialysis is

15     very expensive, means that, without insurance, very few ESRD

16     patients could afford this lifesaving treatment.  The

17     disease, in other words, creates a cruel dilemma.  Patients

18     need insurance, but illness makes it very difficult to

19     afford that.

05:48  20         And responding to those pressing needs, AKF, for

21     decades, has operated a charitable assistance program that

22     helps patients -- including the poorest of the poor ESRD

23     patients -- have a choice in health insurance and have

24     access to health insurance.

05:48  25         Multiple and uncontested declarations, Your Honor,

```
 1    that is, declarations the State has not factually disputed,
 2    establish that as of January 1, AB290's combined regulations
 3    of AKF and providers and patients will force AKF to depart
 4    the state, and that result -- that will result in a loss for
 5    many patients of access to insurance altogether; for other
 6    patients, a lack of choice in insurance; and for many
 7    patients, if not all, a threat to communications -- excuse
 8    me, a threat to truthful advice about insurance options that
 9    providers provide their patients.
10              To take just a few examples -- and, again, none of
11    this is disputed by the State.  There are a material number
12    of ESRD patients who are ineligible for public insurance
13    because of immigration status or work eligibility.  For
14    them, for those patients who use charitable premium
15    assistance to help pay for a private plan, those patients
16    will have no other opposition of public health insurance.  A
17    DaVita analysis, for example -- and this is set forth in the
18    Bailey declaration at Paragraph 18 -- establishes that 10 to
19    20 percent of those who use charitable premium assistance to
20    pay for private insurance are not eligible for Medicare or
21    for full-scope Medicaid or Medi-Cal.  Again, their only
22    access to insurance is through the private market, and
23    AB-290, by forcing AKF out of the state, will deprive those
24    patients of access to any insurance altogether.
25              That loss of access to insurance will mean they'll
```

05:49 (line 10)
05:50 (line 25)

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | be forced to seek dialysis in emergency rooms at a hospital  |
|       | 2  | or risk death for missed treatments.                         |
| 05:50 | 3  | In addition, and again this is uncontested, the              |
|       | 4  | declarations establish that private insurance, again, a      |
|       | 5  | choice that charitable premium assistance that AKF enables   |
|       | 6  | is better for many ESRD patients because private insurance   |
|       | 7  | often covers family members, whereas Medicare does not,      |
|       | 8  | unless those family members are independently eligible.  And |
|       | 9  | that's a significant issue, Your Honor, for ESRD patients.   |
|       | 10 | As Mr. Burchfield explained --                               |
| 05:50 | 11 | *(Court reporter requests clarification for the*             |
|       | 12 | *record.)*                                                   |
| 05:50 | 13 | MR. DUNBAR:  My apologies.                                    |
| 05:50 | 14 | Congress has created a unique entitlement for ESRD           |
|       | 15 | patients, which is that those under the age of 65 can enroll |
|       | 16 | in Medicare upon an ERD -- ES- --                            |
| 05:51 | 17 | *(Court reporter requests clarification for the*             |
|       | 18 | *record.)*                                                   |
| 05:51 | 19 | THE COURT:  Now, stop.  We're gonna stop.                     |
| 05:51 | 20 | MR. DUNBAR:  Upon --                                          |
| 05:51 | 21 | THE COURT:  No, Counsel.  We're done.                         |
| 05:51 | 22 | Just rest now.                                                |
| 05:52 | 23 | *(Brief pause in proceedings.)*                               |
| 05:52 | 24 | THE COURT:  Counsel, I'm going to have you reargue            |
|       | 25 | that entire section again, and even if I'm absorbing, you     |

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 05:53 | 5 |
| 05:53 | 6 |
| 05:53 | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| 05:53 | 12 |
| 05:53 | 13 |
| 05:53 | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

1    don't have a record.  If this went up -- and Debbie's the

2    fastest in the system of any court reporter here.  Nobody

3    can outmatch her.  So I'm trying to be courteous.  I'm

4    trying to give you the opportunity of a record.

5           So I want you to argue that entire section again.

6           MR. DUNBAR:  Thank you, Your Honor.  My apologies.

7           THE COURT:  And, I mean, the entire -- you don't

8    have to.  Don't apologize.  I'm just saying for your

9    argument, you might want to have something decipherable in

10   the future.  I don't mind rehearing the entire argument

11   again.

