JOSEPH N. AKROTIRIANAKIS (SBN 197971)
  jakro@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:    (213) 443-4310

MATTHEW M. LELAND (*pro hac vice*)
  mleland@kslaw.com
ASHLEY C. PARRISH (*pro hac vice pending*)
  aparrish@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
2nd Floor
Washington, DC 20006
Telephone:   (202) 737-0500
Facsimile:    (202) 626-3737

Attorneys for Plaintiffs
JANE DOE, STEPHEN ALBRIGHT,
AMERICAN KIDNEY FUND, INC.,
AND DIALYSIS PATIENT CITIZENS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his Official Capacity as Attorney General of California, *et al.*,<br><br>Defendants. | Case No. **8:19-cv-2105-DOC(ADSx)**<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Filed Concurrently Herewith:<br>1) Statement of Uncontroverted Facts;<br>2) Matthew M. Leland;<br>3) Declaration of Stephen Albright;<br>4) Declaration of Jane Doe;<br>5) Declaration of LaVarne A. Burton;<br>6) [Proposed] Order<br><br>Date:       May 2, 2022<br>Time:      8:30 AM<br>Place:     Courtroom 9D |

**TO THE COURT AND DEFENDANTS AND THEIR ATTORNEYS:**

**PLEASE TAKE NOTICE** that, on May 2, 2022, at 10:00 a.m., or at such other time or such other date convenient to (and ordered by) the Court, in Courtroom 9D of the Ronald Reagan Federal Building and United States Courthouse 411 West Fourth Street, Santa Ana, California, Plaintiffs Jane Doe, Stephen Albright, American Kidney Fund, Inc., and Dialysis Patient Citizens, Inc. ("Plaintiffs") will, and hereby do, move this Court under Federal Rule of Civil Procedure 56 and Local Rule 56 to enter judgment in favor of Plaintiffs against Defendants Rob Bonta, in his Official Capacity as Attorney General of California; Ricardo Lara, in his Official Capacity as California Insurance Commissioner; Shelly Rouillard in her Official Capacity of the California Department of Managed Care; and Tomás Aragón, in his Official Capacity as Director of the California Department of Public Health.

Plaintiff's Motion for Summary Judgment is made on the grounds that  Assembly Bill 290 is (1) unconstitutional under the First and Fourteenth Amendments of the United States Constitution and (2) unconstitutional under the Supremacy Clause of the United States Constitution.

This Motion is based on this Notice of Motion and the attached Memorandum of Points and Authorities; the concurrently filed declarations of Matthew M. Leland, Stephen Albright, LaVarne A. Burton, Jane Doe, Laurence J. Freedman, and the Exhibits appended to those declarations; the concurrently filed Statement of Uncontroverted Facts; all evidence in connection with the hearing on this Motion; all matters of record in the Court's files; and such other evidence and written oral argument as the Court may consider and direct the parties to submit.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on February 18, 2022.

/ /

/ /

/ /

1

Dated: February 25, 2022

**KING & SPALDING LLP**

2

3

By: */s/Joseph N. Akrotirianakis*
JOSEPH N. AKROTIRIANAKIS
MATTHEW M. LELAND
ASHLEY C. PARRISH

4

5

Attorneys for Plaintiffs
JANE DOE, STEPHEN ALBRIGHT,
AMERICAN KIDNEY FUND, INC.,
and DIALYSIS PATIENT CITIZENS,
INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

1

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND .............................................................................2

    A.   End-Stage Renal Disease Is a Debilitating, Potentially Fatal Condition...........2

    B.   Insurance Coverage for Patients with End-Stage Renal Disease......................3

    C.   The American Kidney Fund's Health Insurance Premium Program.................5

    D.   Advisory Opinion 97-1's Safe Harbor. ............................................................5

    E.   California's AB 290. ..........................................................................................6

    F.   AB 290 Will Harm Patients If It Goes into Effect............................................7

III.    LEGAL STANDARD ........................................................................................7

IV.     ARGUMENT ......................................................................................................8

    A.   AB 290 Is Unconstitutional Under the First Amendment. ...............................8

       1.   AB 290 Impermissibly Imposes Content-Based Speech Restrictions. ...........8

       2.   AB 290 Violates AKF's First Amendment Right of Association.................15

       3.   AB 290's Advising Restriction Is Void for Vagueness. ...............................17

       4.   AB 290 Violates the First Amendment's Petition Clause. ...........................18

    B.   AB 290 Is Preempted by Federal Law. ..........................................................19

       1.   It Is Impossible for AKF to Comply with Both State and Federal Law. ......19

       2.   AB 290 Presents a Significant Obstacle to Congress's Objectives Around
           Medicare Coverage for Individuals with ESRD. ..........................................23

V.      CONCLUSION .................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

4

C<small>ASES</small>

5

*Ams. for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021)..................................................................... 15, 17

6

7

*Bigelow v. Virginia*,
   421 U.S. 809 (1975)............................................................................... 17

8

9

*Bolger v. Youngs Drug Prods. Corp.*,
   463 U.S. 60 (1983)................................................................................. 11

10

11

*Boy Scouts of America v. Dale*,
   530 U.S. 640 (2000)............................................................................... 16

12

13

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................. 8

14

15

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*,
   447 US 557 (1980)................................................................................. 14

16

17

*DaVita Inc. v. Virginia Mason Mem'l Hosp.*,
   981 F.3d 679 (9th Cir. 2020) ................................................................ 24

18

*Dex Media West, Inc. v. City of Seattle*,
   696 F.3d 952 (9th Cir. 2012) ................................................................ 11

19

20

*Doe v. Becerra*,
   No. SA CV 19-2105-DOC, 2019 WL 8227464 (C.D. Cal. Dec. 30, 2019).....*passim*

21

22

*Edenfield v. Fane*,
   507 U.S. 761 (1993)................................................................................. 8

23

24

*English v. Gen. Elec. Co.*,
   496 U.S. 72 (1990)................................................................................. 23

25

26

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000)............................................................................... 23

27

28

*Hill v. Colorado*,
   530 U.S. 703 (2000)............................................................................... 18

*Hunt v. City of Los Angeles*,
  638 F.3d 703 (9th Cir. 2011) ................................................................. 11

*IMDB.com, Inc. v. Becerra*,
  257 F. Supp. 3d 1099 (N.D. Cal. 2017) ................................................. 12

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ............................................................................... 23

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ............................................................................... 17

*Merck Sharp & Dohme Corp. v. Albrecht*,
  139 S. Ct. 1668 (2019) ..................................................................... 19, 21

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
  138 S. Ct. 2361 (2018) .......................................................................... 10

*PLIVA, Inc. v. Mensing*,
  564 U.S. 604 (2011) ......................................................................... 19, 22

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ................................................................. 8, 9, 11, 12

*Riley v. Nat'l Fed'n of the Blind of North Carolina, Inc.*,
  487 U.S. 781 (1988) ................................................................... 8, 9, 15

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ......................................................................... 15, 17

*Santopietro v. Howell*,
  857 F.3d 980 (9th Cir. 2017) ................................................................ 15

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) .......................................................................... 18

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) ............................................................................... 17

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................... 9, 10, 11

*Tucson Woman's Clinic v. Eden*,
  379 F.3d 531 (9th Cir. 2004) ................................................................ 18

