JOSEPH N. AKROTIRIANAKIS (SBN 197971)
  *jakro@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:   (213) 443-4310

MATTHEW M. LELAND (*pro hac vice*)
  *mleland@kslaw.com*
ASHLEY C. PARRISH (*pro hac vice forthcoming*)
  *aparrish@kslaw.com*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
2nd Floor
Washington, DC 20006
Telephone:   (202) 737-0500
Facsimile:   (202) 626-3737

Attorneys for Plaintiffs
JANE DOE, STEPHEN ALBRIGHT,
AMERICAN KIDNEY FUND, INC.,
AND DIALYSIS PATIENT CITIZENS, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his Official Capacity as Attorney General of California, *et al.*,<br><br>Defendants. | **Case No. 8:19-cv-2105-DOC-(ADSx)**<br><br>**STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]**<br><br>Filed Concurrently Herewith:<br>1) Notice of Motion and Motion;<br>2) Declaration of Matthew M. Lealand;<br>3) Declaration of Stephen Albright;<br>4) Declaration of Jane Doe;<br>5) Declaration of LaVarne Burton;<br>6) [Proposed] Order<br><br>Date:      May 2, 2022<br>Time:      8:30 AM<br>Place:     Courtroom 9D |

Plaintiffs Jane Doe, Stephen Albright, American Kidney Fund, Inc., and Dialysis Patient Citizens, Inc. ("Plaintiffs") respectfully submit the following Statement of Uncontroverted Facts and Conclusions of Law pursuant to Local Rule 56-1 in support of its motion for summary judgment.

## I.      STATEMENT OF UNCONTROVERTED FACTS SUPPORTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| **Uncontroverted Facts Regarding End-Stage Rental Disease and Dialysis** ||
| 1. End-stage renal disease ("ESRD") is a chronic, painful, and potentially fatal medical condition. | Dkt. 28-1 (Jamgochian Decl. ¶ 3); Dkt. 28-4 (Doe 2019 Decl. ¶¶ 3–9); Doe 2022 Decl. ¶¶ 4–12; Dkt. 28-3 (Albright 2019 Decl. ¶¶ 4–8); Albright 2022 Decl. ¶¶ 4–11. |
| 2. When a patient has ESRD, his or her kidneys are no longer able to filter waste and toxins from the blood. | Dkt. 28-1 (Jamgochian Decl. ¶ 3); Dkt. 28-4 (Doe 2019 Decl. ¶ 5); Dkt. 28-3 (Albright 2019 Decl. ¶¶ 4–5); Albright 2022 Decl. ¶ 4. |
| 3. ESRD is associated with comorbidities such as diabetes, cancer, heart disease, anemia, and hypertension. | Dkt. 28-1 (Jamgochian Decl. ¶ 3); Dkt. 28-2 (Burton 2019 Decl. ¶ 14); Leland Decl. Exh. 1, at 16; Leland Decl. Exh. 2, at 21. |
| 4. Nearly 810,000 people in the United States, and more than 110,000 Californians, have ESRD. | Burton 2022 Decl. ¶ 6. |
| 5. Each year, there are more than 100,000 new ESRD diagnoses in the United | Dkt. 28-1 (Jamgochian Decl. ¶ 3). |

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| States. | |
| 6.  ESRD disproportionately affects racial minorities. | Dkt. 28-1 (Jamgochian Decl. ¶ 7); Dkt. 28-2 (Burton 2019 Decl. ¶ 23); Burton 2022 Decl. ¶ 25. |
| 7.  Without treatment, ESRD is fatal. | Dkt. 28-1 (Jamgochian Decl. ¶¶ 3–4); Dkt. 28-2 (Burton 2019 Decl. ¶ 14). |
| 8.  To survive, ESRD patients must receive a kidney transplant or undergo renal dialysis. | Dkt. 28-1 (Jamgochian Decl. ¶ 4); Dkt. 28-4 (Doe 2019 Decl. ¶ 5). |
| 9.  Due to a shortage of transplantable kidneys, ESRD patients often wait several years for a kidney transplant. | Dkt. 28-2 (Burton 2019 Decl. ¶ 14); Dkt. 28-1 (Jamgochian Decl. ¶ 6); Dkt. 28-4 (Doe 2019 Decl. ¶¶ 4–5); Doe 2022 Decl. ¶ 11; Albright 2022 Decl. ¶ 11. |
| 10. Dialysis is often the only viable treatment option for ESRD patients. | Dkt. 28-2 (Burton 2019 Decl. ¶ 14). |
| 11. Dialysis is a physically draining, time-consuming, and costly procedure. | Dkt. 28-1 (Jamgochian Decl. ¶¶ 4, 9); Dkt. 28-4 (Doe 2019 Decl. ¶¶ 5–9); Doe 2022 Decl. ¶¶ 5–7; Dkt. 28-3 (Albright 2019 Decl. ¶¶ 4–9); Albright 2022 Decl. ¶¶ 6–8. |
| 12. The typical dialysis patient requires three dialysis treatments per week, each lasting four to five hours. | Dkt. 28-1 (Jamgochian Decl. ¶ 4); *see also* Dkt. 28-4 (Doe 2019 Decl. ¶ 8); Doe 2022 Decl. ¶ 6; Albright 2022 Decl. ¶ 8. |
| 13. Because of the demands of their treatment, more than 80% of dialysis patients are unemployed. | Dkt. 28-2 (Burton 2019 Decl. ¶ 21); *see also* Dkt. 28-1 (Jamgochian Decl. ¶¶ 4, 8); Dkt. 28-4 (Doe 2019 Decl. ¶ 10); Dkt. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| | 28-3 (Albright 2019 Decl. ¶¶ 8–9); Albright 2022 Decl. ¶ 12. |
| 14. Many dialysis patients face significant financial challenges. | Dkt. 28-1 (Jamgochian Decl. ¶ 6); Dkt. 28-2 (Burton 2019 Decl. ¶ 21); Dkt. 28-4 (Doe 2019 Decl. ¶¶ 11–14); Doe 2022 Decl. ¶¶ 12, 14–16; Dkt. 28-3 (Albright 2019 Decl. ¶¶ 10–14); Albright 2022 Decl. ¶¶ 12–13. |
| 15. The vast majority of ESRD patients are not able to afford dialysis treatment without health care coverage. | Dkt. 28-1 (Jamgochian Decl. ¶ 8); Dkt. 28-2 (Burton 2019 Decl. ¶¶ 21–22, 24–25); Albright 2022 Decl. ¶ 15. |
| 16. ESRD patients are at heightened risk from COVID-19 because of their compromised immune systems and need to travel to clinics to receive dialysis treatment. | Burton 2022 Decl. ¶¶ 16–18. |
| 17. The U.S. dialysis population shrank in 2020—the first time in 50 years—because so many patients died from COVID-19. | Burton 2022 Decl. ¶ 16. |
| **Uncontroverted Facts Regarding Plaintiffs American Kidney Fund, Jane Doe, Stephen Albright, and Dialysis Patients Citizens** | |
| 18. Plaintiff American Kidney Fund, Inc. ("AKF") is a 501(c)(3) nonprofit charity founded in 1971 that works on behalf of 37 million people living with | Dkt. 28-2 (Burton Decl. ¶¶ 11–13, 40); Burton 2022 Decl. ¶¶ 14–15; Leland Decl. Exh. 3, at 26–28; Leland Decl. Exh. 4, at 39; Leland Decl. Exh. 5, at 48. |