12          MR. DUNBAR:  Thank you, Your Honor.

13          THE COURT:  Okay.

14          MR. DUNBAR:  Your Honor, as reflected in our

15   papers as well as the *amicus* briefs from a leading

16   California medical organization and the state chapter of the

17   NAACP -- NAACP, although AB-290 masquerades as a law helping

18   patients, if the law is allowed to take effect on

19   January 1st, it will inflict deep and lasting harm on ESRD

20   patients, plaintiffs who are dialysis providers, and the

21   ESRD care system in California.  This is a paradigmatic

22   case, we would respectfully submit, Your Honor, in which an

23   injunction to preserve the status quo is critical, given the

24   certainty of irreparable injury to patients and others to

25   follow.

| | | |
|---|---|---|
| 05:54 | 1 | THE COURT:  Just stop for a moment. |
| 05:54 | 2 | All right.  Next paragraph. |
| 05:54 | 3 | MR. DUNBAR:  And with Your Honor's indulgence, |
| | 4 | again, context here is helpful and important.  ESRD patients |
| | 5 | are the sickest of the sick and some of the state's most |
| | 6 | vulnerable residents.  This is the fifth stage of chronic |
| | 7 | kidney disease, a point at which kidneys function at only 10 |
| | 8 | to 15 percent of their capacity.  And at this point, the end |
| | 9 | stage renal disease, dialysis is a literal necessity for |
| | 10 | patients to stay alive. |
| 05:54 | 11 | THE COURT:  Excellent.  Stop. |
| 05:54 | 12 | MR. DUNBAR:  The disease disproportionately |
| | 13 | afflicts, or effects, low income and minority communities, |
| | 14 | and an additional significant consequence of the disease is |
| | 15 | that the time, psychological demands, and health effects of |
| | 16 | dialysis can make it impossible for ESRD patients to work. |
| 05:55 | 17 | At the same time, dialysis, the treatment that |
| | 18 | ESRD patients receive, is very expensive.  Without |
| | 19 | insurance, very few could afford this lifesaving treatment. |
| | 20 | And the disease thus creates a dilemma, a cruel dilemma, |
| | 21 | which is that patients need insurance, but their illness |
| | 22 | makes it very difficult to afford it. |
| 05:55 | 23 | Responding to those needs, AKF has for decades |
| | 24 | operated a charitable assistance program to help patients |
| | 25 | pay for insurance, one that as a matter of fact we know will |

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

43

|        |    |                                                            |
|--------|----|------------------------------------------------------------|
|        | 1  | end in California as of January 1 without an injunction from |
|        | 2  | this Court to preserve the status quote.                   |
| 05:56  | 3  | The harms that follow from that are established,           |
|        | 4  | Your Honor, respectfully, in multiple and effectively      |
|        | 5  | uncontested declarations submitted by plaintiffs in the    |
|        | 6  | related cases.                                             |
| 05:56  | 7  | Those declarations establish that patients will be        |
|        | 8  | harmed either because they will lose access to health     |
|        | 9  | insurance altogether when AKF's charitable assistance     |
|        | 10 | program ends; those patients will lose access to          |
|        | 11 | insurance -- private insurance or public insurance of their |
|        | 12 | choice; or -- and/or, really -- patients will be put at    |
|        | 13 | risk.                                                      |
| 05:56  | 14 | THE COURT:  Why does this end?  Why isn't the             |
|        | 15 | provision in AB-290 that caps reimbursement at the Medicare |
|        | 16 | rate removing any incentive to steer patients to private  |
|        | 17 | insurance?  Why is AKF leaving?                           |
| 05:57  | 18 | MR. DUNBAR:  Your Honor, I believe the answer is          |
|        | 19 | that AKF is leaving because AB-290 imposes several distinct |
|        | 20 | burdens on its charitable mission.                        |
| 05:57  | 21 | THE COURT:  Hold on.  Let's take one of those.            |
|        | 22 | And I'm going to particularly be interested in the State's |
|        | 23 | response in a moment.                                      |
| 05:57  | 24 | You've got Section 3 that lays out these                  |
|        | 25 | requirements for a provider to -- if somebody could put up |

|       |    |                                                                        |
|-------|----|------------------------------------------------------------------------|
|       | 1  | Section 3 for a moment -- to inform a recipient annually of            |
|       | 2  | health coverage options including but not limited to                   |
|       | 3  | Medicare, Medicaid, individual market plans.                           |
| 05:58 | 4  | So are providers going to do this?                                     |
| 05:58 | 5  | And I wanna picture for a moment for the State to                      |
|       | 6  | think about:  A patient walks in and the provider's not                |
|       | 7  | supposed to steer but can advise, and so the very provider,            |
|       | 8  | who's not supposed to steer me but only advise me, starts              |
|       | 9  | laying out the plans.  And guess what I'm going to do?  The            |
|       | 10 | first question I'm probably gonna ask in the real world is:            |
|       | 11 | Well, what do you think?  Because you see you've got this              |
|       | 12 | expert that you've told me has to give me this information,            |
|       | 13 | so therefore, they look like an expert.  And since you've              |
|       | 14 | told me I've got to, you know, absorb this information from            |
|       | 15 | this person, I would think in the real world the first thing           |
|       | 16 | I'm going to ask is, "Golly, gosh, I don't understand a                |
|       | 17 | thing you just said.  What do you think?"  So I don't                  |
|       | 18 | understand, in the real world, the difference between advice           |
|       | 19 | and steer.  And I don't know yet how a provider, whoever               |
|       | 20 | that is, is going to walk that fine line when AB-290 says              |
|       | 21 | you're the ones who are gonna provide the information, so              |
|       | 22 | therefore, you have the mantra of credibility.                        |
| 05:59 | 23 | Now, I see my law clerk rushing me.  He has a                          |
|       | 24 | question I'm supposed to ask.                                          |
| 05:59 | 25 | Oh, thank you very much.                                               |