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)........................................................................ 8, 12

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000)................................................................ 12, 13, 14

*Vill. of Schaumberg v. Citizens for a Better Env't*,
   444 U.S. 620 (1980)............................................................................ 11

*Wayte v. United States*,
   470 U.S. 598 (1985)............................................................................ 19

*Women's Med. Ctr. of Nw. Houston v. Bell*,
   248 F.3d 411 (5th Cir. 2001) ............................................................. 18

*Wooley v. Maynard*,
   430 U.S. 705 (1977)............................................................................. 9

**STATUTES**

42 U.S.C. § 1320a-7a(a)(5)................................................................ 15, 19

42 U.S.C. § 1320a-7d(a) ........................................................................ 20

42 U.S.C. § 1320a-7d(b)(4)(A)............................................................... 20

42 U.S.C. § 1395y(b) .............................................................................. 23

42 U.S.C. § 1395y(b)(1)(C)(i) ................................................................ 24

**OTHER AUTHORITIES**

42 C.F.R. § 411.161(b)(2)(iv) ................................................................. 24

42 C.F.R. § 1008.43 .......................................................................... 20, 22

Advisory Opinion 97-1 ....................................................................*passim*

Assembly Bill 290 .............................................................................*passim*

Fed. R. Civ. P. 56(a) ................................................................................ 8

*Merriam-Webster's Third New International Dictionary* 32 (2002) ........... 18

U.S. Const. amend. I .......................................................................*passim*

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

For over fifty years, the American Kidney Fund ("AKF") has helped sufferers of chronic kidney disease, like Plaintiffs Jane Doe and Stephen Albright, and worked alongside organizations, such as Plaintiff Dialysis Patient Citizens ("DPC"), to provide critical programs ranging from prevention to post-transplant support.  AKF's Health Insurance Premium Program ("HIPP"), which AKF developed after extensive consultation with federal authorities, provides essential assistance to more than 70,000 patients suffering from end-stage renal disease ("ESRD") by helping to pay their health insurance premiums and, in turn, their life-sustaining dialysis treatments.

Assembly Bill 290 ("AB 290") jeopardizes HIPP in California by forcing the program outside of the safe-harbor provisions established by federal regulators and places thousands of ESRD patients in the State at risk of losing their health coverage. Recognizing the profound constitutional flaws of AB 290 and the serious threats it poses to the most vulnerable patients, this Court enjoined the law's enforcement.  Plaintiffs AKF, DPC, Jane Doe, and Stephen Albright now ask this Court to enter a permanent injunction against AB 290 because it violates the First Amendment of the U.S. Constitution and is preempted by federal law.

No facts have come to light that should change the Court's carefully reasoned conclusion that AB 290 violates the First Amendment.  AB 290 prohibits AKF from "advising" patients regarding health insurance policies, a provision that directly controls AKF's speech and that is so vague as to raise the specter of selective enforcement.  Moreover, AB 290 requires that AKF turn over the names of HIPP patients to private insurers—an intrusion on patients' privacy that AKF has never engaged in and strongly rejects.  AB 290 also interferes with the constitutionally protected association between AKF and its donors by sharply reducing the insurance reimbursement rates of dialysis providers that donate to AKF.  Each of these provisions is subject to the strictest constitutional scrutiny.  Yet after months of discovery, the State

can offer no meaningful evidence of patient "steering," the purported rationale the State invoked to justify AB 290's intrusions on free speech rights. Instead, the State continues to rely on the unfounded anecdotes and supposition that this Court has already properly rejected. As the Court previously concluded, AB 290 cannot pass muster under the First Amendment.

AB 290 is also preempted under federal law. The statute forces AKF to venture outside the safe harbor provided by Advisory Opinion 97-1, issued by the federal Department of Health and Human Services ("HHS"), and to risk a violation of the federal Beneficiary Inducement Statute. AKF is thus put in an impossible position—if it complies with AB 290, it risks federal sanctions. Moreover, AB 290 requires dialysis providers to treat ESRD patients within HIPP differently from other patients, violating the plain terms of the Medicare Secondary Payer Act. These irreconcilable conflicts with federal law mean that AB 290 is preempted.

The stakes in this case could not be higher. If AB 290 is not struck down, AKF will be required to halt HIPP's operation in California to avoid imperiling the program nationwide. Thousands of economically vulnerable ESRD patients on dialysis across California—people including Plaintiffs Jane Doe and Stephen Albright—will lose critical financial support and be exposed to mortal danger. And all for no good reason: the State has no credible evidence that patient "steering" is a problem or that AB 290 will do anything to address that concern. Plaintiffs respectfully urge this Court to prevent this outcome by striking down AB 290.

## II. FACTUAL BACKGROUND

### A. End-Stage Renal Disease Is a Debilitating, Potentially Fatal Condition.

Nearly 810,000 people in the United States and more than 100,000 Californians—a disproportionately high number of whom are racial minorities—suffer from ESRD. Statement of Uncontroverted Facts and Conclusions of Law ("SUFCL")

¶¶ 4, 6.[1]  ESRD is the final stage of chronic kidney disease.  It occurs when a patient's kidneys are no longer able to filter waste from the blood.  SUFCL ¶ 2.  Without treatment, ESRD is fatal.  SUFCL ¶¶ 1, 7.

ESRD patients must either receive a kidney transplant or undergo renal dialysis to survive.  SUFCL ¶ 8.  Because transplantable kidneys are in short supply, dialysis is often the only viable treatment option.  SUFCL ¶ 9.  But while dialysis is life-sustaining, it is also physically draining, time-consuming, and costly.  SUFCL ¶ 11.  The typical dialysis patient requires three dialysis treatments every week—each lasting four to five hours.  SUFCL ¶ 12.  Moreover, more than 80% of dialysis patients are unemployed.  SUFCL ¶ 13.  The vast majority of ESRD patients cannot afford dialysis without health care coverage.  SUFCL ¶ 15.

**B.     Insurance Coverage for Patients with End-Stage Renal Disease.**

In 1972, Congress extended Medicare coverage to ESRD patients regardless of their age or disability.  SUFCL ¶ 42.  Patients with ESRD are entitled to Medicare Part A coverage (hospital care), and they are also eligible for Medicare Part B coverage (outpatient care) if they have enough qualifying work time, already receive Social Security Income benefits, or are a child or spouse of someone meeting either prerequisite.  SUFCL ¶ 43.  Importantly, Congress did not require ESRD patients to enroll in Medicare, and, as a result, ESRD patients can retain their private health insurance plans if they choose.  SUFCL ¶ 44.

Congress has taken steps to protect ESRD patients and to ensure that health plans pay their fair share.  In 1981, Congress made Medicare the secondary payer for ESRD patients and, since then, has gradually extended the period that Medicare serves as the secondary payer from 12 months to 30 months.  SUFCL ¶¶ 45–47.  Congress has also prohibited large group health plans from "tak[ing] into account" the Medicare eligibility

---

[1] In 2020, the U.S. dialysis population shrank for the first time in 50 years due to COVID-19.  SUFCL ¶ 17.

of ESRD patients while Medicare is the secondary payer, SUFCL ¶ 48, and prohibited them from "differentiat[ing]" in the benefits they provide to ESRD patients, SUFCL ¶ 49.  In 2010, Congress provided ESRD patients greater access to care and more choices with the enactment of the Affordable Care Act, which requires insurers to issue plans to eligible enrollees without regard to their preexisting medical conditions. SUFCL ¶ 50.