| **Uncontroverted Fact** | **Supporting Evidence** |
| --- | --- |
| kidney disease through advocacy, education, research, and financial assistance. | |
| 19. Over 80,000 distinct donors contribute annually to support AKF's programs. | Burton 2022 Decl. ¶ 29. |
| 20. Ninety-seven cents of every dollar donated to AKF goes to its patients and programs. | Dkt. 28-2 (Burton 2019 Decl. ¶¶ 6, 13); Leland Decl. Exh. 6, at 69; Leland Decl. Exh. 7, at 92. |
| 21. Plaintiff Jane Doe was diagnosed with ESRD in 2018. | Dkt. 28-4 (Doe Decl. ¶ 2); Doe 2022 Decl. ¶ 4. |
| 22. Ms. Doe is 56 years old and currently resides in Irvine, California. | Doe 2022 Decl. ¶ 3. |
| 23. Ms. Doe has experienced fatigue, dizziness, mental fogginess, swelling, and uremic toxicity, a life-threatening condition caused by the buildup of urea in the blood, due to her ESRD. | Dkt. 28-4 (Doe 2019 Decl. ¶ 7); Doe 2022 Decl. ¶ 5. |
| 24. Ms. Doe must receive dialysis treatments at a clinic three times per week to stay alive. | Dkt. 28-4 (Doe 2019 Decl. ¶¶ 5, 8); Doe 2022 Decl. ¶ 6. |
| 25. Due to her ESRD, Ms. Doe must also take approximately 30 medications per day and maintain a special diet. | Doe 2022 Decl. ¶ 7. |
| 26. Due to her ESRD, Ms. Doe is currently unable to work. | Dkt. 28-4 (Doe 2019 Decl. ¶ 10); Doe 2022 Decl. ¶ 12. |

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 27. Ms. Doe has spent all her savings and retirement funds on treating her ESRD. | Dkt. 28-4 (Doe 2019 Decl. ¶ 11); Doe 2022 Decl. ¶ 14. |
| 28. Ms. Doe receives her health insurance through a Medicare Advantage health insurance plan. | Doe 2022 Decl. ¶ 13. |
| 29. AKF pays for Ms. Doe's insurance premiums. | Dkt. 28-4 (Doe 2019 Decl. ¶ 14); Doe 2022 Decl. ¶ 15. |
| 30. Without AKF's assistance, Ms. Doe would be unable to pay for her insurance. | Dkt. 28-4 (Doe 2019 Decl. ¶¶ 12–16); Doe 2022 Decl. ¶ 16. |
| 31. Ms. Doe would die without AKF's support. | Dkt. 28-4 (Doe 2019 Decl. ¶¶ 12–16); Doe 2022 Decl. ¶ 16. |
| 32. Plaintiff Stephen Albright was diagnosed with ESRD in 2017. | Dkt. 28-3 (Albright 2019 Decl. ¶ 5); Albright 2022 Decl. ¶ 4. |
| 33. Mr. Albright is 56 years old and currently resides in Costa Mesa, California. | Albright 2022 Decl. ¶ 3. |
| 34. Mr. Albright has experienced ulcers, fatigue, anemia, sudden weight loss, and neuropathy due to his ESRD. | Dkt. 28-3 (Albright 2019 Decl. ¶¶ 5, 7); Albright 2022 Decl. ¶¶ 7, 9. |
| 35. Mr. Albright must dialyze four times per week to stay alive. | Albright 2022 Decl. ¶ 8. |
| 36. Mr. Albright must take more than 30 pills per day. | Dkt. 28-3 (Albright 2019 Decl. ¶ 7); Albright 2022 Decl. ¶ 9. |
| 37. Due to his ESRD, Mr. Albright is no longer able to work. | Albright 2022 Decl. ¶ 12. |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 38. Mr. Albright receives his health insurance through a Medicare Advantage health insurance plan. | Albright 2022 Decl. ¶ 13. |
| 39. AKF pays Mr. Albright's Medicare premiums. | Dkt. 28-3 (Albright 2019 Decl. ¶ 10); Albright 2022 Decl. ¶ 14. |
| 40. Without AKF's assistance, Mr. Albright would be unable to pay for his insurance. | Dkt. 28-3 (Albright 2019 Decl. ¶ 10); Albright 2022 Decl. ¶ 15. |
| 41. Mr. Albright would die without AKF's support. | Dkt. 28-3 (Albright 2019 Decl. ¶¶ 9–14); Albright 2022 Decl. ¶ 16. |
| **Uncontroverted Facts Regarding Medicare's Coverage of Dialysis Treatment and Kidney Transplants for End-Stage Renal Disease Patients** | |
| 42. In 1972, Congress extended Medicare coverage to ESRD patients who required dialysis or kidney transplants, regardless of their age or disability. | *See* Social Security Amendments of 1972, Pub. L. No. 92-603, tit. II, § 299I, 86 Stat. 1329, 1463 (codified as amended at 42 U.S.C. § 426-1(a)). |
| 43. Patients with ESRD are generally entitled to Medicare Part A coverage and eligible for Medicare Part B coverage if they have worked a sufficient amount of qualifying time under the Social Security program, already receive Social Security Income benefits, or are a child or spouse of someone meeting either requirement. | 42 U.S.C. § 426-1(a). |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 44.Congress did not require ESRD patients to enroll in Medicare, allowing them to retain their private insurance. | *See* 42 U.S.C. § 426-1(b). |
| 45.In 1981, Congress made Medicare the secondary payer for ESRD patients during a "coordination period." | *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, tit. XXI, § 2145, 95 Stat. 357, 800. |
| 46.During the coordination period, if a beneficiary is covered by a commercial insurance policy, that private plan must make the initial payment before Medicare will step in to pay. | *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, tit. XXI, § 2145, 95 Stat. 357, 800. |
| 47.Over time, Congress has extended the coordination period from 12 months to 30 months. | *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. 97-35, tit. XXI, § 2145, 95 Stat. 357, 800; Omnibus Budget Reconciliation Act ("OBRA") of 1990, Pub. L. No. 101-508, tit. IV, § 4203, 104 Stat. 1388, 1388-107–108; Balanced Budget Act of 1997, Pub. L. 105-33, tit. IV, § 4631, 111 Stat. 251, 486, codified as amended at 42 U.S.C. § 1395y(b)(1)(C); Dkt. 28-1 (Jamgochian Dec. ¶ 11). |
| 48.Congress prohibited large group health plans from "tak[ing] into account" the Medicare eligibility of ESRD patients during the coordination period. | Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, tit. VI, § 6202(b), 103 Stat. 2106, 2231, codified at 42 U.S.C. § 1395y(b)(3); 42 C.F.R. § 411.108. |