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

45

05:59    1         Yeah, just to clarify, AB-290 prohibits advising

          2   as well.  You're absolutely right.  We were talking about

          3   that Saturday, weren't we?  Yeah.

05:59    4         So I'm eventually gonna be asking the State, in

          5   the real world, how we're gonna manage that.  But anyway,

          6   Counsel.

06:00    7         Now, when is AKF leaving?

06:00    8         MR. DUNBAR:  January 1, Your Honor.

06:00    9         THE COURT:  Okay.  Packing your bags now?

06:00   10         MR. DUNBAR:  Your Honor --

06:00   11         THE COURT:  If I go to the office, am I gonna

       12   drive down there?  I want you to tell me what policies

       13   haven't issued.  In other words, if I issue an injunction,

       14   I'm supposed to have real harm.  I understand in amendment

       15   issues where there's tremendous public harm, I can issue

       16   that anticipatorily.  But normally, I have to have real

       17   harm.  Where's your concrete proof that you're leaving?

       18   Just because you told me so?  Remember, we're an

       19   800-hundred-pound gorilla here.  You don't want to do

       20   business in California; you're not gonna make much money in

       21   Kansas.

06:00   22         MR. DUNBAR:  Your Honor.

06:00   23         THE COURT:  Or South Dakota.  You're gonna leave?

06:00   24         MR. DUNBAR:  Your Honor, just to be clear, we

       25   represent -- I represent only the dialysis providers.

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

46

| | | |
|---|---|---|
| 06:00 | 1 | THE COURT:  Okay.  Go over and ask them when |
| | 2 | they're gonna leave. |
| 06:00 | 3 | MR. DUNBAR:  They are gonna leave as of January 1, |
| | 4 | according to Ms. Burton's declaration, which is in the |
| | 5 | record.  I believe it's Paragraph 48, Your Honor.  And to be |
| | 6 | clear -- |
| 06:00 | 7 | THE COURT:  Now, just a moment.  This doesn't take |
| | 8 | place -- the first onerous provision from your standpoint |
| | 9 | takes place, I think, really in June or July.  Right now the |
| | 10 | first provision is the steering and advice that's supposed |
| | 11 | to go in on January 1st. |
| 06:01 | 12 | MR. DUNBAR:  That is -- that is correct, |
| | 13 | Your Honor.  And AKF's position -- and, again, I believe |
| | 14 | this is something Mr. Burchfield did touch upon -- is that |
| | 15 | AKF faces a question of as of January 1st. |
| 06:01 | 16 | THE COURT:  Just a moment. |
| 06:01 | 17 | Mr. Burchfield, what policies haven't issued here? |
| | 18 | Where are you, sir?  And prove it to me. |
| 06:01 | 19 | MR. BURCHFIELD:  Your Honor, because -- because I |
| | 20 | think AKF is -- |
| 06:01 | 21 | THE COURT:  Just a moment.  What policies haven't |
| | 22 | issued and prove it to me.  What have -- I hear the harm.  I |
| | 23 | hear the fright.  I hear the fear.  I'll drive over, and |
| | 24 | we'll watch 'em pack.  Kidding you. |
| 06:01 | 25 | MR. BURCHFIELD:  AKF -- |