Although many ESRD patients receive health insurance coverage through Medicare or Medicaid, *see* SUFCL ¶ 51, the federal programs often fail to provide adequate coverage, SUFCL ¶ 52; *see also* SUFCL ¶¶ 53–57.  For instance, Medicare does not cover dependents and does not provide dental coverage.  SUFCL ¶ 53.  As a result, for some patients, commercial insurance options may be better suited to meeting their needs and can lead to better health outcomes.  *See* SUFCL ¶¶ 56–57.  Moreover, some ESRD patients are ineligible for Medicare due to their immigration status, lack of work credentials, or other reasons.  SUFCL ¶ 55.  For these patients, commercial health insurance is the only option.  *See* SUFCL ¶ 55; *see also* SUFCL ¶¶ 62–63 (explaining that emergency room care is a poor option for ESRD patients due to the chronic nature of the condition and the near-constant need for treatment).

Medicare is also expensive.  Medicare recipients have cost-sharing obligations— including a 20% coinsurance requirement—and no limit on out-of-pocket expenditures. SUFCL ¶ 54.  Some ESRD patients must therefore turn to private supplemental insurance, such as Medigap, to afford their deductibles and co-insurance patients. SUFCL ¶ 58. But Medigap is not available to everyone.  Insurers in California do not offer Medigap policies to ESRD patients under 65, as the federal government does not require it.  SUFCL ¶¶ 59–60.  Similarly, Medi-Cal, California's Medicaid program, is available only to ESRD patients who spend all but $600 of their monthly income on medical costs.  SUFCL ¶ 61.  In many cases, commercial insurance is more affordable than Medicare for ESRD patients.  SUFCL ¶ 56.

**C.   The American Kidney Fund's Health Insurance Premium Program.**

AKF is a 501(c)(3) nonprofit charity founded in 1971.  SUFCL ¶ 18.  To help low-income ESRD patients retain their health insurance, AKF created HIPP, which provides charitable grants to low-income ESRD patients by paying their insurance premiums and preserving their coverage.  SUFCL ¶ 66.  In 2021, HIPP assisted 70,731 ESRD patients nationwide, including 3,174 in California.  SUFCL ¶ 76.

HIPP is limited to patients who are on dialysis or who have recently received a kidney transplant.  SUFCL ¶ 72.  AKF provides HIPP assistance based solely on a patient's financial need, SUFCL ¶ 68, and patients are accepted on a first-come, first-served basis, SUFCL ¶ 75.  To qualify, a patient's monthly household income may not exceed reasonable monthly expenses by more than $600.  SUFCL ¶ 69.  HIPP applicants also must prove they already have insurance coverage.  SUFCL ¶ 73.  Nationwide, patients who receive HIPP assistance have an average annual household income of just over $25,000.  SUFCL ¶ 70.  In California, the average is less than $32,000.  SUFCL ¶ 71.

HIPP applicants select their health insurance with no input from AKF.  SUFCL ¶ 74.  AKF does not help HIPP recipients find insurance and does not tell patients to keep or switch insurance.  SUFCL ¶ 78.  AKF continues providing HIPP assistance when patients change their insurance coverage or dialysis provider.  SUFCL ¶ 79.

**D.   Advisory Opinion 97-1's Safe Harbor.**

In 1997, AKF and six dialysis provider donors sought an advisory opinion from the HHS Office of Inspector General ("OIG") to assess whether HIPP violated the Beneficiary Inducement Statute, a federal law that prohibits medical providers from providing certain remuneration to Medicare or Medicaid beneficiaries.  SUFCL ¶¶ 85, 88.  In response, OIG issued Advisory Opinion 97-1, concluding that HIPP did not violate the Beneficiary Inducement Statute.  SUFCL ¶¶ 89–90.  Advisory Opinion 97-1 thus provides a safe harbor for HIPP, but only if "the arrangement in practice comports with the information provided" to the OIG.  SUFCL ¶ 96.  If HIPP were to materially

1   deviate from practices described in Advisory Opinion 97-1, then AKF would lose its
2   safe-harbor protection.  SUFCL ¶ 97.  Since issuing the opinion, OIG has never once
3   alleged that AKF operates HIPP out of compliance with Advisory Opinion 97-1.
4   SUFCL ¶ 98.

5       **E.    California's AB 290.**

6       In 2019, the California legislature enacted AB 290 to address what it asserted as
7   a problem—the purported "steering" of dialysis patients to commercial insurance plans
8   against patients' interests.  SUFCL ¶ 100.  To "remove the incentive[s]" for dialysis
9   providers to contribute to AKF, AB 290 imposes requirements on AKF and dialysis
10  providers (what the statute refers to as "financially interested entities").   AB 290
11  §§ 3(h)(2), 5(h)(2).  Most relevant to Plaintiffs' motion, AB 290 requires that AKF:

12  - inform applicants for premium assistance about "all available health coverage
13      options." *Id.* §§ 3(b)(3), 5(b)(3).

14  - agree "not to steer, direct, or advise the patient into or away from a specific
15      coverage program option or health care service plan contract." *Id.* §§ 3(b)(4),
16      5(b)(4).

17  - provide financial assistance for the full plan year and to notify the patient
18      before an open enrollment period if that assistance is to be discontinued. *Id.*
19      §§ 3(b)(1), 5(b)(1).

20  - not condition financial assistance on the use of any particular facility,
21      healthcare provider, or coverage type. *Id.* §§ 3(b)(5), 5(b)(5).

22  - provide an annual statement to health care service plans certifying that the
23      entity is in compliance with sections 3(b) and 5(b). *Id.* §§ 3(c)(1), 5(c)(1).

24  - disclose the names of enrollees for each health care service plan contract on
25      whose behalf a third-party premium payment is made. *Id.* §§ 3(c)(2), 5(c)(2).

26      Notwithstanding AB 290's stated purpose, the State has no evidence that steering
27  occurs.  The California Department of Managed Health Care ("DMHC"), the California
28  Department of Healthcare Services ("DHCS"), and the California Department of

Insurance ("CDI") are not aware of any California patients who have been "steered,"
and none of these agencies have received any complaints about the "steering" of ESRD
patients. SUFCL ¶¶ 107–110, 112–13, 116–17, 120–21. The State is similarly unaware
of any patient harmed by the purported "steering" of ESRD patients. SUFCL ¶¶ 126–
27.