| Uncontroverted Fact | Supporting Evidence |
| --- | --- |
| 49. Congress also prohibited large group health plans from "differentiat[ing]" in the benefits they provide to patients with ESRD and other covered individuals on the basis of the existence of ESRD, the need for renal dialysis, or in any other manner. | OBRA 1989, Pub. L. No. 101-239, tit. VI, § 6202(b), 103 Stat. 2106, 2231, codified at 42 U.S.C. § 1395y(b)(3); 42 C.F.R. § 411.161. |
| 50. The Affordable Care Act ("ACA") requires insurers to issue plans to eligible enrollees without regard to preexisting conditions. | 42 U.S.C. §§ 300gg-1(a), 300gg-4(a). |
| **Uncontroverted Facts Regarding Insurance Coverage Options for ESRD Patients** | |
| 51. The majority of ESRD patients are on Medicare or Medicaid. | Burton 2022 Decl. ¶ 26. |
| 52. Medicare and Medicaid often do not provide all the coverage that ESRD patients typically need. | Dkt. 28-2 (Burton 2019 Decl. ¶¶ 28–33); *see also* Leland Decl. Exh. 8, at 120–22 (Amd'd. Resp. to AKF Req. for Adm'n Nos. 20–22). |
| 53. Medicare does not cover the dependents of beneficiaries (unless they are independently eligible) and does not provide dental coverage. | Dkt. 28-1 (Jamgochian Decl. ¶ 16); Leland Decl. Exh. 10, at 165–66 (Phillips Depo. at 172:19–173:2). |
| 54. Medicare recipients have cost-sharing obligations, including a 20% | Dkt. 28-2 (Burton 2019 Decl. ¶ 28); Dkt. 28-1 (Jamgochian Decl. ¶ 16); Leland |