| | | |
|---|---|---|
| 06:01 | 1 | THE COURT:  What policies haven't you issued so |
| | 2 | far? |
| 06:01 | 3 | MR. BURCHFIELD:  AKF has ceased issuing policies |
| | 4 | in California as of October 1 in California. |
| 06:01 | 5 | THE COURT:  Okay.  Completely? |
| 06:02 | 6 | MR. BURCHFIELD:  Yes, because those policies are |
| | 7 | not grandfathered. |
| 06:02 | 8 | THE COURT:  Completely? |
| 06:02 | 9 | MR. BURCHFIELD:  My understanding.  Correct. |
| 06:02 | 10 | THE COURT:  Well, check.  Because that's the way |
| | 11 | police officers talk to me:  "To the best of my ability." |
| | 12 | You know, I'm kidding you now, but I used to train police |
| | 13 | officers how to testify and stay out of the perjury:  "To |
| | 14 | the best of my ability," "To the best of my recollection." |
| | 15 | Nonsense.  Let's do this again. |
| 06:02 | 16 | What policies haven't issued? |
| 06:02 | 17 | MR. BURCHFIELD:  Your Honor -- Your Honor, I am -- |
| | 18 | to clarify what I just said, which I -- which is correct, |
| | 19 | AKF has stopped issuing grants for new policies as of |
| | 20 | October 1. |
| 06:02 | 21 | THE COURT:  You have some grandfathers in there, |
| | 22 | but... |
| 06:02 | 23 | MR. BURCHFIELD:  Exactly.  Once they're |
| | 24 | grandfathered, they're continuing. |
| 06:02 | 25 | THE COURT:  How many?  In other words, what's your |

|  |  |  |
|---|---|---|
|  | 1 | volume?  We've got 3,500 in California.  A rough figure, a |
|  | 2 | couple hundred so far? |
| 06:02 | 3 | MR. BURCHFIELD:  Trying to -- |
| 06:02 | 4 | THE COURT:  You know my next question.  Where did |
|  | 5 | they go?  And you may not know.  And I'm gonna ask the State |
|  | 6 | that in just a moment, so we're setting this up for the |
|  | 7 | State.  I want you to think about this.  If they're correct |
|  | 8 | and have actually stopped issuing policies, my next question |
|  | 9 | is, where do they go?  Do they just die?  And how many died? |
|  | 10 | So as we're throwing around fear, we're gonna eventually get |
|  | 11 | into what's our actual harm here, how quick, who's dying, |
|  | 12 | and when. |
| 06:03 | 13 | MR. BURCHFIELD:  Your Honor, I don't have a count |
|  | 14 | for the number of applications they've received since |
|  | 15 | October 1.  We can get that to you. |
| 06:03 | 16 | THE COURT:  Sure. |
| 06:03 | 17 | MR. BURCHFIELD:  But they have ceased issuing new |
|  | 18 | grants. |
| 06:03 | 19 | THE COURT:  Okay.  Well, you know what I'm |
|  | 20 | starting to get interested in. |
| 06:03 | 21 | MR. DUNBAR:  Yes, Your Honor. |
| 06:03 | 22 | THE COURT:  And how you respond will depend upon |
|  | 23 | how I rule. |
| 06:03 | 24 | MR. DUNBAR:  Yes, Your Honor, and I -- and I -- |
|  | 25 | and, again, I do think Question Number 1 does -- just a -- |

| | | |
|---|---|---|
| | 1 | apologies if I'm repeating myself. |
| 06:03 | 2 | THE COURT:  No, please.  You've -- |
| 06:03 | 3 | MR. DUNBAR:  The State -- |
| 06:03 | 4 | THE COURT:  -- got all night. |
| 06:03 | 5 | MR. DUNBAR:  The State has not contested that AKF |
| | 6 | will leave the state as of January 1st because of the |
| | 7 | cumulative burdens the law imposes upon AB-290, and its |
| | 8 | ability to carry out its charitable mission.  The State |
| | 9 | simply says it's arbitrary for AKF to leave. |
| 06:04 | 10 | And I believe, as Mr. Burchfield persuasively |
| | 11 | explained, and I'm happy to talk about it more as well, |
| | 12 | there are a number of reasons that a charity, when it has a |
| | 13 | law that in a highly unusual way is singled out and targeted |
| | 14 | at one particular charity, and it's pro -- and donors and |
| | 15 | patients, that it faced a decision that by virtue of the |
| | 16 | California constitution, this law takes effect on January 1. |
| | 17 | Now, certain -- |
| 06:04 | 18 | THE COURT:  But the State -- the State's going to |
| | 19 | be concerned about the two major entities giving charitable |
| | 20 | donations which, then, in a sense, have the suspicion of |
| | 21 | eventually coming back and boomeranging the State with |
| | 22 | increased payments. |
| 06:05 | 23 | MR. DUNBAR:  Your Honor. |
| 06:05 | 24 | THE COURT:  It's about money. |
| 06:05 | 25 | MR. DUNBAR:  Your Honor, and I -- and I thank you |