### F.     AB 290 Will Harm Patients If It Goes into Effect.

California's Legislative Counsel Bureau concluded that "[t]he changes [to HIPP]
required by AB 290 would remove the legal protection afforded by [Advisory] Opinion
97-1." SUFCL ¶ 102. In particular, as the Legislative Counsel Bureau admitted, "it
may be possible under certain factual scenarios for a patient to infer that the patient's
provider had donated." Dkt. 29-2 (RJN Exh. 3, at 34). "For example, a patient may
receive a billing statement showing that the patient's reimbursement rate had been
lowered to the Medicare reimbursement rate," as required by AB 290. *Id.* at 35. Such
a disclosure breaks with Advisory Opinion 97-1's requirement that "premium payments
should not be attributed to the Companies." Dkt. 29-2 (RJN Exh. 2, at 23). Because
AB 290 could compromise Advisory Opinion 97-1's safe harbor, AKF ceased providing
new ESRD patients in California with HIPP assistance until this Court entered the
preliminary injunction. SUFCL ¶ 133. Similarly, because of the importance of
remaining within Advisory Opinion 97-1's safe harbor, AKF will have no choice but to
withdraw its operations from California if AB 290 becomes effective. SUFCL ¶¶ 132,
134. As a result, California ESRD patients may lose their health insurance. SUFCL
¶ 135. AB 290 also disincentivizes AKF's California donors from making donations,
which will leave AKF with less resources to assist patients across the country. SUFCL
¶ 135. As Mr. Albright succinctly explains: "AB 290 will take away a vital lifeline that
I depend upon to live." Declaration of Stephen Albright ("Albright 2022 Decl.") ¶ 16.

## III.   LEGAL STANDARD

On November 1, 2019, Plaintiffs filed this case challenging AB 290. On
December 30, 2019, the Court entered a preliminary injunction. *See Doe v. Becerra*,

Nos. SA CV 19-2105-DOC-ADS, SA CV 19-2130-DOC-ADS, 2019 WL 8227464, at *11 (C.D. Cal. Dec. 30, 2019).  Plaintiffs now move for summary judgment.  Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.   ARGUMENT

### A.   AB 290 Is Unconstitutional Under the First Amendment.

AB 290 targets AKF with speech restrictions in violation of its First Amendment rights to free speech, free association, and petition.  This Court previously granted a preliminary injunction because it found that AKF was likely to succeed on its First Amendment claims.  *See Doe*, 2019 WL 8227464, at *4–9, *11.  Circumstances have not changed.  After months of discovery, the State has not identified a single example of AKF engaging in patient steering, *see* SUFCL ¶¶ 106–128, the purported evil that AB 290 is supposed to address.  To prevail on summary judgment, however, the State "must demonstrate that the recited harms are real, not merely conjectural, and that the [law] will . . . alleviate these harms in a direct and material way."  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993).  Because the State fails to make that minimal showing, AB 290 should be struck down.

### 1. AB 290 Impermissibly Imposes Content-Based Speech Restrictions.

Multiple provisions of AB 290 control what AKF can and cannot say.  "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech" and constitutes a "content-based regulation."  *Riley v. Nat'l Fed'n of the Blind of North Carolina*, *Inc.*, 487 U.S. 781, 795 (1988).  Such content-based regulations are presumptively invalid unless they are narrowly drawn and justified by a compelling governmental interest.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 163

(2015).  The State cannot carry that burden.  Nor can it even satisfy the lower level of scrutiny applied to commercial speech regulations, as the Court held in its preliminary injunction ruling.  *See Doe*, 2019 WL 8227464, at *4 ("[T]he State has not met its burden under either strict or intermediate scrutiny.").

### a. AB 290 Contains Multiple Content-Based Restrictions.

Sections 3(b)(4) and 5(b)(4) of AB 290 prohibit AKF from "steer[ing], direct[ing], or advis[ing]" any patient with regard to any "specific coverage program option or health care service plan contract."  AB 290 §§ 3(b)(4), 5(b)(4) (the "Advising Restriction").  There is little doubt that this Advising Restriction is a content-based regulation of AKF's speech, and thus "presumptively unconstitutional."  *Reed*, 576 U.S. at 163.  Telling a party what message it must convey (or not convey) on a particular issue is a canonical example of an impermissible content-based regulation.  *See id.* ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.").  It makes no difference that AB 290 prohibits certain types of speech.  "The First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say."  *Riley*, 487 U.S. at 796–97 (emphasis in original); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977).  For that reason, there is "constitutional equivalence [between] compelled speech and compelled silence," and both are equally "unconstitutional as content regulation."  *Riley*, 487 U.S. at 797.

The Advising Restriction is uniquely suspect because it restricts AKF's speech rights based both on the *content* of the speech and the *identity* of the speaker.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564–66 (2011) (Vermont statute prohibiting sale of information about a physician's prescription practices to pharmaceutical marketers, but not to other parties, qualified as a content-based restriction).  It disfavors speech with a particular *content*; namely, "steer[ing], direct[ing], or advis[ing]" any patient with regard to any "specific coverage program option or health care service plan contract," AB 290 §§ 3(b)(4), 5(b)(4), regardless of the benefits that such speech may provide for

patients.   The Advising Restriction also disfavors particular *speakers*; namely, the parties that the statute defines as "financially interested entities" (AKF and the dialysis providers).   *See id.*   And because the Advising Restriction targets health-related information, the statute is more susceptible to First Amendment scrutiny.   *See Sorrell*, 564 U.S. at 566 (observing that the free flow of information "has great relevance in the fields of medicine and public health, where information can save lives").

In addition to the Advising Restriction, AB 290 contains three other content-based regulations, each of which demands that AKF "speak a particular message." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*"). ***First***, sections 3(b)(3) and 5(b)(3) compel AKF to inform patients of "all available health coverage options."  That is something that AKF has never done and, but for AB 290, would not do.  *See* Declaration of LaVarne Burton ("Burton 2022 Decl.") ¶ 39. Consistent with Advisory Opinion 97-1, HIPP is entirely neutral among patients' insurance options, and AKF requires patients to have obtained insurance *before* enrolling in HIPP.  *Id.*; SUFCL ¶ 73.  Requiring AKF to raise insurance issues with patients will generate confusion and place AKF in an untenable position that it has sought to avoid.  Burton 2022 Decl. ¶¶ 38–40.  ***Second***, sections 3(c)(1) and 5(c)(1) require AKF to provide an annual statement to health care service plans certifying that it is in compliance with sections 3(b) and 5(b) of AB 290, which include multiple unconstitutional provisions, including the Advising Restriction.  *See supra* pp. 9–10; *infra.* pp. 14–16.   In effect, these provisions require AKF to admit that it has acknowledged and complied with unnecessary, overbroad, and vague limitations on its speech.   In itself, this is a further infringement of AKF's First Amendment rights. ***Third***, sections 3(c)(2) and 5(c)(2) require AKF to disclose HIPP patient names to health insurers.  That is completely contrary to AKF's policies, *see* Dkt. 28-2 (Burton 2019 Decl. ¶ 45), would force AKF outside of Advisory Opinion 97-1's safe harbor, and would place AKF at significant legal risk, *see infra.* pp. 20–21.  These provisions thus necessarily "alte[r] the content" of AKF's speech.  *NIFLA*, 138 S. Ct. at 2371

1    (citation omitted).

2            **b. Strict Scrutiny Applies Because None of the Content-Based**

3             **Restrictions Qualifies as Commercial Speech.**

4         The four described provisions are all content-based regulations that "are

5 presumptively unconstitutional and may be justified only if the government proves that

6 they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

7 Unable to meet this burden, the State contends that AB 290's provisions regulate

8 "commercial speech," which requires a slightly less stringent showing: "that the statute

9 directly advances a substantial governmental interest and that the measure is drawn to

10 achieve that interest." *Sorrell*, 564 U.S. at 571–72. Though AB 290 fails under either

11 standard, as the Court previously recognized, *see Doe*, 2019 WL 8227464, at *4–6,

12 none of the restrictions relates to commercial speech.