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| coinsurance requirement, and no limit on out-of-pocket expenditures. | Decl. Exh. 9, at 132 (Amd'd. Resp. to AKF Req. for Adm'n No. 3). |
| 55. Some ESRD patients are not eligible for Medicare due to their immigration status, their lack of work credentials, or other reasons. | Leland Decl. Exh. 8, at 123 (Amd'd. Resp. to AKF Req. for Adm'n No. 23). |
| 56. For some ESRD patients, commercial insurance may be more affordable than Medicare. | Leland Decl. Exh. 11, at 177; Leland Decl. Exh. 10, at 164–65 (Phillips Depo. at 171:25–172:4). |
| 57. ESRD patients on private insurance plans tend to have better health outcomes than patients on public insurance options, such as Medicare. | Leland Decl. Exh. 12, at 183–189 (Waterman Depo. at 126:11–132:2). |
| 58. Many ESRD patients covered by Medicare must turn to private supplemental insurance, such as Medigap, to afford their deductibles and co-insurance payments. | Dkt. 28-2 (Burton 2019 Decl. ¶ 21). |
| 59. The federal government does not require insurance carriers to offer Medigap to ESRD patients under 65. Such coverage is left to each state. | Dkt. 28-2 (Burton 2019 Decl. ¶ 29); Leland Decl. Exh. 13, at 197; Leland Decl. Exh. 14, at 201; Leland Decl. Exh. 15, at 204. |
| 60. In California, insurers are not required to offer Medigap policies to ESRD patients under age 65. | *See* Ca. Health & Safety Code § 1358.11(a)(2); Dkt. 28-2 (Burton 2019 Decl. ¶ 29); Leland Decl. Exh. 14, at 201; *see also* Leland Decl. Exh. 8, at 125 |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| | (Amd'd. Resp. to AKF Req. for Adm'n No. 26). |
| 61. Medi-Cal, California's Medicaid program, is available only to ESRD patients who spend all but $600 of their monthly income on medical costs. | *See* Cal. Welf. & Inst. Code §§ 14005.7, 14005.9; California Medi-Cal Eligibility Procedures Manual, Article 8F-60; Dkt. 28-2 (Burton 2019 Decl. ¶ 30); *see also* Leland Decl. Exh. 8, at 124 (Amd'd. Resp. to AKF Req. for Adm'n No. 24). |
| 62. Emergency room care is not an appropriate solution for ESRD patients to obtain treatment for their ESRD due to the need for constant management of their chronic condition. | *See* Dkt. 28-2 (Burton 2019 Decl. ¶ 32); Burton 2022 Decl. ¶ 10. |
| 63. ESRD patients who attempt to receive regular dialysis through emergency room care are at higher risk of severe illness and death. | *See* Dkt. 28-2 (Burton 2019 Decl. ¶ 32); Burton 2022 Decl. ¶ 10. |
| **Uncontroverted Facts Regarding AKF's Health Insurance Premium Program** | |
| 64. Maintaining insurance coverage is critical for ESRD patients. | Dkt. 28-2 (Burton 2019 Decl. ¶ 22). |
| 65. Few ESRD patients can afford health plan coverage without financial assistance. | Dkt. 28-1 (Jamgochian Decl. ¶¶ 14, 17). |
| 66. To assist low-income ESRD patients retain their health insurance, AKF | Dkt. 28-2 (Burton 2019 Decl. ¶¶ 7, 15); Leland Decl. Exh. 16, at 217; Leland Decl. Exh. 6, at 70; Leland Decl. Exh. 5, at 50; |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| created the Health Insurance Premium Program ("HIPP") in 1997. | Leland Decl. Exh. 17, at 233; Leland Decl. Exh. 18, at 237; Leland Decl. Exh. 7, at 93; Leland Decl. Exh. 19, at 248. |
| 67. AKF's HIPP provides charitable grants to low-income ESRD patients that allow them to maintain their health insurance by paying the premiums due under their preexisting health insurance plans. | Dkt. 28-2 (Burton 2019 Decl. ¶ 24); Leland Decl. Exh. 16, at 217; Leland Decl. Exh. 6, at 70; Leland Decl. Exh. 5, at 50; Leland Decl. Exh. 7, at 93. |
| 68. AKF's HIPP provides assistance based solely on a patient's lack of personal funds to pay their insurance premiums. | Dkt. 28-2 (Burton 2019 Decl. ¶¶ 7, 16, 40–41); Burton 2022 Decl. ¶ 34; Leland Decl. Exh. 16, at 218; Leland Decl. Exh. 6, at 70; Leland Decl. Exh. 5, at 51; Leland Decl. Exh. 18, at 237; Leland Decl. Exh. 7, at 93; *see also* Leland Decl. Exh. 21, at 238 (AKF Resp. to Defs.' Interrog. No. 5). |
| 69. To qualify for HIPP, a patient's monthly household income may not exceed reasonable monthly expenses by more than $600. | Dkt. 28-2 (Burton 2019 Decl. ¶ 16); Leland Decl. Exh. 16, at 218; Leland Decl. Exh. 6, at 73; Leland Decl. Exh. 20, at 251; Leland Decl. Exh. 5, at 51; Leland Decl. Exh. 7, at 96. |
| 70. Nationwide, patients who receive HIPP assistance have an average annual household income of just over $25,000. | Burton 2022 Decl. ¶ 25. |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 71. In California, the average annual income of HIPP recipients is less than $32,000. | Burton 2022 Decl. ¶ 25. |
| 72. AKF's HIPP assistance is limited to patients who are on dialysis or who have recently received a kidney transplant. | Dkt. 28-2 (Burton 2019 Decl. ¶ 16); Leland Decl. Exh. 16, at 215; Leland Decl. Exh. 5, at 51. |
| 73. A HIPP applicant must prove that he or she already has insurance coverage. | Dkt. 28-2 (Burton 2019 Decl. ¶ 16); Leland Decl. Exh. 16, at 221; Leland Decl. Exh. 5, at 53. |
| 74. HIPP applicants select their health insurance with no input from AKF. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41); Leland Decl. Exh. 19, at 248. |
| 75. Patients are eligible for HIPP support on a first-come, first-served basis. | Dkt. 28-2 (Burton Decl. ¶ 41); Leland Decl. Exh. 6, at 71; Leland Decl. Exh. 7, at 94; Leland Decl. Exh. 19, at 248. |
| 76. In 2021, AKF's HIPP assisted 70,731 ESRD patients nationwide, including 3,174 in California. These numbers are less than previous years due to the COVID pandemic. | Burton 2022 Decl. ¶ 24. |
| 77. Approximately 65% of HIPP recipients nationwide, and 75% of HIPP recipients in California, are members of racial or ethnic minorities. | Burton 2022 Decl. ¶ 25. |

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 78.AKF does not help patients find new insurance and does not advocate that patients keep or switch insurance. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41); Leland Decl. Exh. 19, at 248. |
| 79.AKF continues providing assistance if a patient changes their health insurance coverage or dialysis provider. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41). |
| 80.Many dialysis providers with patients who receive HIPP assistance do not contribute to AKF. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41). |
| 81.AKF's staff responsible for processing and approving HIPP grants are prohibited from accessing information about which providers have contributed to HIPP. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41); Burton 2022 Decl. ¶ 34. |
| 82.Donors' contributions to AKF are not made on behalf of individual patients. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41); *see also* Dkt. 29-2 (RJN Exh. 2, at 23–24). |
| 83.There is no guarantee that patients referred to HIPP will receive assistance. | Dkt. 28-2 (Burton 2019 Decl. ¶ 41); Leland Decl. Exh. 22, at 241; Leland Decl. Exh. 19, at 248; *see also* Dkt. 29-2 (RJN Exh. 2, at 24). |
| 84.Over 60% of AKF's grants nationwide, and over 56% in California, pay for Medicare-related coverage, such as Medicare Part B and Medigap. | Dkt. 28-2 (Burton 2019 Decl. ¶ 24); Burton 2022 Decl. ¶ 26; *see also* Leland Decl. Exh. 20, at 251. |
| **Uncontroverted Facts Regarding the Health Insurance Portability and Accountability Act of 1996 and Advisory Opinion 97-1** | |