|       |    |                                                                |
|-------|----|----------------------------------------------------------------|
|       | 1  | for asking the question, and I think that is part of State's   |
|       | 2  | justification for the law.                                     |
| 06:05 | 3  | THE COURT:  Sure.                                              |
| 06:05 | 4  | MR. DUNBAR:  And I think, respectfully, I think we             |
|       | 5  | would respectfully suggest that the reference in the          |
|       | 6  | questions to a nefarious incentive or that there's something  |
|       | 7  | improper about this scheme -- we really emphatically ask       |
|       | 8  | Your Honor to reconsider that.  The reason is that this        |
|       | 9  | system -- this system of charitable premium assistance is     |
|       | 10 | one that has existed for decades on the State's own account,  |
|       | 11 | all of this is some attempt to exploit some loop hole in the  |
|       | 12 | Affordable Care Act, or ObamaCare.                            |
| 06:05 | 13 | THE COURT:  What brought this to a head?  Did it              |
|       | 14 | just get too expensive?                                        |
| 06:05 | 15 | MR. DUNBAR:  No, Your Honor.  I believe what                  |
|       | 16 | brought it to a head is that insurance companies are unhappy  |
|       | 17 | with the fact that the Affordable Care Act, as one of its     |
|       | 18 | central requirements, now makes private insurance available  |
|       | 19 | to a wider range of patients than previous, including ESRD    |
|       | 20 | patients.  The State's opposition brief itself confirms that  |
|       | 21 | prior to the ACA, ESRD patients --                            |
| 06:06 | 22 | THE COURT:  Just a moment.  Why would the State              |
|       | 23 | care about a private insurer?  Let's go back.  What's the     |
|       | 24 | impetus of the State?  What's their concern?  I would think   |
|       | 25 | it would be higher premium payouts when the State's           |

1    involved.

06:06    2              MR. DUNBAR:  Your Honor, that is one -- that is a

3    finding that in the finding section, but it is a finding

4    that is absolutely devoid of any factual content.  We

5    respectfully submit that the lack of any evidence of a

6    problem here -- and I -- and I would like to return in a

7    second to explain why, again, we don't think there's

8    anything nefarious about this system of charitable premium

9    assistance, but we actually think the lack of evidence of a

10   problem, it's telling.  The State submit -- there is no

11   evidence submitted in the opposition brief or the State's

12   materials from the legislative record attempting to

13   demonstrate that charitable premium assistance raises

14   insurance premiums.  It's also quite remarkable, we think,

15   Your Honor, that there is no provision in AB-290, none, that

16   requires any illusory savings to be passed back to patients.

06:07   17              The reality is that AB-290 is the result of

18   special interest lobbying.  Insurance companies and certain

19   labor unions dissatisfied with dialysis providers in their

20   union policies have been waging a campaign against dialysis

21   providers, against AKF, against charitable assistance for

22   reasons that have to do with their bottom line or their

23   displeasure with certain policies and providers.  And i

24   think that is -- that powerfully explains why, despite the

25   fact that California has attempted to justify this as an

|   |   |   |
|---|---|---|
| | 1 | anti-steering measure, there is not a single example in the |
| | 2 | record the State has submitted to you, for purposes of a |
| | 3 | preliminary injunction, of a single patient in California |
| | 4 | that has been steered on to a plan against his or her best |
| | 5 | interest; there's not an example of a single patient that |
| | 6 | was somehow harmed by that purported steering. |
| 06:08 | 7 | THE COURT:  Okay. |
| 06:08 | 8 | MR. DUNBAR:  The State doesn't say anything about |
| | 9 | the fact that providers recognize the need for controls to |
| | 10 | prevent steering and -- and improper steering from happening |
| | 11 | and those exist.  Those are set forth in the declarations of |
| | 12 | each of the provider plaintiffs.  And, again, those are |
| | 13 | uncontested. |
| 06:08 | 14 | If I could return for a second, Your Honor, to |
| | 15 | the -- I -- to put a little context around charitable |
| | 16 | premium assistance.  I think it's important to note that |
| | 17 | providers have been contributing to and financially |
| | 18 | supporting AKF for decades, even prior to the 19 -- to the |
| | 19 | 97-1 opinion. |
| 06:08 | 20 | THE COURT:  Well, something stirred up the |
| | 21 | California legislature.  This passed overwhelmingly, and |
| | 22 | California is a relatively progressive state, so... |
| 06:09 | 23 | MR. DUNBAR:  Uh, well, Your Honor, I think -- I |
| | 24 | think -- again, I think this is a case study in special |
| | 25 | interest politics.  Your Honor may be aware, and this is set |

forth in our complaint.