13         Whether speech is "commercial" turns on three components: "[1] the speech is

14 an advertisement, [2] the speech refers to a particular product, and [3] the speaker has

15 an economic motivation." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 (9th Cir.

16 2011) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). The

17 first two components are absent. None of the regulated speech is either advertising or

18 in reference to particular product; it relates to the provision of health insurance

19 information and AKF's relationship with patients. The State's reliance on the

20 "economic motivation" prong is also unavailing. Although AKF is a non-profit charity

21 that solicits donations from many individuals and organizations, including dialysis

22 providers, that is not "commercial speech." *See Vill. of Schaumburg v. Citizens for a

23 Better Env't*, 444 U.S. 620, 632 (1980) (holding that charitable solicitation "has not

24 been dealt with in our cases as a variety of purely commercial speech"). And even if

25 the solicitation of charitable donations did qualify as an economic motive, "the fact that

26 [AKF may] ha[ve] an economic motivation for [its speech] [is] clearly . . . insufficient

27 to turn the [speech] into commercial speech." *Bolger*, 463 U.S. at 67; *Dex Media West,*

28 *Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) ("[E]conomic motive in itself

1 | is insufficient to characterize a publication as commercial.").

### c. The Content Restrictions Do Not Satisfy Either Strict or Intermediate Scrutiny.

To justify AB 290's content-based restriction, the State must "prove that the restriction[s] further[] a compelling interest and [are] narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (citation omitted). The State cannot meet either part of this test, or even the standards applicable to intermediate scrutiny.

To justify AB 290, the State "must present more than anecdote and supposition"; it must identify "an actual problem." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000); *see also Turner*, 512 U.S. at 664 (holding that the government "must demonstrate that the recited harms are real, not merely conjectural"). Moreover, that demonstration must be part of the legislative record: "If there is no reasonable basis for believing a speech restriction is necessary, the government cannot impose one and then hope a justification materializes in discovery." *IMDB.com, Inc. v. Becerra*, 257 F. Supp. 3d 1099, 1102 (N.D. Cal. 2017), *aff'd*, 962 F.3d 1111 (9th Cir. 2020).

***No Evidence of Steering***. This Court previously observed that "the State has yet to identify a single California patient steered into a private insurance plan by a dialysis provider or third-party payer." *Doe*, 2019 WL 8227464, at *5. More than three years after the enactment of AB 290, the State *still* has not identified a single instance of AKF "steering" a patient. That is unsurprising because patients apply for HIPP support only *after* they have selected an insurance policy and dialysis provider. Burton 2022 Decl. ¶ 23.

The State instead relies on a 2016 New York Times article reporting that a small number of social workers raised concerns about steering. *See* Declaration of Matthew M. Leland ("Leland Decl.") Exh. 34, at 340, 350 (Amd'd Resp. to AKF Interrog. No. 3). But the article contains no specific examples of steering, let alone examples in California. Leland Decl. Exh. 52, at 541–46 (K. Thomas & R. Abelson, *Kidney Fund Seen Insisting on Donations, Contrary to Government Deal*, N.Y. Times (Dec. 25,

2016)).  In fact, the article reported that although one "administrator [of a dialysis clinic] said he had refused to donate to the charity[,] [t]he Kidney Fund continued to help pay for . . . patients' insurance."  *Id.*  The article is not only the kind of "anecdote and supposition" that the Supreme Court has warned against, it is also erroneous.  As LaVarne Burton, the President and CEO of AKF unequivocally states in her declaration, AKF has *never* engaged in patient steering.  Burton 2022 Decl. ¶ 41.

The only other example of alleged steering is in a single snippet from AKF's 2015 HIPP manual, *see* Burton 2022 Decl. Exh. 1, which the State contends is evidence that AKF refuses patients treated at facilities that do not donate to HIPP.  *See* Leland Decl. Exh. 34, at 340, 350 (Amd'd Resp. to AKF's Interrog. Nos. 3, 5).  The plain text of the manual undermines the claim and, as the undisputed evidence shows, the charity has never considered a patient's provider in administering HIPP.  *See* Burton 2022 Decl. ¶¶ 42–43.  In fact, more than 50% of the dialysis providers that have referred patients to HIPP do not contribute to AKF.  *Id.* ¶ 44.  The legislative record merely amounts to a "handful of complaints" regarding AKF.  *Playboy Entm't Grp.*, 529 U.S. at 821–22.  That is insufficient to make out an important—much less compelling—government interest.

The record also shows that the State passed AB 290 with no evidence of steering.  For example, the CDI did not have knowledge of "AKF hav[ing] any influence over which insurance plan the patient chooses," Leland Decl. Exh. 42, at 434 (Ghoddoucy Depo. at 147:15–18); SUFCL ¶ 118, and it conceded, more broadly, that the Department was unable to identify particular ESRD patients in California "who were harmed by being steered, directed, or advised by a dialysis provider into an insurance coverage option that was not in their best interests."  Leland Decl. Exh. 42, at 437 (Ghoddoucy Depo. at 160:09–25); SUFCL ¶ 127.  The California DHMC also was unaware of any ESRD patient in California who was steered into selecting a particular health care plan or coverage option and, even today, is unable to identify what steps, if any, the department took to determine whether such steering occurred.  Leland Decl. Exh. 10, at

152 (Phillips Depo. at 142:11–24); SUFCL ¶ 107.  Indeed, the DMHC is not aware of any complaints from any ESRD patient in California regarding allegations that he or she was steered by any plaintiff into selecting a particular health care plan or coverage. SUFCL ¶ 108.  (The California DHCS likewise had no knowledge of "any evidence underlying or supporting" any of AB 290's legislative findings.  *See* Leland Decl. Exh. 41, at 398–407 (Mollow Depo. at 91:11–100:18) (being questioned regarding AB 290 § 1).)

***No Evidence of Impact on Health Insurance Costs.***  AB 290's second purported rationale is to reduce rising health care costs due to "distortion of the insurance pool caused when providers steer patients into particular health insurance plans."  *See* AB 290 §§ 1(e), 1(i).  Notably, the law contains no provisions requiring that insurers pass any such savings onto consumers, for example, in the form of reduced premiums or co-payments.  What's more, this rationale turns on the existence on steering, of which the State has no evidence.  But, as the Court previously observed, the rationale is "anemic" on its own terms because "[i]f these harms were real, rather than speculative or conjectural, the State . . . would *already* understand and be able to demonstrate these economic effects."  *Doe*, 2019 WL 8227464 at *5 (emphasis in original).  There is nothing persuasive in AB 290's legislative record showing that alleged steering has impacted costs in the California health insurance market or harmed patients.

***The Restrictions Are Not Narrowly Tailored.***  Even beyond the absence of any evidence of steering or its impact on health insurance costs, the content-based restrictions must fail because they are not narrowly tailored.  Under strict scrutiny, any content-based regulation must be the least restrictive option possible; "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative."  *Playboy Entm't Grp.*, 529 U.S. at 813; *see also Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 US 557, 566 (1980) ("For commercial speech . . . [the restriction must be] not more extensive than is necessary to serve that interest.").