13

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 85. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") authorizes the U.S. Department of Health & Human Services ("HHS") Office of Inspector General ("OIG") to seek civil and monetary penalties against any entity offering remuneration to a federal health care program beneficiary with knowledge that such remuneration is likely to influence that individual's choice of healthcare provider (the "Beneficiary Inducement Statute"). | *See* HIPAA § 231(h), codified at 42 U.S.C. § 1320a-7a(a)(5); Dkt. 28-2 (Burton 2019 Decl. ¶ 35). |
| 86. The OIG is empowered to opine on "[w]hether any activity or proposed activity constitutes grounds for the imposition of a sanction under [the Beneficiary Inducement Statute]." | *See* HIPAA § 205, codified at 42 U.S.C. § 1320a-7d(b)(2)(E). |
| 87. A favorable advisory opinion acts as a safe harbor against a federal enforcement action. | *See* 42 U.S.C. § 1320a-7d(b)(4)(A). |
| 88. In 1997, AKF and six dialysis provider donors sought an OIG advisory opinion assessing whether permitting dialysis providers to donate to HIPP violated the Beneficiary Inducement Statute. | Dkt. 28-2 (Burton Decl. ¶ 36); *see also* Dkt. 29-2 (RJN Exh. 2, at 19). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 89. The OIG assessed HIPP and issued Advisory Opinion 97-1. | Dkt. 28-2 (Burton Decl. ¶ 37); *see also* Dkt. 29-2 (RJN Exh. 2, at 19). |
| 90. The OIG concluded that HIPP did not "constitute grounds for the imposition of civil monetary penalties under Section 231(h) of HIPAA." | Dkt. 29-2 (RJN Exh. 2, at 19). |
| 91. The OIG stated that dialysis providers' donations to AKF do not constitute impermissible "remuneration" because "the interposition of AKF, a *bona fide*, independent, charitable organization, and its administration of HIPP provides sufficient insulation so that the premium payments should not be attributed to the [dialysis provider] Companies." | Dkt. 29-2 (RJN Exh. 2, at 24); *see also* Dkt. 28-2 (Burton Decl. ¶ 39). |
| 92. The OIG stated that, because HIPP beneficiaries will likely have already selected a provider before applying for assistance, "AKF's payment of premiums will expand, rather than limit, beneficiaries' freedom of choice." | Dkt. 29-2 (RJN Exh. 2, at 25); *see also* Dkt. 28-2 (Burton Decl. ¶¶ 38–40); Leland Decl. Exh. 8, at 128 (Amd'd. Resp. to AKF Req. for Adm'n No. 29). |
| 93. The OIG stated that HIPP provides "[a]ssistance . . . to all eligible patients on an equal basis." | Dkt. 29-2 (RJN Exh. 2, at 21); *see also* Dkt. 28-2 (Burton Decl. ¶ 40). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 94. The OIG stated that donors' contributions to AKF are not made on behalf of individual patients. | Dkt. 29-2 (RJN Exh. 2, at 23–24); *see also* Dkt. 28-2 (Burton 2019 Decl. ¶ 41). |
| 95. The OIG stated that there is no guarantee that patients referred to HIPP by donors will receive assistance. | Dkt. 29-2 (RJN Exh. 2, at 24); *see also* Dkt. 28-2 (Burton 2019 Decl. ¶ 41). |
| 96. Advisory Opinion 97-1 provides a safe harbor for HIPP, but only if "the arrangement in practice comports with the information provided" to the OIG. | Dkt. 29-2 (RJN Exh. 2, at 26); *see also* 42 C.F.R. § 1008.43; Dkt. 28-2 (Burton 2019 Decl. ¶ 5); Leland Decl. Exh. 8, at 126–27 (Amd'd. Resp. to AKF Req. for Adm'n No. 27). |
| 97. If HIPP were to materially deviate from practices described in Advisory Opinion 97-1, then AKF would lose its safe-harbor protection. | Dkt. 29-2 (RJN Exh. 2, at 26); 42 C.F.R. § 1008.43; *see also* Burton 2019 Decl. ¶¶ 5–8, 48–51; Burton 2022 Decl. ¶ 31; Leland Decl. Exh. 23, at 246–47, 251–53 (Freedman Rep. ¶¶ 23, 35, 83, 92–94). |
| 98. The OIG has never alleged or determined that AKF has operated HIPP out of strict compliance with Advisory Opinion 97-1. | Burton 2022 Decl. ¶ 46; *see also* Dkt. 28-2 (Burton 2019 Decl. ¶¶ 34–42); Leland Decl. Exh. 24, at 255–56. |
| **Uncontroverted Facts Regarding the Legislative History of Assembly Bill 290** | |
| 99. Assembly Member James Wood introduced AB 290 on January 28, 2019. | Leland Decl. Exh. 25, at 258. |
| 100. Like SB 1156, AB 290 was introduced to combat the purported | Leland Decl. Exh. 26, at 270, 273; Leland Decl. Exh. 27, at 280, 282–83; Leland |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| "steering" of dialysis patients to commercial insurance plans against their interest. | Decl. Exh. 28, at 290, 292–93; Leland Decl. Exh. 29, at 299–300; Leland Decl. Exh. 30, at 303, 307; Leland Decl. Exh. 31, at 316; Leland Decl. Exh. 32, at 321, 324; Leland Decl. Exh. 33, at 332; Leland Decl. Exh. 34, at 337–40 (Amd'd. Resp. to AKF Interrog. No. 3); Leland Decl. Exh. 35, at 353–56 (2d. Amd'd. Resp. to AKF Interrog. No. 3). |
| 101.  California legislators were aware that AKF had determined that it would be compelled to withdraw the HIPP program from California if AB 290 were to go into effect because of the risk that compliance with AB 290 would take AKF outside of the safe harbor protections of Advisory Opinion 97-1. | Dkt. 46-1 (Medley Decl. Exh. 2, at 1–2); Dkt. 28-2 (Burton 2019 Decl. ¶¶ 43, 48); Leland Decl. Exh. 1, at 8; Leland Decl. Exh. 36, at 365–66; Leland Decl. Exh. 37, at 368; Leland Decl. Exh. 38, at 372. |
| 102.  California's Legislative Counsel Bureau concluded that "the changes [to HIPP] required by AB 290 would remove the legal protection afforded by [Advisory] Opinion 97-1." | Dkt. 29-2 (RJN Exh. 3, at 33); Dkt. 28-2 (Burton 2019 Decl. ¶ 48); *see also* Leland Decl. Exh. 8, at 129 (Amd'd. Resp. to AKF Req. for Adm'n No. 31). |
| 103.  The Legislative Counsel Bureau acknowledged compliance with Advisory Opinion 97-1 in such | Dkt. 29-2 (RJN Exh. 3, at 35–36 & n.33). |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| circumstances "would be a factual determination made by the OIG and could involve consideration of facts not available to" the Bureau. | |
| 104.  The California legislature passed AB 290. | Leland Decl. Exh. 39, at 378–79. |
| 105.  On October 13, 2019, Governor Newsom signed AB 290. | Dkt. 28-2 (Burton 2019 Decl. ¶ 43); Leland Decl. Exh. 40, at 381. |
| **Uncontroverted Facts Regarding the "Steering" of Dialysis Patients** | |
| 106.  The California Department of Managed Health Care ("DMHC") regulates health care service plans and regulates 96% of health care carriers. | Leland Decl. Exh. 10, at 165 (Phillips Depo. at 17:2–12). |
| 107.  The DMHC is not aware of any ESRD patient in California who was "steered" by any Plaintiff into selecting a particular health care plan or insurance coverage. | Leland Decl. Exh. 10, at 152 (Phillips Depo. at 142:11–24); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. Exh. 8, at 117–19 (Amd'd. Resp. to AKF Req. for Adm'n Nos. 6, 8). |
| 108.  The DMHC is not aware of any complaints that it, or any other executive branch department, has received from any ESRD patient in California regarding such "steering." | Leland Decl. Exh. 10, at 153–54 (Phillips Depo. at 143:02–144:15); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| | Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4). |
| 109.   The DMHC is not aware of any steps it has taken to identify patients who were "steered." | Leland Decl. Exh. 10, at 152 (Phillips Depo. at 142:16–24); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4). |
| 110.   The DMHC has no evidence that DaVita, Fresenius, or U.S. Renal Care "steered" any California ESRD patients into selecting a particular health care plan or insurance coverage. | Leland Decl. Exh. 10, at 154 (Phillips Depo. at 144:02–15); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4). |
| 111.   The California Department of Healthcare Services ("DHCS") has a mission to provide Californians with access to affordable, integrated, high-quality healthcare. | Leland Decl. Exh. 41, at 390–91 (Mollow Depo. at 34:21–35:1). |
| 112.   The DHCS is not aware of any evidence of dialysis providers "steering" patients into a particular health care plan or insurance coverage. | Leland Decl. Exh. 41, at 394–96 (Mollow Depo. at 87:22–88:12, 89:4–11). |
| 113.   The DHCS is not aware of any complaints by ESRD patients being | Leland Decl. Exh. 41, at 395–96 (Mollow Depo. at 88:14–19, 88:21–89:2). |