06:09        *(Court reporter requests clarification for the
        record.)*

06:09            MR. DUNBAR:  A similar measure, that this is
ultimately, Your Honor -- this is the result of special
interest politics, not sound evidence-based legislating.
And you don't need to take our word for this.  If you read
the brief from the California Medical Association, it says
the same thing.  AB-290 is not based on health -- sound
health care policy.  It's based on special interest
politics.  And SP 1156 was a bill that was very similar in
many respects to AB-290 that passed the legislature narrowly
last year and was vetoed because of its potential effects on
patients.  Dissatisfied with that, Your Honor may recall,
the labor unions put forth a ballot initiative,
Proposition 8, which purported to regulate --

06:10        *(Court reporter requests clarification for the
        record.)*

06:10            MR. DUNBAR:  -- purported to regulate the rates of
dialysis providers, in which the voters rejected.

06:10            AB-290 was narrowly passed, again behind the
muscle of special interests, and whether Your Honor needs to
credit that finding for preliminary injunction purposes, I
don't think that's vital.  I think the clearest evidence of
that is the absence of a record of harm to patients.

06:10    1            This is a law that is designed, the State says, to

         2    help patients, yet it's telling:  There is no concrete

         3    evidence of patient harm, whether that's in the form of

         4    insurance premiums or patients being improperly steered.

06:11    5            THE COURT:  So once again, how is this harming the

         6    State?  Why is the state so concerned?  Why does this

         7    overwhelmingly pass the state legislature?

06:11    8            Now all these special interests aren't going to go

         9    with a lobbyist to every legislature and affect 'em, but

        10    this is a pretty resounding number of legislators who passed

        11    AB-290.  This is a fairly progressive state.

06:11   12            What's the State worried about?

06:11   13            MR. DUNBAR:  Your Honor, the State may, uh, look

        14    at this system where providers donate to AKF, uh, and have

        15    concerns.  Our -- our --

06:11   16            THE COURT:  Counsel, before you explain that away,

        17    I'm gonna keep boring in on you until you succinctly state

        18    what the State's concerned about.  You've heard their

        19    argument.  Just say it.

06:11   20            What's the State concerned about here?

06:11   21            MR. DUNBAR:  The State says in the legislative

        22    finding sections that these donations create an incentive to

        23    steer patients onto plans that are harmful to them and that

        24    there's unjust enrichment.  Respectfully --

06:12   25            THE COURT:  And how is it harmful to the State?

06:12   1            MR. DUNBAR:  Your Honor, I'm not actually sure

2       that the State claims it's harmful -- this practice is

3       harmful to it.  In fact, for what it's worth, although it's

4       not central to our analysis, the bill analysis notes that a

5       result -- a result of the law could be a shift of a lotta

6       patients, who are relying on charitable premium assistance,

7       to Medi-Cal, driving up the State's expenses.  And I know

8       that --

06:12   9            THE COURT:  Just a moment.  See how succinctly you

10      put that.  The harm to the State is it might drive people

11      from private providers to Medi-Cal, which will drive up

12      state expenses.

06:12   13           MR. DUNBAR:  That's correct, Your Honor.  That's

14      its theory, but unfortunately, the law, for many reasons, as

15      Your Honor succinctly summarized our arguments, implicates

16      the First Amendment.  So we're not talking about rational

17      basis review here, Your Honor.  The State has chosen to

18      impose a variety of targeted and punitive regulations on

19      speech and expressive associations, and when the legislature

20      does that, there's a process it needs to follow.  It needs

21      to build a record that there is a genuine nonspeculative

22      problem, and it then needs to build a record that the

23      solutions it proposes are narrowly tailored to address those

24      problems.

06:13   25           Respectfully, at least, on this preliminary

```
 1   injunction record, Your Honor, the State hasn't really made
 2   an attempt to satisfy any of -- any of its burdens.  Whether
 3   it can do so eventually before a final judgment is a
 4   question we'll certainly face, but for purposes of this
 5   preliminary injunction record, the evidence -- the record is
 6   really devoid of any attempt to demonstrate a genuine
 7   problem.
```

06:13   8            THE COURT:  Well --

06:13   9            MR. DUNBAR:  Your Honor is exactly correct that

```
10   they have said there are these problems.  They simply just
11   haven't proven them in the slightest, which we submit is
12   insufficient under the relative -- excuse me -- under the
13   applicable constitutional review standards.
```

06:13  14        *(Court reporter requests clarification for the*

```
15        record.)*
```

06:13  16            MR. DUNBAR:  Applicable constitutional review

```
17   standards.
```