AB 290 collapses under these requirements.  The State never explains how prohibiting AKF from "advis[ing]" patients regarding anything related to health insurance, AB 290 §§ 3(b)(4), 5(b)(4), or requiring it to inform patients of "all available health coverage options," *id.* §§ 3(b)(3), 5(b)(3), will reduce steering, much less health insurance costs.  Indeed, the law contains no provisions to ensure that cost savings are passed to payers of insurance premiums.  More fundamentally, there are numerous arrangements that are less restrictive alternatives.  As the Court pointed out, "one plausible alternative" to the content restrictions would be "a targeted prohibition against steering rather than a total ban on advising," or "the State could rely on antifraud law to protect patients and increase its own educational efforts to provide patients with adequate information about insurance options."  *Doe*, 2019 WL 8227464, at *6.  Nothing prevents the State from using its existing laws to police any unlawful steering activity.  *See Riley*, 487 U.S. at 795 ("North Carolina has an antifraud law, and we presume that law enforcement officers are ready and able to enforce it.").  Indeed, federal law in the form of the Beneficiary Inducement Statute already polices such matters.  *See* 42 U.S.C. § 1320a-7a(a)(5).  As AB 290 is not properly tailored, it must necessarily fail.

## 2. AB 290 Violates AKF's First Amendment Right of Association.

AB 290 also violates AKF's right of association with both its donors and the thousands of ESRD patients that AKF supports.  *See Santopietro v. Howell*, 857 F.3d 980, 989 (9th Cir. 2017) ("Association for the purpose of engaging in protected activity is itself protected by the First Amendment.").  The First Amendment protects the right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."  *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).  As the Supreme Court explained just last year, these protections guard against "compelled disclosure," given "that '[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.'"  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021)

1   (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 466 (1958)).

2        To qualify as an "expressive association" fully protected by the First
3   Amendment, an organization "must engage in some form of expression, whether it be
4   public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).  AKF
5   readily satisfies this standard.  AKF is a nationwide 501(c)(3) nonprofit charity that has
6   been in operation for more than 50 years and has conducted advocacy and research on
7   behalf of more than 37 million ESRD patients.  SUFCL ¶ 18.  AKF attracts more than
8   80,000 distinct donors annually and runs a financial assistance program (HIPP) to
9   support low-income ESRD patients' need for dialysis across all 50 states.  SUFCL
10  ¶¶ 19, 66–68.  Such extensive public outreach and charitable conduct is more than
11  sufficient to qualify as "expressive association" for the purposes of First Amendment
12  protection.  *Cf. Dale*, 530 U.S. at 649–50 (Boy Scouts qualified as an expressive
13  association because it seeks to "instill values in young people," and "[i]t seems
14  indisputable that an association that seeks to transmit such a system of values engages
15  in expressive activity").

16       AB 290 intrudes on AKF's associational rights in three ways.  ***First***, the Act
17  requires AKF to "agree not to condition financial assistance on eligibility for, or receipt
18  of, any surgery, *transplant*, *procedure*, drug, or device."  AB 290 §§ 3(b)(2), 5(b)(2)
19  (emphasis added).  Complying with that requirement would undermine the core of
20  AKF's mission, which consists of providing premium assistance to ESRD patients who
21  are undergoing *dialysis* or who have received a kidney *transplant* within the past year.
22  Burton 2022 Decl. ¶¶ 2, 14–15.  Central to AKF's mission is providing assistance to
23  those kidney disease patients with the greatest need, both in terms of health and
24  economic circumstances.  *Id.* ¶¶ 21, 23.

25       ***Second***, the Act reduces the insurance reimbursements for HIPP patients to the
26  lower Medicare reimbursement for those dialysis providers that give to HIPP.  *See* AB
27  290 §§ 3(e)(1), 5(e)(1) ("Reimbursement Penalty").  It is well established that charitable
28  donations fall within the ambit of AKF's right of associational expression and are

1    accordingly protected. *See Roberts*, 468 U.S. at 626–27 (explaining that "charitable"

2    activities are "worthy of constitutional protection under the First Amendment"); *see*

3    *also Bigelow v. Virginia*, 421 U.S. 809, 818 (1975) (state may not prohibit protected

4    activity merely because it involves a financial gain); *see also Joseph Burstyn, Inc. v.*

5    *Wilson*, 343 U.S. 495, 501 (1952) (the publication of for-profit works constitutes "a

6    form of expression whose liberty is safeguarded by the [F]irst [A]mendment"). Yet the

7    Reimbursement Penalty imposes a heavy "financial burden" on giving to dialysis

8    providers, so that it "operate[s] as [a] disincentive[] to speak" and associate with AKF.

9    *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 117

10   (1991).

11        ***Third***, AB 290 mandates the disclosure of HIPP patients' names to health

12   insurers. AB 290 §§ 3(c)(2), 5(c)(2) ("Patient Disclosure Mandate"). "'It is hardly a

13   novel perception that compelled disclosure of affiliation with groups engaged in

14   advocacy may constitute as effective a restraint on freedom of association as [other]

15   forms of governmental action.'" *Ams. for Prosperity*, 141 S. Ct. at 2382 (quoting

16   *Patterson*, 357 U.S. at 462). The Patient Disclosure Mandate burdens AKF's

17   relationship with patients, forcing AKF to disclose patient details in a manner it would

18   not agree to, *see* Dkt. 28-2 (Burton 2019 Decl. ¶ 45), and exposing information that

19   patients may not want revealed to their insurers.

20        Because each of these restrictions on association is supported by the steering and

21   healthcare cost rationales debunked above, they too must fail under any degree of

22   scrutiny. *See supra* at 12–14; *see also Ams. for Prosperity*, 141 S. Ct. at 2385 (applying

23   "exacting scrutiny" to disclosure requirement and requiring "a substantial relation

24   between the disclosure requirement and a sufficiently important governmental interest"

25   (citation and internal quotation marks omitted)).

26        **3. AB 290's Advising Restriction Is Void for Vagueness.**

27        AB 290's Advising Restriction also must be struck down because it is

28   unconstitutionally vague. The Advising Restriction fails to give "ordinary people . . .

fair notice of the conduct" that is prohibited. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (internal quotation marks omitted). The terms "steer," "direct," and "advise" are undefined in AB 290, making it impossible for AKF to know *ex ante* what they mean and what speech is prohibited. For instance, the Advising Restriction's prohibition on "advis[ing]" any patient with regard to coverage program options could expose AKF to liability when it provides information and services to patients as part of its routine HIPP operations. *See Merriam-Webster's Third New International Dictionary* 32 (2002) (defining "advise" as "to give information or notice to" or to "inform"); Burton 2022 Decl. ¶ 38.

Moreover, the plastic nature of the Advising Requirement means that it will "authorize[] or even encourage[] arbitrary . . . enforcement," which is a hallmark of unconstitutional vagueness. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Instead of providing clear guidance on what AKF may or may not say, AB 290 impermissibly leaves that question to the subjective judgments of State officials. That is plainly unconstitutional. *Cf. Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004) (invalidating statutory provision that required "full recognition" of a patient's dignity and individuality because it was "too vague and subjective for providers to know how they should behave in order to comply," in addition to being "too vague to limit arbitrary enforcement"); *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001) (holding statutory provision requiring physicians to treat patients in a manner that enhances dignity and respect to be unconstitutionally vague because it "impermissibly subject[ed] physicians to sanctions based not on their own objective behavior, but on the subjective viewpoints of others").