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| "steered" into a particular health care plan or insurance coverage prior. | |
| 114.   The DHCS is not aware of any evidence underlying or supporting any of AB 290's legislative findings. | Leland Decl. Exh. 41, at 398–407 (Mollow Depo. at 91:18–100:18). |
| 115.   The California Department of Insurance ("CDI") regulates health insurers and regulates 4% of health care carriers. | Leland Decl. Exh. 10, at 139 (Phillips Depo. at 17:2–12). |
| 116.   The CDI is not aware of any ESRD patient in California who was "steered" by DaVita, Fresenius, or U.S. Renal Care into selecting a particular health care plan or insurance coverage. | Leland Decl. Exh. 42, at 427–28 (Ghoddoucy Depo. at 118:25–119:16); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4); Leland Decl. Exh. 8, at 117–19 (Amd'd. Resp. to AKF Req. for Adm'n Nos. 6, 8). |
| 117.   The CDI is not aware whether CMS received any specific allegations of DaVita, Fresenius, or U.S. Renal Care "steering" ESRD patients. | Leland Decl. Exh. 42, at 431 (Ghoddoucy Depo. at 126:04–24); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. No. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4). |
| 118.   The CDI is not aware of whether AKF has ever had any influence over which insurance plans patients select. | Leland Decl. Exh. 42, at 434 (Ghoddoucy Depo. at 147:15–18). |

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]