06:14  18            THE COURT:  Now, let's assume hypothetically that

```
19   you eventually prevailed on this.  And let's assume
20   hypothetically that I issued a TRO.  But let's assume that
21   the Court was wrong, that it made a mistake in issuing that
22   TRO.  How quickly are you prepared to go to trial?  Because
23   remember, this legislation is segmented out in a series of
24   dates.  And the true what I call 800-hundred-pound gorilla
25   is about a year away.  July gets pretty interesting, but in
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | a year, this really does have an effect, but it's            |
|       | 2  | sequential.                                                  |
| 06:14 | 3  | So how soon are you prepared to go to trial if I             |
|       | 4  | issued a TRO?                                                |
| 06:14 | 5  | MR. DUNBAR:  Very soon, Your Honor.                          |
| 06:14 | 6  | THE COURT:  How soon?                                        |
| 06:14 | 7  | MR. DUNBAR:  With the caveat that we think the               |
|       | 8  | case could likely be decided on cross motions for summary    |
|       | 9  | judgment rather than trial --                               |
| 06:14 | 10 | THE COURT:  Let's assume that I didn't, and let's            |
|       | 11 | assume we had dueling experts, and let's assume that it was  |
|       | 12 | a material issue of fact.  How soon?                         |
| 06:15 | 13 | MR. DUNBAR:  This summer, Your Honor.                        |
| 06:15 | 14 | THE COURT:  Okay.  Excellent.                                |
| 06:15 | 15 | MR. DUNBAR:  We don't believe there would -- to be           |
|       | 16 | clear and to add a little bit of context to that, we don't   |
|       | 17 | believe there is a need for discovery in this type of        |
|       | 18 | constitutional litigation.  The State's defenses will rise   |
|       | 19 | and fall on the legislative record.                          |
| 06:15 | 20 | THE COURT:  I'm gonna repeat back:  This summer?             |
| 06:15 | 21 | So if the Court made a mistake, hypothetically,              |
|       | 22 | but issued a TRO, I want to hear, once again, that you're    |
|       | 23 | ready to go to trial before what I call substantial          |
|       | 24 | sequential harm would ensue.  That harm starts in July       |
|       | 25 | potentially.                                                |

06:15     1          MR. DUNBAR:  Your Honor, I stand by my statement

          2     about when we would go to trial.  I would disagree with the

          3     premise that no harm begins as of January 1, but I didn't

          4     want to distract.

06:15     5          THE COURT:  We'll quibble about that.

06:15     6          MR. DUNBAR:  Yes.  But it is quite significant,

          7     Your Honor, that there are serious harms that begin on

          8     January 1 including -- now, in a world in which you granted

          9     a TRO, if that's the predicate for the question, I would

         10     agree that that would resolve all of the harm I think that

         11     would begin as of January 1.  But in a world in which there

         12     is no injunctive or TRO relief from this Court, we know that

         13     the "advising" restriction takes effect as of January 1.  We

         14     know that AKF will likely cease its HIPP program in the

         15     state as of January 1, and we also know that providers'

         16     First Amendment interests will also be immediately affected

         17     in the sense that -- and this is a provision we haven't

         18     talked in detail about -- the reimbursement penalty in the

         19     law basically imposes a tax on providers if they have a

         20     financial relationship with AKF.  Because the law takes

         21     effect on January 1, it stands to reason that they face the

         22     risk that if they continue to contribute to AKF's charitable

         23     mission, they face a First Amendment risk of eventually

         24     being heavily penalized for making those contributions.

06:17    25          So I do think there are a number of immediate --

harms that begin as of January 1, Your Honor, which is why
we've -- we've come to court and asked for emergency relief,
recognizing, of course, that this has imposed a burden on
the Court and forces a fairly quick decision; but we believe
it's vital to prevent against irreparable harm that will
inevitably follow.

06:17        But as Mr. Burchfield has explained, the State has
essentially in its opposition taken the position that we
don't really see the law doing much of anything until July,
and if that's the case, entering a status quo preserving
injunction, or TRO, shouldn't harm the State, but should
allow for an expedited resolution of this case.  And, again,
whether that's trial or cross motions for summary judgment
would obviously be a decision, uh, that Your Honor would
make, uh, moving forward in the future.

06:18        If I could return just -- just for, uh, not to --
I wanna close the loop, though, on the idea that adding a
few quick points on the virtual necessity of this charitable
assistance program that AKF is operating, and the concern
that you've identified that the State might think this --
this arrangement is nefarious, I think it's really important
to remember that, of course, this is an arrangement that has
been affirmatively reviewed and blessed by the federal
government through the 97-1 opinion.

06:18        That providers have been making these

1    contributions to AKF well before -- decades before, um, the

2    Affordable Care Act came along, which helps refute the

3    central idea behind the State's bill, as Your Honor put it,

4    that this is all some nefarious attempt to exploit a

5    loophole.  The record instead establishes that while