### 4. AB 290 Violates the First Amendment's Petition Clause.

Finally, AB 290 requires AKF to seek a new advisory opinion from the OIG as a precondition for delaying AB 290's effective date (and avoiding an otherwise impossible choice between whether to comply with state or federal law). AB 290 § 1(j). Such a requirement violates the First Amendment's petition clause for the reasons given

above.  *See Wayte v. United States*, 470 U.S. 598, 610 & n.11 (1985) ("Although the right to petition and the right to free speech are separate guarantees, they are related and generally subject to the same constitutional analysis.").

**B.     AB 290 Is Preempted by Federal Law.**

Though the Court can decide this case entirely on First Amendment grounds, AB 290 is also preempted by federal law for two reasons.  ***First***, it is impossible for AKF to both comply with AB 290 and the Beneficiary Inducement Statute as that federal statute has been authoritatively construed by its implementing agency. ***Second***, AB 290 stands as an obstacle to the structure that Congress has adopted for the reimbursement of ESRD treatments.

**1.     It Is Impossible for AKF to Comply with Both State and Federal Law.**

Federal conflict preemption doctrine applies "when it is impossible for a private party to comply with both state and federal requirements."  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019) (internal quotation marks omitted); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (impossibility preemption exists when it is "not lawful under federal law for [affected parties] to do what state law require[s] of them").  "The question for 'impossibility,' is whether the private party c[an] independently do under federal law what state law requires of it."  *PLIVA, Inc.*, 564 U.S. at 620.  It is not enough to "imagine that a third party or the Federal Government *might* do something that makes it lawful for a private party to accomplish under federal law what state law requires of it."  *Id.* (emphasis in original).  Indeed, Congress could always rewrite federal law to follow state law, *id.* at 620–21, but unless and until it does, state law must yield to federal law.

The Beneficiary Inducement Statute's regime reflects a careful balancing of interests.  While the statute prohibits knowingly giving "remuneration" to "influence . . . individual[s] to order or receive [treatment] from a particular provider," 42 U.S.C. § 1320a-7a(a)(5); *see also id.* § 1320a-7a(i)(6); Leland Decl. Exh. 23, at 248 (Freedman

Expert Rep. ¶¶ 36–38), Congress recognized the statute's "enormous breadth and severe penalties," *id.* ¶ 39.  It thus gave parties the power to seek "safe harbor" advisory opinions from the OIG HHS on whether particular arrangements are consistent with the Beneficiary Inducement Statute.  42 U.S.C. §§ 1320a-7d(a), (b).

As Mr. Freedman—Plaintiffs' expert—explains, through the advisory opinion process "health care providers could engage in conduct beneficial to patients," such as HIPP, "without risking criminal prosecution, severe financial penalties, and exclusion from the Medicare program."  Leland Decl. Exh. 23, at 248 (Freedman Expert Rep. ¶ 39).  Critically, "[e]ach advisory opinion issued by the Secretary shall be binding as to the Secretary and the party or parties requesting the opinion."  42 U.S.C. § 1320a-7d(b)(4)(A).  Parties who depart from the terms of these advisory opinions place themselves at legal risk, a particular concern for a reputable charity like AKF.  *See* Dkt. 29-2 (RJN Exh. 2, at 26); 42 C.F.R. § 1008.43; Leland Decl. Exh. 23, at 249 (Freedman Expert Rep. ¶ 55); Burton 2022 Decl. ¶¶ 36, 38, 40.

In the case of AKF, the HHS OIG granted HIPP a federal safe harbor for three reasons: (1) AKF was responsible for administering HIPP and acted as a "bona fide, independent, charitable organization," thereby "provid[ing] sufficient insulation" between the dialysis providers and HIPP recipients "so that the premium payments should not be attributed to the [provider] Companies," Dkt. 29-2 (RJN Exh. 2, at 24); (2) potential HIPP beneficiaries will have likely already selected a provider before applying for HIPP assistance, *id.* at 25; and (3) AKF's policy is to offer assistance to eligible ESRD patients "on an equal basis," *id.* at 21.

The State does not contest this characterization of the Beneficiary Inducement Statute, the advisory opinion process, or the status of those opinions as authoritative constructions of the statute.  SUFCL ¶¶ 85–98.  Those concessions are dispositive here because AB 290 explicitly demands that AKF breach the requirements of Advisory Opinion 97-1 and thus depart from the federal safe-harbor interpretation of the Beneficiary Inducement Statute.  AB 290 requires AKF to inform insurers of those

patients for whom it provides premium assistance, so that the insurers can reduce reimbursement rates to providers for those patients.  *See* AB 290 §§ 3(c)(2), 3(e), 5(c)(2), 5(e).  When HIPP participants receive their Explanations of Benefits reflecting lower payments, they will know their provider is a HIPP donor and may be likely to seek treatment from providers who donate to HIPP.  Leland Decl. Exh. 23, at 250 (Freedman Expert Rep. ¶ 76).

As Mr. Freedman explains, "[t]he OIG states in [Advisory Opinion] 97-1 that patients likely have already selected a dialysis provider before applying for assistance from AKF, which reduces the risk that AKF's assistance would influence the patient's decision in selecting a dialysis provider."  Leland Decl. Exh. 23, at 250–51 (Freedman Expert Rep. ¶ 78).  But AB 290 unravels that safeguard.  "Once a patient starts receiving assistance for AKF, the patient will see whether their co-insurance amounts decrease or not."  *Id.*  A patient whose current provider donates to AKF will see a decrease in co-insurance payments and thus know that, by virtue of AB 290 those reductions come because that patient's provider gives to AKF.  *Id.*  AB 290 thus creates a mechanism by which patients will be informed whether their dialysis provider donated to AKF.  *Id.* That is outside of what Advisory Opinion 97-1 indicated falls within the safe harbor for the Beneficiary Inducement Statute.

At its core, AB 290 requires AKF to deviate from the program that was described by the OIG, putting both the program and the charity in legal peril.  Burton 2022 Decl. ¶¶ 36–40.  If AKF declines to do so and continues its federally sanctioned practice under the Beneficiary Inducement Statute (as construed in Advisory Opinion 97-1), then the charity is in violation of California law.   That is a pristine example of conflict preemption: "it is impossible for [AKF] to comply with both state and federal requirements."  *Merck Sharp*, 139 S. Ct. at 1672 (internal quotation marks omitted).

AB 290's section 7 reflects the State's recognition of this fundamental conflict. It provides that the Act shall not become operative with respect to a "financially interested entit[y] . . . unless one or more parties to Advisory Opinion 97-1 requests an

1   updated opinion from the United States Department of Health and Human Services

2   Office of Inspector General."   AB 290 § 7.[2]   There would be no need for such a

3   provision unless California itself saw a conflict between AB 290 and how the

4   Beneficiary Inducement Statute applies to HIPP.

5          Moreover, section 7 does not remedy AB 290's preemption difficulties.  As the

6   Supreme Court explained in *PLIVA*, "[t]he question for 'impossibility' is whether the

7   private party could *independently* do under federal law what state law requires of it."

8   564 U.S. at 620 (emphasis added).  After all, "[w]e can often imagine that a third party

9   or the Federal Government *might* do something that makes it lawful for a private party

10  to accomplish under federal law what state law requires of it."   *Id.* (emphasis in

11  original).   "[W]hen a party cannot satisfy its state duties without the Federal

12  Government's special permission and assistance, which is dependent on the exercise of

13  judgment by a federal agency, that party cannot independently satisfy those state duties

14  for pre-emption purposes." *Id.* at 623–24.  Thus, whether AKF might convince the OIG

15  to issue a new advisory opinion is irrelevant to the preemption analysis.

16         Such an effort would also be fraught as a practical matter.  The advisory opinion

17  process is lengthy and offers no guarantees.  In the interim, HIPP would be plagued

18  with uncertainty and donors could well decide to hold back their donations pending

19  action by the federal government.  Burton 2022 Decl. ¶ 49.  That would put HIPP and

20  the patients who rely on it in serious jeopardy.  Even assuming that AKF could obtain

21  a new advisory opinion, under 42 CFR § 1008.43, a party requesting an advisory

22  _____

23  [2] California's Legislative Counsel Bureau stated, before the Legislature enacted AB
    290: "[T]he changes in the premium assistance program required by AB 290 would
24  remove the legal protection afforded by Opinion 97-1." Dkt. 29-2 (RJN Exh. 3, at 32)
    (letter dated June 28, 2019).  While the Legislative Counsel Bureau proceeded to
25  (wrongly) determine that AKF "would remain in compliance with the arrangement
    approved in Advisory Opinion 97-1," it nonetheless conceded that whether AKF could
26  fulfill the requirements of AB 290 while remaining within Advisory Opinion 97-1's
    safe harbor "would be a factual determination made by the OIG and could involve
27  consideration of facts not available to" the Legislative Counsel Bureau.  *Id.* at 34–35.

28

1   opinion must certify in good faith that it will enact the proposed scheme.  AKF cannot
2   make that certification.  Dkt. 28-2 (Burton 2019 Decl. ¶ 49).  Adopting a scheme based
3   on AB 290 would devastate HIPP and its objectives.  It would penalize donors for giving
4   to AKF and furnish insurance companies with further mechanisms to deny HIPP
5   patients' insurance payments.  Burton 2022 Decl. ¶¶ 37, 39.  If AB 290 goes into effect,
6   the only way for AKF to preserve HIPP for the remainder of the country will be for
7   AKF to depart California, an outcome that will gravely injure thousands of desperately
8   ill and financially challenged ESRD patients.  *Id.* ¶ 36, 40.  If such a catastrophic result
9   comes to pass, it will be because the State has sought to force an esteemed charity into
10  a manufactured violation of federal law.  That is a quintessential example of preempted
11  state action.

12  ### 2. AB 290 Presents a Significant Obstacle to Congress's Objectives
13  ### Around Medicare Coverage for Individuals with ESRD.

14       The second relevant form of preemption is obstacle preemption.  When a state
15  statute such as AB 290 "present[s] an obstacle to the variety and mix of [regulatory
16  approaches]" selected by Congress, it is preempted by federal law.  *Geier v. Am. Honda
17  Motor Co.*, 529 U.S. 861, 881 (2000).  Among the "special features" of federal law that
18  may require obstacle preemption, *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990)
19  (citation omitted), is a specialized federal enforcement regime that would be thwarted
20  by state legislation, *see Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 144 (1990).

21       The Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b) ("MSPA"), as
22  amended by Congress, ensures that private health plans share in the cost of treating
23  ESRD.  AB 290 precludes this system from functioning as intended, allowing insurers
24  to skirt their fair share of the burden.  AB 290 thus presents a clear obstacle to
25  Congress's "accomplishment and execution of . . . important means-related federal
26  objectives."  *Geier*, 529 U.S. at 881 (internal quotation marks omitted).

27       The MSPA, "as the name suggests, designate[s] Medicare as the secondary payer
28  in certain circumstances when both Medicare and a non-Medicare entity have

1    independent duties to pay for a covered person's healthcare costs." *DaVita Inc. v.*
2    *Virginia Mason Mem'l Hosp.*, 981 F.3d 679, 685 (9th Cir. 2020).  Beginning in the late
3    1980s, however, "Congress added many provisions that go well beyond simply
4    requiring plans to make primary payments." *Id.* at 693.  Among these was a requirement
5    that "plans may not treat persons with ESRD differently even if they are not enrolled in
6    Medicare." *Id.*  As the Ninth Circuit has observed, "some persons with ESRD never go
7    on Medicare, and nearly everyone with ESRD is ineligible for Medicare during their
8    first three months of treatment." *Id.*  The statute and its implementing regulations thus
9    require that group insurers treat ESRD patients the same as non-ESRD patients, and that
10   plans cannot pay providers less for the same service for individuals with ESRD than
11   without.  42 U.S.C. § 1395y(b)(1)(C)(i); 42 C.F.R. § 411.161(b)(2)(iv); SUFCL ¶¶ 48–
12   49.  This arrangement is critical because dialysis is a costly service and Medicare
13   reimbursement rates are often well below private insurance reimbursement rates.  *See*
14   *Virginia Mason Mem'l Hosp.*, 981 F.3d at 683–84.

15       AB 290 would unravel this system both for dialysis providers and a much broader
16   set of healthcare providers.  Dialysis providers that contribute to AKF become
17   "financially interested" under AB 290, *see* AB 290, §§ 3(h)(2)(A), 5(h)(1)(A), and are
18   thus subject to the reduced reimbursement rate for all ESRD patients on dialysis that
19   are also HIPP recipients, *see id.* §§ 3(e), 5(e).  Non-HIPP dialysis patients do not fall
20   under this reimbursement scheme and thus fall within the standard negotiated
21   reimbursement rates.  AB 290 thus draws a sharp, and impermissible, distinction in
22   payments for HIPP and non-HIPP ESRD patients.  Still more troublingly, nothing in
23   AB 290 limits this result to just dialysis providers.  Sections 3(h)(2)(A) and 5(h)(1)(A)
24   of AB 290 define "[f]inancially interested" as "[a] provider of health care services that
25   receives a direct or indirect financial benefit from a third-party premium payment."
26   This would reach the hundreds of healthcare professions who work with ESRD patients
27   and have donated in good faith because they support AKF's mission.  *See* Burton 2022

28

1   Decl. ¶ 29.  These professionals' HIPP ESRD patients will again be treated differently

2   from non-HIPP patients for reimbursement purposes.

3       The end result would be to transform the ESRD reimbursement arrangement in

4   California.  It would change from the Congressionally authorized model in which all

5   payers are subject to the same rules for all ESRD patients to one in which HIPP patients

6   are disfavored, with heavily reduced reimbursements rates depending on their insurance

7   plan.  Such a result badly undermines and poses an intolerable obstacle to federal

8   objectives in this space.

9   **V.    CONCLUSION**

10      The Court should grant Plaintiffs' motion for summary judgment.

11

12  Dated: February 25, 2022           **KING & SPALDING LLP**

13

14                              By:  */s/Joseph N. Akrotirianakis*
                                     JOSEPH N. AKROTIRIANAKIS
15                                   MATTHEW M. LELAND
                                     ASHLEY C. PARRISH
16
                                     Attorneys for Plaintiffs
17                                   JANE DOE, STEPHEN ALBRIGHT,
                                     AMERICAN KIDNEY FUND, INC.,
18                                   and DIALYSIS PATIENT CITIZENS,
                                     INC.
19

20

21

22

23

24

25

26

27

28