| **Uncontroverted Fact** | **Supporting Evidence** |
|---|---|
| 119.   The CDI is not aware of AKF ever having rejected a patient's application based on which dialysis provider referred the patient. | Leland   Decl.   Exh.   42,   at   442–43 (Ghoddoucy Depo. at 167:22–168:1). |
| 120.   The CDI is not aware of any complaints regarding the "steering" of ESRD patients. | Leland Decl. Exh. 42, at 416, 419, 426–28 (Ghoddoucy Depo. 18:14–17; 44:04–25; 117:14–118:6, 118:16–119:16). |
| 121.   The CDI did not undertake any efforts to address allegations of "steering." | Leland   Decl.   Exh.   42,   at   459–60 (Ghoddoucy Depo. at 264:16–265:10); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. No. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4). |
| 122.   The   CDI   did   not   consider approaches to address the alleged "steering" of ESRD patients other than AB 290 and its predecessor, SB 1156. | Leland Decl. Exh. 42, at 460 (Ghoddoucy Depo. at 265:13–21); *see also* Leland Decl. Exh. 34, at 337–47 (Amd'd. Resp. to AKF Interrog. No. 3, 4); Leland Decl. Exh. 35, at 353–63 (2d. Amd'd. Resp. to AKF Interrog. Nos. 3, 4). |
| 123.   Laura Fiallos, who testified before the   California   legislature   about DaVita's alleged "steering" of ESRD patients, has not identified any patient who was "steered" into a commercial insurance plan. | Leland Decl. Exh. 43, at 484, 487–88, 491 (Fiallos Depo. at 57:12–14, 60:13–17, 60:23–61:06, 139:8–11); Leland Decl. Exh. 44, at 496–99 (Defs.' Rule. 26(a) Initial Disclosures). |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 124.   The DMHC understands the ban on "advising" patients to encompass more than "steering" them to commercial insurance plans. | Leland Decl. Exh. 10, at 148–52 (Phillips Depo. at 138:12–140:18, 141:11–14, 141:21–142:2). |
| 125.   The CDI understands the ban on "advising" patients to encompass more than "steering" them to commercial insurance plans. | Leland Decl. Exh. 42, at 422–23 (Ghoddoucy Depo. at 104:15–105:1). |
| 126.   The DMHC is not aware of any California patients who were harmed by the purported "steering" of ESRD patients. | Leland Decl. Exh. 10, at 160–61, 169–70 (Phillips Depo. at 165:11–166:11, 238:9–239:16). |
| 127.   The CDI is not aware of any California patients who were harmed by the purported "steering" of ESRD patients. | Leland Decl. Exh. 42, at 437–39, 446, 448–51 (Ghoddoucy Depo. at 160:07–162:22, 197:17–24, 199:07–201:05, 201:24–202:05). |
| 128.   The DMHC did not have any evidence that Californians are paying higher insurance premiums due to the "steering" of ESRD patients. | Leland Decl. Exh. 10, at 157 (Phillips Depo. at 152:14–20). |
| 129.   The CDI did not conduct any analysis regarding how HIPP would impact Californians' commercial insurance premiums. | Leland Decl. Exh. 42, at 453, 455–56 (Ghoddoucy Depo. at 204:2–22, 206:23–207:05). |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 130.   The State is aware of potential alternatives to the restrictions imposed by AB 290. | Leland Decl. Exh. 10, at 142–45 (Phillips Depo. at 74:14–77:25); Leland Decl. Exh. 42, at 463–64 (Ghoddoucy Depo. 271:25–272:09); Leland Decl. Exh. 45, at 505–07 (Waterman Rep. at 2–4); *see also* Leland Decl. Exh. 46, at 509–521. |
| **Uncontroverted Facts Regarding the Impact of AB 290 on Plaintiffs If It Goes into Effect** | |
| 131.   AKF has determined that it cannot seek a revised Advisory Opinion from the OIG because doing so could jeopardize HIPP nationwide. | Dkt. 28-2 (Burton 2019 Decl. ¶ 49); Burton 2022 Decl. ¶ 36. |
| 132.   AKF will withdraw its operations from California if AB 290 goes into effect. | Dkt. 28-2 (Burton 2019 Decl. ¶¶ 8, 10, 43, 52); Burton 2022 Decl. ¶¶ 36, 40; Leland Decl. Exh. 47, at 524; Leland Decl. Exh. 48, at 530; Leland Decl. Exh. 49, at 533; Leland Decl. Exh. 50, at 535–36. |
| 133.   AKF ceased providing new ESRD patients in California with HIPP assistance until the Court entered the preliminary injunction. | Dkt. 28-1 (Jamgochian Decl. ¶ 12). |
| 134.   Upon its departure, AKF will no longer provide assistance to low-income ESRD patients in California. | Dkt. 28-2 (Burton 2019 Decl. ¶ 8); Burton 2022 Decl. ¶ 36; Leland Decl. Exh. 47, at 524; Leland Decl. Exh. 49, at 533; Leland Decl. Exh. 51, at 539. |

| Uncontroverted Fact | Supporting Evidence |
|---|---|
| 135. Upon AKF's departure, the California patients who receive HIPP assistance may lose health insurance. | Dkt. 28-2 (Burton 2019 Decl. ¶¶ 8, 10, 44); Leland Decl. Exh. 47, at 524; Leland Decl. Exh. 51, at 539. |
| 136. If AB 290 goes into effect, it will disincentivize AKF's donators from continuing to donate and AKF will have less funds to provide patient assistance as a result. | Burton 2022 Decl. ¶ 37. |

## II.   CONCLUSIONS OF LAW SUPPORTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standards.

1.   "Summary judgment is proper if 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Seaman v. Pyramid Techs., Inc.*, No. SACV 10-00070 DOC (RNBx), 2011 WL 5508971, at *2 (C.D. Cal. Nov. 7, 2011) (citing Fed. R. Civ. P. 56) (Carter, J.); *see also* Fed. R. Civ. Proc. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

2.   This standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

3.   "A party cannot create a genuine issue of material fact simply by making assertions in its legal papers.  There must be specific, admissible evidence identifying the basis for the dispute." *Seaman*, 2011 WL 5508971, at *2.

4.   Federal Rules of Civil Procedure Rule 56(a) also enables a party to move for partial summary judgment.

5.     "Under Federal Rules of Civil Procedure, Rule 56(g), a court may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Ready Pac Foods, Inc.*, 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011).

6.     In this way, "Rule 56(g) allows a court to grant partial summary judgment, thereby reducing the number of facts at issue in a trial." *Id.*

**B.     The Provisions of AB 290.**

7.     AB 290 defines "financially interested entities" as the following: "(A) A provider of health care services that receives a direct or indirect financial benefit from a third-party premium payment," and "(B) An entity that receives the majority of its funding from one or more financially interested providers of health care services, parent companies of providers of health care services, subsidiaries of health care service providers, or related entities." AB 290 §§ 3(h)(2), 5(h)(1).

8.     AB 290 requires financially interested entities making third-party premium payments to inform applicants for premium assistance about "all available health coverage options," including Medicare, Medicaid, individual market plans, and employer plans. AB 290 §§ 3(b)(3), 5(b)(3); Dkt. 28-2 (Burton 2019 Decl. ¶ 50).

9.     AB 290 requires a financially interested entity making third-party premium payments to agree "not to steer, direct, or advise the patient into or away from a specific coverage program option or health care service plan contract." AB 290 §§ 3(b)(4), 5(b)(4); Cal. Health & Safety Code § 1367.016(b)(4); Dkt. 28-2 (Burton 2019 Decl. ¶ 50).

10.     AB 290 requires financially interested entities making third-party premium payments to provide financial assistance for the full plan year and to notify the patient before an open enrollment period if that assistance is to be discontinued. AB 290 §§ 3(b)(1), 5(b)(1).

11.     AB 290 requires that financial assistance must not be conditioned on

eligibility for, or receipt of, any surgery, transplant, procedure, drug, or device.   AB
290 §§ 3(b)(2), 5(b)(2).

12.    AB 290 requires that financial assistance must not be conditioned on the
use of any particular facility, healthcare provider, or coverage type.  AB 290 §§ 3(b)(5),
5(b)(5).

13.    AB 290 requires a financially interested entity making third-party premium
payments to provide an annual statement to health care service plans certifying that the
entity is in compliance with Sections 3(b) and 5(b).  AB 290 §§ 3(c)(1), 5(c)(1).

14.    AB 290 states that a financially interested entity "shall not make a third-
party premium payment . . . [unless it] [d]iscloses to the health care service plan . . . the
name of the enrollee for each health care service plan contract on whose behalf a third-
party premium payment described in this section will be made."  AB 290 §§ 3(c)(2),
5(c)(2); Dkt. 28-2 (Burton 2019 Decl. ¶ 45).

15.    AB 290 provides that "[f]or financially interested entities covered by
Advisory Opinion No. 97-1 . . . , Sections 3 to 6, inclusive, of this act shall become
operative on July 1, 2020, unless one or more parties to Advisory Opinion 97-1 requests
an updated opinion" and "notifies the [State] of that request[.]"  AB 290 § 7.

**C.    The First Amendment Right of Free Speech.**

16.    The right of free speech, right to associate, and right to petition are
protected by the First Amendment.  U.S. Const. amend. I.

17.    When speech rights are restricted based on either the content of the speech
or the identity of the speaker, such restrictions are "content-based."  *Sorrell v. IMS
Health Inc.*, 564 U.S. 552, 564–66 (2011).

18.    "Mandating speech that a speaker would not otherwise make necessarily
alters the content of the speech" and thus constitutes a "content-based regulation."  *Riley
v. Nat'l Fed'n of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795 (1988); *see also
Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162–65 (2015).

19.    Content-based regulations of speech are presumptively invalid unless the

government proves the restrictions are (1) justified by a compelling government interest, and (2) narrowly drawn to serve that interest. *See Reed*, 576 U.S. at 163; *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011); *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018); *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

20.   To satisfy strict scrutiny, the government must identify an "actual problem" that would justify the statute at issue. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000).  The government "must do more than simply posit the existence of the disease sought to be cured." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (internal quotation marks omitted); *see also Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) (similar)*; IMDB.com, Inc. v. Becerra*, 257 F. Supp. 3d 1099, 1102 (N.D. Cal. 2017), *aff'd*, 962 F.3d 1111 (9th Cir. 2020) (finding a restriction must be "actually necessary" to serve a compelling government interest).

21.   To satisfy strict scrutiny, any content-based regulation must be the least restrictive option possible. *Playboy Entm't Grp.*, 529 U.S. at 813.

22.   Speech constitutes "commercial speech" where "the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)).

23.   An "economic motivation" alone does not render speech "commercial speech." *IMDB.com*, 962 F.3d at 1122; *see also Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) ("[E]conomic motive in itself is insufficient to characterize a publication as commercial.").

24.   The mere solicitation of charitable donations does not render speech "commercial speech." *See Vill. of Schaumberg v. Citizens for a Better Env't*, 444 U.S. 620, 631–32 (1980).

25.   Commercial speech restrictions are assessed under intermediate scrutiny. *See Sorrell*, 564 U.S. at 571–72.  Under intermediate scrutiny, the State must establish

that a speech restriction (1) "furthers an important or substantial governmental interest" and (2) that it advances the asserted interest "in a direct and material way" that it "is no greater than is essential to the furtherance of that interest." *Turner Broad.*, 512 U.S. at 662, 664 (citation omitted); *see also Sorrell*, 564 U.S. at 571–72 (finding the "commercial speech inquiry" requires showing "that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest").

> **D.** **The First Amendment Right to Associate.**

26.     The First Amendment protects the right to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

27.     "Association for the purpose of engaging in protected activity is itself protected by the First Amendment." *Santopietro v. Howell*, 857 F.3d 980, 989 (9th Cir. 2017).

28.     An organization "must engage in some form of expression, whether it be public or private" to qualify for First Amendment protection as an "expressive association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 649 (2000).

29.     The right to associate protects against "compelled disclosure" because "'[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958)).

30.     Charitable donations are protected by the right of association. *See Roberts*, 468 U.S. at 622 (explaining that "charitable" activities are "worthy of constitutional protection under the First Amendment"); *see also Bigelow v. Virginia*, 421 U.S. 809, 818 (1975) (state may not prohibit protected activity merely because it involves a financial gain); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) (publication of for-profit works constitutes "a form of expression whose liberty is safeguarded by

the [F]irst [A]mendment").

### E.     The First Amendment Right to Petition.

31.     The right to petition is subject to the same constitutional analysis as the right to free speech.  *See Wayte v. United States*, 470 U.S. 598, 610 n.11 (1985).

### F.     The Void for Vagueness Doctrine.

32.     Laws that fail to give "ordinary people fair notice of the conduct" that is prohibited are void for vagueness.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (internal quotation marks omitted).

33.     Laws are void for vagueness when they "authorize[] or even encourage[] arbitrary . . . enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 555 (9th Cir. 2004); *Women's Med. Ctr. of Nw. Houston v. Bell*, 248 F.3d 411, 422 (5th Cir. 2001).

### G.     Impossibility Conflict Preemption.

34.     The federal conflict preemption doctrine applies "when it is impossible for a private party to comply with both state and federal requirements."  *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1672 (2019) (internal quotation marks omitted); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011).

35.     "The question for 'impossibility' is whether the private party c[an] independently do under federal law what state law requires of it."  *PLIVA*, 564 U.S. at 620.  It is not enough to "imagine that a third party or the Federal Government *might* do something that makes it lawful for a private party to accomplish under federal law what state law requires of it."  *Id.*  Thus, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes."  *Id.* at 623–24.

### H.     Obstacle Preemption.

36.     The federal conflict preemption doctrine also applies where state law is "an obstacle to the accomplishment and execution of the important means-related

1    federal objectives" enshrined in federal law.  *Geier v. Am. Honda Motor Co.*, 529 U.S.

2    861, 881 (2000) (internal quotation marks omitted).

3        37.    Obstacle preemption applies when a specialized federal enforcement

4    regime would be thwarted by state legislation.  *See Ingersoll-Rand Co. v. McClendon*,

5    498 U.S. 133, 144 (1990); *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990).

6

7    Dated: February 25, 2022            **KING & SPALDING LLP**

8

9                                       By:  */s/Joseph N. Akrotirianakis*
                                             JOSEPH N. AKROTIRIANAKIS
10                                           MATTHEW M. LELAND

11                                           Attorneys for Plaintiffs
                                             JANE DOE, STEPHEN ALBRIGHT,
12                                           AMERICAN KIDNEY FUND, INC.,
                                             and DIALYSIS PATIENT CITIZENS,
13                                           INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT [L.R. 56-1]