6    providers recognize they benefit indirectly from these

7    donations, they also make these contributions because they

8    fundamentally believe their patients, some of the poorest

9    already in society, ought to have the same access to

10   insurance choice as everyone else and that for better or

11   worse in our health care system, where one can wonder

12   whether it's the most efficiently or logically designed,

13   there are critical gaps for ESRD patients, and that without

14   the charitable premium assistance that AKF has provided,

15   which has been funded in part by providers, many patients

16   would simply be left without access to lifesaving dialysis

17   treatment.  And it's also -- and again, this is set forth in

18   our declarations and not contested by the State, and I think

19   this helps respond to the idea that this it is unjust

20   enrichment.

06:20   21        What the record establishes is that 9 out of every

22   10 dialysis patients that providers treat is reimbursed at

23   the Medicare rate, which is set by the federal government in

24   its infinite wisdom, but according to federal government's

25   own analysis is below cost.  It does not pay the full cost

1    of dialysis treatment, which is a recognition by the federal

2    government that reimbursement rates paid by private

3    insurance companies, which it bears emphasis, are agreed to

4    between insurance companies and providers in arm's length,

5    sophisticated negotiations, that those insurance rates are

6    vital to keep the dialysis care and coverage system afloat,

7    because if it was just up to Medicare, many clinics couldn't

8    operate.  Dialysis patients wouldn't have convenient access

9    to clinics.  And none of that, again, is contested by the

10   State.

06:21   11          So while the State makes facial claims about

12   unjust enrichment and patient harm, if this were rational

13   basis review, perhaps those justifications would stand, Your

14   Honor; but this is -- again for various reasons, this law is

15   subject to heightened First Amendment scrutiny, whether

16   that's strict scrutiny or intermediate scrutiny, either way,

17   the State has an evidentiary burden to show the problem

18   exists and to show that the provisions it is adopted are

19   narrowly tailored to address that.

06:21   20          Respectfully, on this record, the State hasn't

21   really come close to attempting to carry its burden on those

22   points, Your Honor.  And for those reasons, unless

23   Your Honor has additional questions, I'd just like to begin

24   where I -- excuse me, end where I began, which is that

25   preliminary relief by January 1 is vital to prevent harms

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

62

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | that are factually certain to occur.                                 |
| 06:22 | 2  | Again, the State has not contested that AKF will                     |
|       | 3  | leave, that it will leave as a result of AB-290, or that a           |
|       | 4  | preliminary injunction would avert those harms.  In these            |
|       | 5  | circumstances, we think given the many different legal               |
|       | 6  | claims we have that established at least a serious question          |
|       | 7  | on the merits, preliminary relief is needed.                         |
| 06:22 | 8  | Thank you, Your Honor.                                                |
| 06:22 | 9  | THE COURT:  Just a moment.  Go over and talk to                      |
|       | 10 | your colleagues for just a moment.  And, Counsel, talk to            |
|       | 11 | your team.  Make certain there's something you haven't               |
|       | 12 | neglected that might be obvious to all your colleagues.  And         |
|       | 13 | then there's going to be a second round.  So have a                  |
|       | 14 | conference for just a moment, and in just a moment, I'll pay         |
|       | 15 | you the same courtesy after your argument.  Okay.                    |
| 06:22 | 16 | And while you're doing that, Counsel, could you                      |
|       | 17 | kind of move the herd that way.                                      |
| 06:25 | 18 | *(Pause in proceedings at 6:25 p.m.)*                                |
| 06:25 | 19 | *(Further proceedings contained in Volume II.)*                      |
| 06:25 | 20 | -oOo-                                                                 |
| 06:25 | 21 |                                                                      |
|       | 22 |                                                                      |
|       | 23 |                                                                      |
|       | 24 |                                                                      |
|       | 25 |                                                                      |

8:19-CV-2105-DOC - 12/17/2019 - Items 22 & 23 Volume I

63

| | | |
|---|---|---|
| 06:25 | 1 | -oOo- |
| 06:25 | 2 | |
| 06:25 | 3 | CERTIFICATE |
| 06:25 | 4 | |
| 06:25 | 5 | I hereby certify that pursuant to Section 753, |
| | 6 | Title 28, United States Code, the foregoing is a true and |
| | 7 | correct transcript of the stenographically reported |
| | 8 | proceedings held in the above-entitled matter and that the |
| | 9 | transcript page format is in conformance with the |
| | 10 | regulations of the Judicial Conference of the United States. |
| 06:25 | 11 | |
| 06:25 | 12 | Date:  December 17, 2019 |
| 06:25 | 13 | Cover corrected:  September 29, 2020 |
| 06:25 | 14 | |
| 06:25 | | /s/ Debbie Gale |
| 06:25 | 15 | |
| 06:25 | | _____ |
| 06:25 | 16 | DEBBIE GALE, U.S. COURT REPORTER |
| | | CSR NO. 9472, RPR, CCRR |
| 06:25 | 17 | |
| 06:25 | 18 | |
| 05:23 | 19 | |
| 05:23 | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |