ROB BONTA
Attorney General of California
MARK R. BECKINGTON, SBN 126009
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorneys General
LISA J. PLANK, SBN 153737
S. CLINTON WOODS, SBN 246054
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6046
  Fax: (916) 324-8835
  E-mail: Matthew.Wise@doj.ca.gov
*Attorneys for Defendants Rob Bonta, et al.*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| **JANE DOE; STEPHEN ALBRIGHT; AMERICAN KIDNEY FUND, INC.; and DIALYSIS PATIENT CITIZENS, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his Official Capacity as Attorney General of California; RICARDO LARA in his Official Capacity as California Insurance Commissioner; SHELLY ROUILLARD in her official Capacity as Director of the California Department of Managed Health Care; and TOMAS ARAGON, in his Official Capacity as Director of the California Department of Public Health,**<br><br>Defendants. | Case No. 8:19-cv-2105-DOC-ADS<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br><span style="color:red">**PROVISIONALLY REDACTED PURSUANT TO PENDING APPLICATION FOR LEAVE TO FILE UNDER SEAL**</span><br><br>Date:        May 2, 2022<br>Time:        8:30 a.m.<br>Courtroom:  9D<br>Judge:       The Honorable David O. Carter<br>Trial Date:  July 12, 2022<br>Action Filed: November 1, 2019 |

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................... 1

Background ........................................................................................... 2

    I.     The Dialysis Industry's Self-Funded Private Insurance Scheme ......... 2

    II.    California's Efforts to Regulate the Dialysis Industry ....................... 4

    III.   AKF's Plan to Leave California ............................................................. 6

Argument ............................................................................................. 8

    I.     AB 290 Does Not Violate Plaintiffs' First Amendment Rights ........... 8

        A.    AB 290's Steering Prohibition Neither Restricts AKF's Speech Nor Is Unconstitutionally Vague ................................. 8

            1.    AB 290's Steering Prohibition Permissibly Regulates Commercial Speech .................................... 8

            2.    AB 290's Steering Prohibition Is Sufficiently Clear ..... 15

        B.    AB 290's Reimbursement Cap and Anti-Discrimination Provision Do Not Violate AKF's Right of Association ........... 16

        C.    AB 290's Disclosure Provisions Do Not Unlawfully Compel Speech ........................................................................ 17

        D.    AB 290's Provision Allowing AKF to Request an Updated Advisory Opinion Does Not Abridge AKF's Right to Petition ........................................................................ 20

    II.    AB 290 Is Not Preempted by Federal Law ........................................ 20

        A.    Neither the Beneficiary Inducement Statute Nor Advisory Opinion 97-1 Preempt AB 290 ............................................... 21

            1.    AKF Can Comply with Both Federal and State Law ..... 21

            2.    Advisory Opinion 97-1 Does Not Impose a Requirement with the Force of Federal Law ................. 22

            3.    Advisory Opinion 97-1 Does Not Conflict with AB 290 ................................................................................. 23

        B.    The Medicare Secondary Payer Act Does Not Preempt AB 290 ........................................................................................ 24

Conclusion ......................................................................................... 25

i

# TABLE OF AUTHORITIES

Page

CASES

*Am. Acad. of Pain Mgmt. v. Joseph*
353 F.3d 1099 (9th Cir. 2004)................................................................8

*Arizona v. United States*
567 U.S. 387 (2012) .............................................................................21

*BlueCross and BlueShield of Fla. v. DaVita*
No. 19-cv-574 (M.D. Fla.)..................................................................12

*Bolger v. Youngs Drug Products Corp.*
463 U.S. 60 (1983) ................................................................................8

*Buckley v. Valeo*
424 U.S. 1 (1976) ................................................................................16

*Cal-Almond, Inc. v. U.S. Dep't of Agric.*
14 F.3d 429 (9th Cir. 1993)................................................................20

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*
447 U.S. 557 (1980) ..............................................................................9

*Christensen v. Harris Cty.*
529 U.S. 576 (2000) .............................................................................22

*City of Renton v. Playtime Theatres, Inc.*
475 U.S. 41 (1986) ..............................................................................10

*CTIA – The Wireless Ass'n v. City of Berkeley*
928 F.3d 832 (9th Cir. 2019)........................................................19, 20

*DaVita Inc. v. Amy's Kitchen, Inc.*
981 F.3d 664 (9th Cir. 2020)..............................................................25

*Edenfield v. Fane*
507 U.S. 761 (1993) ..................................................................9, 12, 14

*Edge v. City of Everitt*
929 F.3d 657 (9th Cir. 2019)........................................................15, 16

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

*English v. Gen. Elec. Co.*

4
    496 U.S. 72 (1990) ....................................................................... 25

5

*Fyock v. Sunnyvale*

6
    779 F.3d 991 (9th Cir. 2015)....................................................... 10

7

*Gammoh v. City of La Habra*

8
    395 F.3d 1114 (9th Cir. 2005)..................................................... 15

9

*Geier v. Am. Honda Motor Co.*
    529 U.S. 861 (2000) ................................................................... 25

10

*Grayned v. City of Rockford*

11
    408 U.S. 104 (1972) ................................................................... 15

12

*Hunt v. City of Los Angeles*

13
    638 F.3d 703 (9th Cir. 2011)................................................ 15, 16

14

*IMDB.com, Inc. v. Becerra*

15
    257 F. Supp. 3d 1099 (N.D. Cal. 2017)...................................... 10

16

*In re DaVita Inc. v. Stockholder Derivative Litig.*

17
    No. 17-152-MPT, 2019 WL 1855445 (D. Del. Apr. 25, 2019) ......... 12

18

*Interpipe Contracting, Inc. v. Becerra*

19
    898 F.3d 879 (9th Cir. 2018)...................................................1, 16

20

*Meese v. Keene*
    481 U.S. 465 (1987) ................................................................... 19

21

*Merck Sharp & Dohme Corp. v. Albrecht*

22
    139 S. Ct. 1668 (2019) ..........................................................21, 22

23

*Milavetz, Gallop & Milavetz, P.A. v. United States*

24
    559 U.S. 229 (2010) ................................................................... 18

25

*Minority Television Project, Inc. v. F.C.C.*

26
    736 F.3d 1192 (9th Cir. 2018) ................................................... 10

27

*Nat'l Endowment for the Arts v. Finley*

28
    524 U.S. 569 (1998) ................................................................... 15

1
2

### TABLE OF AUTHORITIES
(continued)

Page

3
4
*Nat'l Inst. of Family and Life Advocates v. Becerra*
    138 S. Ct. 2361 (2018) ............................................................... 19, 20

5
6
*Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*
    372 F. Supp. 3d 1139 (D. Colo. 2019) ....................................... 11

7
8
*PLIVA, Inc. v. Mensing*
    564 U.S. 604 (2011) ..................................................................... 21

9
*Reed v. Town of Gilbert*
    576 U.S. 155 (2015) ....................................................................... 8

10
11
*Reid v. Johnson & Johnson*
    780 F.3d 952 (9th Cir. 2015) ...................................................... 23

12
13
*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*
    487 U.S. 781 (1988) ............................................................... 18, 19

14
15
*United States, ex. rel. Gonzalez v. DaVita Health Care Partners*
    No. 166-cv-11840-NMG (D. Mass) .............................................. 12

16
17
*United States v. Diaz*
    876 F.3d 1194 (9th Cir. 2017) .................................................... 24

18
19
*United States v. Mead Corp.*
    533 U.S. 218 (2001) ..................................................................... 22

20
*United States v. Williams*
    553 U.S. 285 (2008) ..................................................................... 15

21
22
*Village of Schaumburg v. Citizens for a Better Env'tt*
    444 U.S. 620 (1980) ................................................................. 9, 19

23
24
*Wos v. E.M.A. ex rel. Johnson*
    568 U.S. 627 (2013) ..................................................................... 22

25
26
*Wyeth v. Levine*
    555 U.S. 555 (2009) ..................................................................... 23

27
28
*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*
    471 U.S. 626 (1985) ....................................................... 1, 18, 19, 20

# TABLE OF AUTHORITIES
### (continued)

**Page**

**STATUTES**

Assembly Bill 290 ................................................................................................*passim*
   § 1(b)...........................................................................................................5
   § 1(c)..................................................................................................*passim*
   § 1(d)....................................................................................................5, 17
   § 1(e)....................................................................................................5, 13
   § 1(g)......................................................................................................5, 9
   § 1(h).........................................................................................................7
   § 1(i)...................................................................................................15, 19
   § 2..........................................................................................................14
   § 2(a)....................................................................................................6, 8
   § 3...........................................................................................................6
   § 3(b)(2)..................................................................................................17
   § 3(b)(3).......................................................................................6, 17, 20
   § 3(b)(4)...................................................................................................8
   § 3(b)(5)...................................................................................................6
   § 3(c).........................................................................................6, 17, 20
   § 3(d)(1)...................................................................................................7
   § 3(e).......................................................................................................6
   § 3(e)(1)..................................................................................................16
   § 3(h)(3)..................................................................................................23
   § 3(j).......................................................................................................6
   § 3(m).......................................................................................................5
   § 4..........................................................................................................14
   § 5...........................................................................................................6
   § 5(b)(2)..................................................................................................17
   § 5(b)(3)..................................................................................................17
   § 5(d)(1)...................................................................................................7
   § 5(h)(2)..................................................................................................23
   § 5(j).......................................................................................................6
   § 7...............................................................................................7, 20, 24

Public Law 114-255
   § 17006....................................................................................................4

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

United States Code, Title 42

4

§§ 1320a-7a, *et seq.* ........................................................... 20

§ 1395y(b)(1)(C)(i) ............................................................. 24

5

§ 1395y(b)(1)(C)(ii) ............................................................ 25

6

**CONSTITUTIONAL PROVISIONS**

7

United States Constitution

8

First Amendment .......................................................... *passim*

9

**OTHER AUTHORITIES**

10

Advisory Opinion 97-1 ................................................... *passim*

11

*Merriam-Webster's Third New International Dictionary* (2002) ........................... 16

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

A few years after reforms enacted by the Affordable Care Act broadened the insurance options of end-stage renal disease (ESRD) patients, the California Legislature joined regulators, lawmakers, and courts nationwide in scrutinizing a disturbing development in the dialysis industry—the proliferation of steering of patients into commercial insurance. For good reason. This practice not only "result[s] in an unjust enrichment of the financially interested provider," but "expose[s] patients to direct harm" and comes "at the expense of consumers purchasing health insurance." AB 290, § 1(c). Assembly Bill 290 tackles this problem head-on by prohibiting steering and by capping the reimbursement rates that have served as the financial incentive to steer patients.

Plaintiff American Kidney Fund (AKF), which accepts "donations" from providers to cover the insurance premiums of the providers' patients, is the middleman in this scheme. AKF claims that AB 290's implementation would require AKF to "halt" its assistance to ESRD patients in California and nationwide. ECF No. 132, Pls.' MPA 2. But that is AKF's choice, not a consequence of the law. While Plaintiffs may disagree with the Legislature's policy choices, they have not alleged a cognizable legal claim.

Plaintiffs first raise an assortment of First Amendment arguments. None has merit. AB 290's steering prohibition is constitutionally sound: it does not restrict AKF from appropriately assisting patients, and it provides fair notice of the prohibited conduct. AB 290's reimbursement cap does not implicate AKF's right of association because AKF has no First Amendment right to "amass funds" from dialysis providers. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 892 (9th Cir. 2018). Nor do AB 290's disclosure provisions unlawfully coerce speech; they require only the truthful disclosure of "purely factual and uncontroversial information." *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). And the provision in AB 290 allowing AKF to

request an updated advisory opinion from the U.S. Department of Health and Human Services (HHS) Office of the Inspector General (OIG) does not violate any First Amendment right because it does not compel AKF to do anything at all.

Nor is AB 290 preempted by federal law.  Plaintiffs allege that AB 290 is preempted by the federal Beneficiary Inducement Statute because Advisory Opinion 97-1—an opinion issued by OIG long ago—concluded that AKF's premium assistance program did not violate that statute.  But neither that statute nor the Opinion impose a mandate with the force of federal law, and so neither preempts AB 290.  Plaintiffs also allege that AB 290 is preempted by the Medicare Secondary Payer Act (MSPA).  This claim fails because AB 290, which treats all ESRD patients equally, presents no obstacle to MSPA provisions that prohibit disparate treatment of patients based on their Medicare eligibility or ESRD status.

This Court should reject Plaintiffs' attempt to upset the careful balance struck by the Legislature to address steering and its attendant harms while preserving AKF's ability to assist patients in need.  Plaintiffs' motion should be denied.

## BACKGROUND

### I. THE DIALYSIS INDUSTRY'S SELF-FUNDED PRIVATE INSURANCE SCHEME

End-stage renal disease "is irreversible and permanent."  ECF No. 128-5, Defendants' Statement of Uncontroverted Facts and Conclusions of Law (SUF) 1.  ESRD patients require a kidney transplant or regular dialysis to survive.  SUF 2.  Recognizing the necessity and high costs of treatment, Congress permitted ESRD patients, regardless of age, to obtain Medicare coverage when it enacted the Social Security Amendments of 1972.  SUF 3.  Medicare covers a range of services to treat kidney failure, including transplant and dialysis services, along with other health care needs.  SUF 4.  Some patients may qualify for and receive coverage through both Medicare and Medi-Cal, California's Medicaid system.  SUF 5.

In 2010, the Patient Protection and Affordable Care Act (ACA) enacted a set of reforms "to make health insurance more affordable and accessible to millions of

Americans." SUF 6. One such reform, which took effect on January 1, 2014, "prohibited insurers . . . from imposing pre-existing condition exclusions" and required them "to guarantee the availability and renewability of non-grandfathered health plans to any applicant." *Id*. Under this "guaranteed issue" provision, among other ACA provisions, ESRD patients can no longer be denied coverage or charged higher premiums based on their health status. *See id.*

These provisions, together with the "higher reimbursement rates available through private coverage when compared to Medicare," "in effect created a financial incentive for dialysis facilities to leverage [the higher rates] by providing premium assistance to ESRD patients"—primarily through a third party entity, AKF—"and inappropriately steering them to purchase coverage in the individual market." SUF 7. HHS became concerned that health care providers were "encouraging individuals to make coverage decisions based on the financial interest of the health care provider, rather than the best interests of the individual patients." SUF 8. Based on this concern, the Centers for Medicare & Medicaid Services (CMS), a subdivision of HHS, issued a Request for Information on August 23, 2016, seeking public comment "about health care providers and provider-affiliated organizations steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan for the purpose of obtaining higher payment rates." SUF 9. In response, CMS received over 800 public comments from patients, providers, and other stakeholders. SUF 10.

These comments "documented a range of concerning practices, with providers and suppliers"—such as DaVita and Fresenius—"influencing enrollment decisions in ways that put the financial interest of the supplier above the needs of patients." *Id*. In particular, commenters noted that patients "are sometimes specifically discouraged from pursuing Medicare or Medicaid" and "are unaware that a dialysis facility is seeking to enroll them in the individual market," and that facilities "retaliate against social workers who attempt to disclose additional information to

consumers." SUF 11.  Commenters agreed that these practices are fueled by a powerful incentive—the considerably higher rates at which commercial coverage reimburses dialysis providers as compared to public coverage.  SUF 12.  Even more troubling, HHS's own data and the comments "suggest[ed] that this inappropriate steering of patients may be accelerating over time." SUF 13.[1]

The comments also reflected three types of possible harms to patients: "[n]egatively impacting patients' determination of readiness for a kidney transplant, potentially exposing patients to additional costs for health care services, and putting individuals at significant risk of a mid-year disruption in health care coverage." SUF 14.  In addition, comments "indicat[ed] that inappropriate steering practices"—which add ESRD patients to the individual market—"could have the effect of skewing the insurance risk pool."  SUF 15.

In the face of such harms, "which go to essential patient safety and care in life-threatening circumstances," CMS issued an interim final rule establishing new standards for Medicare-certified dialysis facilities that pay premiums for individual market health plans, whether directly or through another entity.  SUF 16.  Shortly after that rule was issued, it was enjoined for failure to comply with Administrative Procedures Act requirements.  SUF 17.  That decision was not appealed.

## II.   CALIFORNIA'S EFFORTS TO REGULATE THE DIALYSIS INDUSTRY

In the absence of federal regulations addressing inappropriate steering of dialysis patients, states across the country, including California, took action.  SUF

---

[1] CMS did not, of course, conclude that *every* commercially insured ESRD patient was steered into that insurance.  No one disputes that "commercial insurance may be more affordable than Medicare" "[f]or some ESRD patients," ECF No. 132-1, Pls.' SUFCL 55, particularly when AKF chooses to cover a patient's insurance premium —although Plaintiffs overstate the point.  *Compare id., with* Pls.' MPA 4 ("In *many* cases, commercial insurance is more affordable . . . .") (emphasis added). At the same time, Plaintiffs understate the affordability of public insurance options for ESRD patients.  *See, e.g.*, Pub. L. 114-255, § 17006 (allowing ESRD patients to enroll in Medicare Advantage plans, which limit out-of-pocket costs); Statement of Additional Material Facts (SAMF) 76 (testimony of René Mollow, Deputy Director of Health Care Benefits and Eligibility at the California Department of Health Care Services, that patients in Medi-Cal's ESRD program "don't have a spend-down requirement").

18.  In 2018, the California Legislature passed Senate Bill 1156, a predecessor to AB 290.  SUF 19.  But Governor Brown ultimately vetoed SB 1156 because it "would permit health plans and insurers to refuse premium assistance and to choose which patients they will cover."  SUF 20.

The following legislative session, the Legislature considered AB 290, which included provisions addressing the reason for Governor Brown's veto.  AB 290, § 3(m) (reaffirming obligations of health insurers, including the requirement not to "deny coverage to an insured whose premiums are paid by a third party").  Echoing CMS's concerns, the Legislature observed that "third-party payment arrangements have proliferated in recent years as a result of health care providers that have demonstrated a willingness to exploit the Affordable Care Act's guaranteed issue rules for their own financial benefit," which has the effect of "expos[ing] patients to direct harm."  AB 290, §§ 1(b)-(c).  The Legislature noted that this trend coincided with a rise in DaVita and Fresenius's "market dominance"—these companies now account for 92 percent of all dialysis industry revenue nationwide.  *Id.*, § 1(g).  The Legislature also embraced CMS's findings that "patients caught up in these schemes may face higher out-of-pocket costs and mid-year disruptions in coverage, and may have a more difficult time obtaining critical care such as kidney transplants."  *Id.*, § 1(d).  And the Legislature recognized that "[c]onsumers also pay higher health insurance premiums due to the distortion of the insurance risk pool" caused by inappropriate steering.  *Id.*, § 1(e).

AB 290 approaches the problem at hand from at least three angles.  First, AB 290's anti-steering provisions prohibit chronic dialysis clinics from "steer[ing], direct[ing], or advis[ing] a patient regarding any specific coverage program option or health care service plan contract"; require a "financially interested entity" that is making third-party premium payments to notify patients of alternative coverage options, including Medicare and Medicaid; and provide that financial assistance shall not be conditioned on use of any particular facility, healthcare provider, or

coverage type. *Id.*, § 2(a), §§ 3(b)(3) & 3(b)(5).[2]  Second, AB 290 caps the dialysis reimbursement rate for those patients receiving third-party premium assistance at the Medicare rate, or through an independent dispute resolution process.  *Id.*, § 3(e).[3]  Third, AB 290 requires that a financially interested entity providing premium assistance submit an annual statement of compliance with the law and disclose to health insurers the names of each insured patient who will receive premium assistance.  *Id.*, § 3(c).[4]

## III.   AKF'S PLAN TO LEAVE CALIFORNIA

AKF not only opposed AB 290, but notified the Legislature that it would "be forced to shut down in California if AB 290 is enacted" because, in its view, "AB 290 would take us outside the protection of our Advisory Opinion."  ECF No. 128-6, RJN, Ex. 1.[5]  That opinion, Advisory Opinion 97-1, issued by HHS's OIG in 1997 at AKF's request, concluded that AKF's practice of paying Medicare Part B and Medigap premiums for ESRD patients in financial need did not violate the

---

[2] The provisions in Section 3 of AB 290 that were added to the Health and Safety Code were also added to the Insurance Code in Section 5 of the bill.

[3] This provision also prohibits providers from billing or seeking reimbursement from the insured patient for services, except for co-payments according to the patient's insurance plan contract.  AB 290, § 3(e).  Given that third party entities such as AKF often provide patients with debit cards that patients then use to pay their premiums, SUF 21, prohibiting providers from directly billing enrollees facilitates the identification of patients receiving premium assistance.

[4] Insurance companies are then required to report to the California Department of Managed Health Care (DMHC) or California Department of Insurance (CDI), as applicable, the number of patients who received premium assistance, the identity of providers subject to the Medicare rate cap, and the identity of providers who failed to comply with the disclosure requirements.  AB 290, §§ 3(j) & 5(j).

[5] California's Legislative Counsel opined, in contrast, that based on the available facts, AKF "would remain in compliance with the arrangement approved in Advisory Opinion 97-1" if AB 290 were enacted and AKF "complies with the changes enacted by that bill."  SUF 66.  Just as it did in a legislative hearing on AB 290, RJN in Support of Defs.' Opp'n (Opp'n RJN), Ex. 2, AKF fails to accept this conclusion, and instead takes out of context an earlier snippet noting that compliance with AB 290 would remove Advisory Opinion 97-1's legal protections.  Pls.' MPA 7.  But directly following that clause, Legislative Counsel, foreshadowing its ultimate determination, clarified that it appeared that based on the reasoning in Advisory Opinion 97-1, AKF could comply with AB 290 without violating HIPAA.  SAMF 82-83.

federal prohibition against providing remuneration to Medicare-eligible individuals
if such remuneration is likely to influence the individual's health care choices.  SUF
63.  OIG found it significant that AKF, rather than dialysis providers, determined
which patients would receive AKF's Health Insurance Premium Program (HIPP)
assistance and that HIPP assistance was available regardless of the patient's
provider.  SUF 64.  AB 290 would have no impact on these aspects of HIPP.
Advisory Opinion 97-1 also specifies that it is "case specific" and "is limited in
scope to the specific arrangement described in this letter and has no applicability to
other arrangements, even those which appear similar in nature or scope."  SUF 65.[6]

     While AB 290 does not conflict with Advisory Opinion 97-1, the Legislature
nonetheless made a concerted effort to accommodate AKF's concerns that AB 290
and Advisory Opinion 97-1 are incompatible.  SUF 22.  In particular, the Senate
amended AB 290 so that it would not become operative as to financially interested
entities covered by Advisory Opinion 97-1 until July 1, 2020—and any entity that
requested an updated advisory opinion would be exempt until OIG issued an
opinion confirming that AB 290 does not conflict with federal law.  *Compare* ECF
No. 128-6, RJN, Ex. 2, *with* AB 290, § 7.  The Senate also amended the bill to
ensure that AKF could continue to provide premium assistance to patients who
were receiving assistance as of October 1, 2019, without complying with AB 290's
requirements.  *Compare* ECF No. 128-6, RJN, Ex. 2, *with* AB 290, §§ 3(d)(1))
& 5(d)(1).  Yet AKF maintained its plans to leave California at the end of 2019,
despite these amendments largely delaying AB 290's implementation.  SUF 71.

     Governor Newsom signed AB 290 on October 13, 2019.

---

[6] Much has changed since Advisory Opinion 97-1 was issued.  Back then,
ESRD patients generally lacked access to commercial insurance, and "less than ten
percent" of donations to AKF were from companies that owned dialysis providers.
SUF 67.  But now, reforms under the ACA have made commercial insurance more
widely available, and as AKF has expanded HIPP assistance to pay the premiums
of commercially-insured patients, the contributions of "[l]arge dialysis companies"
have grown to "more than 80 percent" of AKF's revenue.  AB 290, § 1(h); SUF 70.

## ARGUMENT

## I.   AB 290 DOES NOT VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS

### A.   AB 290's Steering Prohibition Neither Restricts AKF's Speech Nor Is Unconstitutionally Vague

AB 290 provides that a chronic dialysis clinic or financially interested entity cannot "steer, direct, or advise" a patient toward a specific coverage option or health care plan.  AB 290, §§ 2(a), 3(b)(4).  As shown below, this steering prohibition is constitutionally sound.

#### 1.   AB 290's Steering Prohibition Permissibly Regulates Commercial Speech

Plaintiffs allege that the steering prohibition "is a content based regulation of AKF's speech, and thus 'presumptively unconstitutional.'"  Pls.' MPA 9 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).  Not so.  The steering prohibition regulates commercial speech.  Under the governing test from *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), speech may be "characterized as commercial when (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing *Bolger*, 463 U.S. at 66-67).  While the combination of all of these characteristics strengthens the conclusion that the speech at issue is "properly characterized as commercial speech," it is not necessary for "each of the characteristics" to "be present in order for speech to be commercial." *Bolger*, 463 U.S. at 67 n.14.

The steering prohibition meets the latter two *Bolger* factors.  It primarily regulates patient interactions with dialysis social workers and insurance counselors, who are tasked with helping patients "obtain insurance and apply for financial assistance," and who "may face a perceived or actual conflict of interest in doing so, since they may recommend insurance options that help patients remain on

1   dialysis and maximize profits for the dialysis centers in which they work." SUF

2   23.[7]  The economic motive for these staff to promote a specific product—

3   commercial insurance, for which "reimbursement rates [] are many times the cost

4   associated with providing care"—is powerful.  AB 290, § 1(g).  Documents in the

5   legislative record, including J.P. Morgan research reports, detail how critical

6   commercial patients are to the providers' bottom line.  SUF 24 (e.g., report

7   describing the increase in "[i]nvestor concern regarding [DaVita's] commercial mix

8   and earning power" in light of the probability that DaVita was "receiving more than

9   its market share" of HIPP-supported commercial patients).  So do the providers'

10  communications with shareholders.  SUF 25 (assurance from Fresenius CEO that

11  loss of commercial payers in 2018 was "self-inflicted" and that the company would

12  "sort through what needs to be done and get it fixed").  ██████████████

13  █████████████████████████████████████████

14  ████████████████████████████████████ *See,*

15  *e.g.*, SUF 26.  The steering prohibition thus regulates a commercial transaction

16  between patients and providers.

17       Because commercial speech is at issue, intermediate scrutiny applies: AB 290

18  must directly advance a substantial governmental interest and do so in a manner

19  that is not more extensive than necessary.  *Central Hudson Gas & Elec. Corp. v.*

20  *Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).  Put another way, AB 290 must

21  tackle harms that are "real" and must "in fact alleviate them to a material degree."

22  *Edenfield*, 507 U.S. at 770-71.  Indeed, AB 290 is tailored to address a practice with

23  harms so compelling that the law would survive any level of scrutiny.

24       That practice—"encouraging," or steering "patients to enroll in commercial

25  insurance coverage for the financial benefit of the provider," AB 290, § 1(c)—is

26  _____

27       [7] Because the steering prohibition does not address charitable solicitation,
    Plaintiffs' cite to *Village of Schaumburg v. Citizens for a Better Environment*, 444
    U.S. 620, 632 (1980) for the principle that such solicitation is not "a variety of
    purely commercial speech," Pls.' MPA 11, is inapposite.

28

well documented.[8]  In addition to the CMS record, *ante* Background I, the SB 1156 legislative record refers to a Washington Office of the Insurance Commissioner (OIC) order requiring DaVita "to immediately stop engaging in the business of unauthorized insurance via steering dialysis patients into higher reimbursing plans by offering to pay premiums."  SUF 27.  Washington OIC took enforcement action after learning that DaVita insurance coordinator Cary Ancheta had attempted "to sign up approximately 30 kidney dialysis patients, most of whom [we]re receiving Medicaid," onto commercial insurance.  SUF 28.  The order was rescinded by stipulation of the parties on the condition, among other requirements, that DaVita counselors "not ask or urge dialysis patients to enroll in any particular kind of insurance from any particular insurer" for a period of two years.  SUF 29.

That investigation also uncovered evidence provided by a former DaVita social worker of a DaVita PowerPoint presentation directing insurance counselors and social workers "to 'target' Medicaid eligible patients to get them to purchase commercial insurance."  SUF 30.  Known as "Medicaid Opportunity," this program, which began in 2015, was designed to increase the number of Medicaid patients enrolled in an individual market plan (paid for with HIPP assistance) as primary coverage.  SUF 31.  DaVita set about to discuss this "absolutely amazing opportunity" with "every single" patient on Medicaid.  SUF 32.  DaVita considered this program a "true win-win situation" for patients and DaVita.  SUF 33.  DaVita's

---

[8] Plaintiffs mistakenly imply that the Legislature enacted AB 290 with the "hope [that] a justification [would] materialize[] in discovery."  Pls.' MPA 12 (quoting *IMDB.com, Inc. v. Becerra*, 257 F. Supp. 3d 1099, 1102 (N.D. Cal. 2017), *aff'd*, 962 F.3d 1111 (9th Cir. 2020)).  As methodically presented here, the Legislature was well aware of evidence of steering from numerous sources, including the CMS record, enforcement actions in other states, and news coverage of such practices.  In any event, Defendants are not confined to "the legislative history of the enactment" in defending AB 290; they are "entitled to rely on any evidence 'reasonably believed to be relevant' to substantiate its important interests."  *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015) (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)); *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1199 (9th Cir. 2018) (en banc) (observing that the Supreme Court "has looked beyond the [legislative] record [] at the time of enactment" "[a]s a matter of course" in its First Amendment jurisprudence).

efforts to enroll patients in HIPP to facilitate the move to private primary insurance were meticulously tracked, and staff were urged to use "additional hours" to ensure that every patient was "educated" on HIPP availability.  SUF 34.[9]

████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████

     While the provider plaintiffs are unwilling to publicly admit that they have engaged in patient steering, this practice has achieved notoriety in recent years.  It has been the subject not only of federal rulemaking and state regulatory efforts, but of numerous lawsuits.  One federal court, observing that DaVita's "own definition of 'steering' [] as legal communications with ESRD patients" was "a weak plausible alternative explanation as to the meaning of the statement that it 'does not steer,'" concluded that there was a "strong inference that [DaVita] made statements about steering and the source of [DaVita's] financial success with the intent to manipulate, deceive, or defraud."  SUF 37 (*Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1155 (D. Colo. 2019); *id.* at 1143, 1147 (denying DaVita's motion to dismiss securities fraud class action alleging that DaVita made false and misleading statements about steering patients

---

[9] Former DaVita insurance specialist Laura Fiallos corroborated the existence and purpose of the "Medicaid Opportunity" scheme at a legislative hearing on AB 290, testifying that she had "watched DaVita increasingly push to have more commercially insured patients in their clinics" through this program.  SAMF 79.

toward private insurance and the impact on its performance)).  Another federal court determined that it was "reasonable to infer . . . that the Medicaid Opportunity initiative was part of a larger, systematic plan by DaVita's management to drive revenues and profitability through [DaVita's] AKF donations."  SUF 38 (*In re DaVita Inc. v. Stockholder Derivative Litig.*, No. 17-152-MPT, 2019 WL 1855445, \*14 (D. Del. Apr. 25, 2019); *id.* at \*1, \*12 (denying DaVita's motion to dismiss stockholder derivative action challenging specific Board decisions related to the Medicaid Opportunity initiative)).[10]  This industry scheme has also been the focus of countless news articles and investigative journalism (*see*, e.g., SUF 39) and even the report of a California-based House representative.  *See* ECF No. 128-1 at 17 nn.11-12.

As the old adage goes, where there's smoke, there's fire.  There is ample evidence that when the Legislature turned its attention to regulating patient steering, it was dealing with a "real" problem.  *See Edenfield*, 507 U.S. at 771.

Notably absent from Plaintiffs' moving papers is any mention of this evidence.  Instead, Plaintiffs suggest that Defendants must present direct evidence that a specific patient was steered to show that AB 290 addresses a real problem.  Pls.' MPA 13-14.  That is wrong.  That Defendants' representatives—who never purported to have firsthand knowledge of steering—could not identify a victim of steering does not suggest that "the State," Pls.' MPA 13, lacked sufficient evidence of the problem when AB 290 was enacted.[11]  Record evidence of personal anecdotes of misconduct has never been required to establish the existence of a substantial governmental interest.  Plaintiffs cite no authority to the contrary.

---

[10] Other similar lawsuits include *BlueCross and BlueShield of Fla. v. DaVita*, No. 19-cv-574 (M.D. Fla.), *see* ECF No. 128-4, Ex. 15, and *United States, ex. rel. Gonzalez v. DaVita Health Care Partners*, No. 166-cv-11840-NMG (D. Mass), *see* ECF No. 128-4, Ex. 16.

[11] Plaintiffs repeatedly conflate the Legislature and Defendants in their moving papers.  *See, e.g.*, Pls.' MPA 1-2, 6-7, 8, 14 (referring to them interchangeably as "the State").  The departments within the executive branch that Plaintiffs have sued are, of course, within an entirely separate branch of government from the Legislature.

Steering is thus a real problem—and it causes real harm.  As described in the CMS record and the legislative findings, *ante* Background I and II, steering injures patients in at least three ways.  First, patients steered into commercial insurance who would have been eligible for a kidney transplant under Medicare may be unable to demonstrate the financial means to care for a new kidney, given that HIPP assistance ends within months to a year of transplant.  SUF 40 (e.g., public comment of Dr. Teri Browne, observing that the expected loss of HIPP assistance post-transplant "results in dialysis patients not being eligible to get listed for a kidney transplant").  This "threat of cessation of health insurance benefits" not only impairs transplant eligibility but "may induce some patients to remain on dialysis and never pursue transplant."  SUF 41.  Second, patients steered into commercial insurance are saddled with high out-of-pocket expenses post-transplant when HIPP assistance ends, which may lead them to stop taking their immunosuppressant drugs, causing their transplant to fail.  SUF 42 (e.g., observation of Dr. Browne that post-transplant patients who were steered into commercial insurance get "stuck" with "impossibly high premiums" they "cannot afford").  Third, and relatedly, patients who are unable to "make other arrangements" face mid-year disruptions in coverage, leading to similarly bad outcomes.  SUF 43.

In addition to the harm to patients, steering raises health insurance premiums for a wide swath of the population because it "distort[s] [] the insurance risk pool." AB 290, § 1(e).  Various researchers and other groups have examined the potential scope of the problem.  SUF 44 (expert John Bertko projected a 5.3% premium increase in Covered California plans due to increase in ESRD enrollees, and cited Dr. Erin Trish's research letter estimating a 4.1% increase in individual market spending if 10% of non-aged Medicare enrollees with ESRD moved to the individual market); *id.* (Association of Health Insurance Plans provided examples of rise in insurance plan spending on ESRD services, including one plan's increase "from $1.7 million in 2013 to $36.8 million in 2015"); *id.* ████████████

1 ██████████████████████████████████████████

2 ███████████████████████ But the fact that an increase in commercially-insured

3 ESRD patients results in higher insurance premiums for everyone in the market is

4 not in serious dispute.[12]

5     By placing guardrails on staff communications with patients, the steering

6 prohibition "will in fact alleviate [these harms] to a material degree." *Edenfield*,

7 507 U.S. at 770. It "would remove a potential conflict of interest" from staff-

8 patient interactions, providing the space for independent advocacy organizations,

9 such as the Health Insurance Counseling and Advocacy Program (HICAP), to step

10 in to "help patients navigate the complexities of their different insurance options."

11 SUF 45; *see* AB 290, § 2. And together with the disclosure requirements, the

12 steering prohibition "[i]ncrease[s] transparency regarding coverage options and

13 third-party premium payments," which "is important for patients to be able to make

14 informed decisions and minimize their potential exposure to financial liabilities."

15 SUF 46.

16     This incremental, targeted approach directly advances California's substantial

17 interest in protecting ESRD patients and the condition of the insurance risk pool

18 without requiring more of providers and AKF than is necessary to serve the law's

19 purposes. Plaintiffs suggest that less restrictive alternatives to AB 290 are

20 available, Pls.' MPA 15, but provide no explanation as to how such approaches

21 would effectively address steering and its attendant harms. As explained below,

22 *post* Argument I.A.2, AB 290's steering prohibition carefully addresses the various

23

---

24 [12] AB 290 requires insurers to file a "schedule documenting the cost savings associated [with the law] and the impact on rates." AB 290, § 4. Plaintiffs question

25 whether AB 290 will result in lower insurance premiums because it does not also include a specific provision requiring insurers to pass on savings to consumers.

26 Pls.' MPA 14. But they present no evidence that cost savings would not flow naturally from a healthier risk mix, given the close relationship between the risk

27 of the pool and insurance premiums. *See* SAMF 80; *see also* Opp'n RJN, Ex. 1 (DMHC premium rate review FAQ explaining that health plan premiums increase

28 due to a variety of factors, including "when individuals use more health care services than expected or when they require expensive care").

forms of persuasion used by providers to enroll patients in commercial insurance; a
narrower ban would risk allowing some of these methods to continue unabated.
And had state anti-fraud laws sufficiently deterred providers from steering patients,
then regulators, lawmakers, and courts would not have taken notice of, and needed
to address, this mushrooming problem.  As one of Defendants' experts put it, AB
290 serves unique and important purposes as part of a "larger fabric of regulatory
changes occurring nationwide."  SAMF 81.

### 2.    AB 290's Steering Prohibition Is Sufficiently Clear

AB 290's steering prohibition is also sufficiently definite to "give the person
of ordinary intelligence a reasonable opportunity to know what is prohibited, so that
he may act accordingly." *Edge v. City of Everitt*, 929 F.3d 657, 664 (9th Cir. 2019)
(quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).  A statute will
generally survive a vagueness challenge so long as the speaker is not "compelled to
steer too far clear of any forbidden area" of speech.  *Nat'l Endowment for the Arts
v. Finley*, 524 U.S. 569, 588 (1998) (internal quotation marks omitted).  Indeed,
"perfect clarity and precise guidance have never been required even of regulations
that restrict expressive activity." *Edge*, 929 F.3d at 664 (quoting *United States v.
Williams*, 553 U.S. 285, 304 (2008)).

Here, the term "advise" is not difficult to understand, particularly "when read
in context with the entire provision." *Hunt v. City of Los Angeles*, 638 F.3d 703,
714 (9th Cir. 2011).  The steering prohibition addresses the concerning practice of
"[e]ncouraging patients to enroll in commercial insurance coverage for the financial
benefit of the provider."  AB 290, § 1(c).  Its purpose is thus to "shield patients
from potential harm caused by being steered into coverage options that may not be
in their best interest." *Id.*, § 1(i).  Taken together, "steer, direct, or advise" covers
the forms of encouragement prohibited by AB 290.  When "used in combination,"
these terms "provide sufficient clarity." *Edge*, 929 F.3d at 665 (quoting *Gammoh v.
City of La Habra*, 395 F.3d 1114, 1120 (9th Cir. 2005)).  Providing factual

1    information or answering questions about plan options is permissible; telling or

2    prompting a patient to choose a certain option is not.  The term "advice" is thus

3    "reasonably ascertainable to a person of ordinary intelligence."  *Id*. at 666.

4         Plaintiffs' citation to their preferred definition of "advise" in the *Merriam-

5    Webster* dictionary—"to give information or notice to" or to "inform"—does not

6    help their argument.  Pls.' MPA 18 (quoting *Merriam-Webster's Third New

7    International Dictionary* 32 (2002)).  The more common meaning of "advise" is "to

8    give advice to" or "counsel" ("was *advised* to try a warmer climate"), to "caution"

9    or "warn" ("*advised* him of the danger"), and to "recommend" ("*advise* going

10   slow").  *Merriam-Webster* 32.  Another definition of "advise" is "to give advice" or

11   to "offer counsel"—for example, "an article written to inform, not to *advise*."  *Id.*

12   Given the Legislature's deliberate placement of "advise" directly after "steer" and

13   "direct," the plain meaning of the term is evident:  it connotes recommending a

14   particular course of action, not merely informing a patient of their options.  *Hunt*,

15   638 F.3d at 714 (term that may be "unclear when read in isolation" "find[s] clarity"

16   when interpreted "in context of the entire provision").

17   **B.  AB 290's Reimbursement Cap and Anti-Discrimination
         Provision Do Not Violate AKF's Right of Association**

18

19        AB 290 caps the reimbursement rate for those patients receiving third-party

20   premium assistance at the higher of the Medicare rate or a rate determined through

21   an independent dispute resolution process.  AB 290, § 3(e)(1).  Plaintiffs suggest

22   that this cap curtails the association of providers with AKF by imposing a financial

23   burden on their contributions.  Pls.' MPA 17.  But the Court has only recognized

24   "the right of an individual to contribute, not the right of a[n] . . . organization to

25   amass funds."  *Interpipe*, 898 F.3d at 892 (citing *Buckley v. Valeo*, 424 U.S. 1, 21

26   (1976) (per curiam)).  While AKF appears to assert that "the First Amendment right

27   applies equally to the contributor *and* the recipient," the Court has never

28

1  "establish[ed] an independent constitutional right of recipients to 'amass' funds."

2  *Id.*  AKF's argument, which "ignores this bedrock principle," *id.*, thus fails.

3        Nor is AKF's right of association infringed by AB 290's requirement that a

4  financially interested entity "agree not to condition financial assistance on

5  eligibility for, or receipt of, any surgery, transplant, procedure, drug, or device."

6  AB 290, §§ 3(b)(2) & 5(b)(2).  This provision addresses certain practices noted in

7  the CMS record that are harmful to patients, such as the withdrawal of premium

8  assistance when a patient receives a kidney transplant.  *See* AB 290, §§ 1(c) & (d);

9  SAMF 84 (CMS record shows that major non-profits "will not continue to provide

10  financial assistance once a patient receives a successful transplant").  AKF

11  misconstrues this provision, arguing that it would interfere with AKF's ability to

12  provide financial assistance to an ESRD patient for a "procedure" (e.g., dialysis) or

13  "transplant."  Pls.' MPA 20.  But the provision poses no First Amendment

14  problems because it would merely require entities such as AKF that offer premium

15  assistance not to discriminate against an ESRD patient who chooses the best course

16  of treatment—even if that treatment is not dialysis.

17      **C.**    **AB 290's Disclosure Provisions Do Not Unlawfully Compel Speech**

18

19        AB 290 requires a financially interested entity like AKF to inform HIPP

20  recipients of "all available health coverage options, including but not limited to,

21  Medicare, Medicaid, individual market plans, and employer plans."  AB 290,

22  §§ 3(b)(3) & 5(b)(3).  AB 290 similarly prohibits a financially interested entity

23  from making a third-party premium payment unless it provides an annual statement

24  of compliance with the law and discloses to a health insurer the name of each

25  insured patient who will receive premium assistance.  *Id.*, § 3(c).[13]  These are some

26           [13] While Plaintiffs claim that disclosing the names of HIPP recipients to insurers is "an intrusion on patients' privacy that AKF has never engaged in and

27  strongly rejects," Pls.' MPA 1, they fail to explain how a patient's identity would not be disclosed when AKF engages in its preferred method of conveying grant

28

of the key provisions in AB 290 that "support[] transparency for ESRD patients" and "assist [patients] in making informed decisions about how to finance their own care by removing potentially ethically compromising dynamics between AKF, dialysis providers, and private insurance companies." SUF 60. While Plaintiffs mistakenly apply the First Amendment tests for speech restrictions to these provisions, Pls.' MPA 10-15, they are the sort of disclosure requirements long held to be permissible under *Zauderer* and its progeny.

In *Zauderer*, the Supreme Court held that Ohio could require lawyers advertising contingency arrangements to disclose that clients might be liable for litigation costs if their cases were unsuccessful. 471 U.S. at 650-53. Noting the "material differences between disclosure requirements and outright prohibitions on speech," the Court recognized that there is only a "minimal" constitutionally protected interest in not providing "factual and uncontroversial information" to a consumer. *Id.* at 650, 651. The Court concluded that such disclosure requirements do not implicate First Amendment concerns as long as they "are reasonably related to the State's interest in preventing deception of consumers." *Id.* at 651.

Consistent with *Zauderer*, the Court has repeatedly acknowledged the government's authority to require disclosures of factual information that promote transparency. The Court has made clear that a requirement for fundraisers to "disclose unambiguously" their paid status "would withstand First Amendment scrutiny," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 799 n.11 (1988); has upheld a federal statute requiring attorneys advertising debt relief assistance to disclose that such relief would likely involve filing for bankruptcy, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 250 (2010); and has observed that a statutorily mandated disclosure of a film's connection to a federally registered agent of a foreign government would "better enable the public

_____

payments to insurers. SAMF 85 (AKF patient handbook states that "[w]hen possible, AKF will send grant payments directly to the insurance company").

to evaluate the [film's] import," *Meese v. Keene*, 481 U.S. 465, 480 (1987).  The

Court has also long recognized that requiring entities—including charitable

organizations—to "report certain information" on a routine basis does not offend

First Amendment interests.  *Schaumburg*, 444 U.S. at 637-38 n.12 (1980); *Riley*,

487 U.S. at 800 (same).

The Court's decision in *National Institute of Family and Life Advocates v.

Becerra*, 138 S. Ct. 2361 (2018) (*NIFLA*) did not undermine this precedent.  There,

the Court held that the *Zauderer* standard applies only if the compelled disclosure

involves "purely factual and uncontroversial" information.  *Id.* at 2372.  In so

holding, the Court "d[id] not question the legality of health and safety warnings

long considered permissible, or purely factual and uncontroversial disclosures about

commercial products."  *Id.* at 2376.  Thus, "[u]nder *Zauderer*, compelled disclosure

of commercial speech complies with the First Amendment if the information in the

disclosure is reasonably related to a substantial governmental interest and is purely

factual and uncontroversial."  *CTIA – The Wireless Ass'n v. City of Berkeley*, 928

F.3d 832, 845 (9th Cir. 2019).

AB 290's disclosure provisions meet this standard:  they implicate commercial

speech, are reasonably related to a substantial governmental interest, and are purely

factual and uncontroversial.  Like the steering prohibition, the disclosure provisions

regulate the discussion of a specific commercial product—in particular, commercial

insurance products—which providers have an economic motive to promote.  *Ante*

Argument I.A.[14]  And like the steering prohibition, the disclosure provisions are

reasonably related to California's substantial governmental interest in "shield[ing]

patients from potential harm caused by being steered into coverage options that

may not be in their best interest," AB 290, § 1(i); these provisions ensure that

---

[14] Plaintiffs deny that they are a part of this discussion, Pls.' MPA 10, but if
true, that is only because providers have shouldered the responsibility of discussing
coverage options with patients.  Providers have embraced this role; indeed, for a
time, DaVita even affirmatively advertised HIPP on its website.  SAMF 86.

patients are informed of their coverage options and that health plans and insurers receive the information necessary for the law to be properly implemented.

The disclosed information is also "purely factual and uncontroversial," as that requirement was further defined in NIFLA.  There, the Court specified that a purely factual statement was not uncontroversial where the statement "took sides in a heated political controversy." *CTIA*, 928 F.3d at 845 (citing *NIFLA*, 138 S. Ct. at 2372).  The Court further required that the statement "relate to the product or service that is provided by an entity subject to the requirement." *Id.* (citing *NIFLA*, 138 S. Ct. at 2372).  Here, the disclosure provisions require a financially interested entity to make truthful and neutral statements about a patient's health coverage options and receipt of premium assistance, *see* AB 290, §§ 3(b)(3), 3(c)—subjects that relate directly to the HIPP assistance that AKF provides patients.  These "purely factual and uncontroversial" statements meet the *Zauderer* standard, and thus, AB 290 permissibly regulates commercial speech.

### D.   AB 290's Provision Allowing AKF to Request an Updated Advisory Opinion Does Not Abridge AKF's Right to Petition

Finally, Plaintiffs allege that AB 290 abridges AKF's freedom to petition by delaying the law's effective date if AKF seeks a new advisory opinion. Pls.' MPA 18-19.  This argument mischaracterizes Section 7 of the law, which merely provides AKF the *option* to request an updated advisory opinion.  Without "a coerced nexus between the individual and the specific expressive activity," there is no First Amendment violation. *See Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 435 (9th Cir. 1993).

### II.   AB 290 IS NOT PREEMPTED BY FEDERAL LAW

Plaintiffs initially alleged that Advisory Opinion 97-1 preempts AB 290.  ECF No. 1, Compl. ¶ 85.  Now they shift gears, arguing that the federal Beneficiary Inducement Statute, 42 U.S.C. §§ 1320a-7a, *et seq.*—as interpreted by Advisory

1  Opinion 97-1—preempts state law.  Pls.' MPA 19.  Neither argument is correct.

2  Nor is there is a conflict between AB 290 and the Medicare Secondary Payer Act.

### A.   Neither the Beneficiary Inducement Statute Nor Advisory Opinion 97-1 Preempt AB 290

#### 1.   AKF Can Comply with Both Federal and State Law

6  Conflict preemption occurs when "compliance with both federal and state

7  regulations is a physical impossibility."  *Arizona v. United States*, 567 U.S. 387,

8  399 (2012) (internal quotation marks and citation omitted).  Plaintiffs identify no

9  provision of the Beneficiary Inducement Statute that is impossible to comply with

10  while also complying with AB 290.  Instead, Plaintiffs attempt to create a conflict

11  by asserting that compliance with AB 290 would require AKF to "depart" from

12  Advisory Opinion 97-1's determination that HIPP, as it existed in 1997, did not

13  violate the Beneficiary Inducement Statute.  Pls.' MPA 20.  This attempt fails

14  because the Beneficiary Inducement Statute simply prohibits "medical providers

15  from providing certain remuneration to Medicare or Medicaid beneficiaries."  *Id.* at

16  5.  It does not require HIPP to exist in any particular form—or to exist at all.

17  The drug-labeling cases cited by Plaintiffs provide an instructive contrast to

18  this case because in those cases, impossibility preemption resulted from a federal

19  *requirement* that directly conflicted with state law.  In *Merck Sharp & Dohme*

20  *Corp. v. Albrecht*, the Supreme Court held that to establish preemption of a state

21  law drug labeling claim, there must be "clear evidence" that the Food and Drug

22  Administration—which was required to approve the drug label in question—would

23  not approve the drug label as compelled by state law.  139 S. Ct. 1668, 1676-80

24  (2019).  Similarly, in *PLIVA, Inc. v. Mensing*, the Court found impossibility

25  preemption where federal laws required generic drug manufacturers to conform

26  their labels with those of the name-brand drug, while state regulations imposed

27  additional requirements on generic labeling.  564 U.S. 604, 618 (2011).  In both

28  cases, it was clear that federal law placed affirmative requirements on drug

manufacturers to label their products in certain ways, and that state laws imposing conflicting requirements may be preempted.

Here, there is no federal requirement for AKF to run a charitable program like HIPP, and thus no requirement that would make it impossible to comply with federal law and AB 290.  Given that the Supreme Court has "refused to find clear evidence of such impossibility where the laws of one sovereign permit an activity that the laws of the other sovereign restrict or even prohibit," *Merck*, 139 S. Ct. at 1678, this Court should conclude that AB 290 is not preempted by federal law.

> ## 2. Advisory Opinion 97-1 Does Not Impose a Requirement with the Force of Federal Law

The existence of Advisory Opinion 97-1 does not change the analysis because the Opinion lacks the force of federal law or regulation and thus cannot preempt state law.  Advisory Opinion 97-1 examines AKF's practice in 1997 of paying premiums for Medicare Part B and Medigap policies using funds that were donated in part by dialysis companies and concludes that the arrangement as described did *not* fall within the HIPAA remuneration prohibition.  SUF 63.  Advisory Opinion 97-1 is therefore a finding that AKF's practices with respect to the payment of Medicare Part B and Medigap policies, as described in 1997, complied with HIPAA.  It imposes no legal obligations on AKF or any other entity.  Nor does it immunize AKF from compliance with state law or purport to preempt state law.

Plaintiffs are thus incorrect to ascribe to Advisory Opinion 97-1 the mandate of federal law.  It is black letter law that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all . . . lack the force of law[.]"  *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000); *see also Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 643 (2013) (agency memorandum and letter approving of state statutory scheme for Medicaid reimbursement were "opinion letters, not regulations with the force of law"); *United States v. Mead Corp.*, 533 U.S. 218, 233 (2001) (federal agency's

1  "classification ruling" letters did not have the force of law when agency did not

2  engage in notice-and-comment, and did not bind third parties).

3       Although "an agency regulation with the force of law can pre-empt conflicting

4  state requirements," an agency action that was not the product of notice-and-

5  comment rulemaking does not have the force of law and thus cannot, by itself, have

6  preemptive effect. *Wyeth v. Levine*, 555 U.S. 555, 576, 580 (2009) (cleaned up);

7  *see also Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (9th Cir. 2015).

8  Accordingly, Advisory Opinion 97-1 does not have the force of federal law or

9  regulation and cannot preempt AB 290.

10              **3.    Advisory Opinion 97-1 Does Not Conflict with AB 290**

11       In any event, there is no conflict between the Advisory Opinion 97-1 and AB

12  290.  First, the Opinion's conclusion that AKF's practice of paying Medicare Part B

13  and Medigap premiums did not violate a federal prohibition does not immunize that

14  practice as it existed in 1997—or AKF's current practices, which differ

15  substantially—from the application of state consumer protection or insurance laws.

16  States routinely prohibit conduct that is not prohibited under federal law, and

17  nothing in the Opinion indicates that AKF *must* be permitted to pay Medicare Part

18  B and Medigap premiums, such that AB 290 conflicts with the Opinion.

19       Second, by its own express terms, Advisory Opinion 97-1 only considers

20  payments for Medicare Part B or Medigap premiums.  SUF 65 (Opinion is "case

21  specific" and "limited in scope to the specific arrangement described in this letter

22  and has no applicability to other arrangements, even those which appear similar in

23  nature or scope.").  It does not discuss premium payments for commercial insurance

24  or group health coverage.  Thus, the Opinion's restrictions would apply only to

25  payments for Medicare Part B or Medigap premiums, neither which fall within the

26  scope of AB 290.  *See* AB 290, §§ 3(h)(3) & 5(h)(2).

27       Plaintiffs rely on the testimony of their attorney "expert," Laurence J.

28  Freedman, to attempt to show that because AB 290 requires AKF to disclose a

HIPP recipient's identity to their insurer, the disclosure will lead the recipient to determine that their provider is a donor, and the recipient will then feel obligated to stay with their provider—a chain of events which they allege is contrary to Advisory Opinion 97-1.  Pls.' MPA 20-21.  The Court should disregard the testimony of Mr. Freedman, as it consists of legal conclusions on ultimate issues of law.  ECF No. 142; *see also United States v. Diaz*, 876 F.3d 1194, 1196-97 (9th Cir. 2017).  His analysis is also inaccurate.  To be clear, a HIPP recipient is highly unlikely to learn of their dialysis providers' donor status because of AKF's disclosure.  SUF 74.  But even under Plaintiffs' theory, a HIPP recipient would only *potentially* learn that their provider is a donor *after* (1) picking a provider, (2) applying for and receiving HIPP, (3) obtaining dialysis, and (4) receiving a benefits statement.  SAMF 87.  By then, the HIPP recipient would have already picked a provider without undue influence, as required by Advisory Opinion 97-1.  *Id.*

Finally, Section 7 of AB 290 is not, as Plaintiffs claim, Pls.' MPA 21-22, a concession that the law is preempted.  Rather, it was an attempt to address concerns raised by AKF in the legislative process.  The provision's mere existence does not make compliance with federal law impossible.[15]

### B.  The Medicare Secondary Payer Act Does Not Preempt AB 290

Plaintiffs also inaccurately contend that AB 290 conflicts with requirements in the MSPA that insurers treat ESRD and non-ESRD patients equally.  Pls.' MPA 24.  Plaintiffs rely on the "take into account" and "non-differentiation" provisions in the MSPA's ESRD sections.  *Id.* at 3-4.  Neither provision preempts AB 290.

The "take into account" provision prohibits group health plans from "tak[ing] into account that an individual [with ESRD] is entitled to or eligible for [Medicare] benefits" for the first thirty months of eligibility.  42 U.S.C. § 1395y(b)(1)(C)(i).

---

[15] Plaintiffs also incorrectly claim that California's Legislative Counsel determined that it was impossible for AKF to comply with both AB 290 and Advisory Opinion 97-1.  Pls.' MPA 22 n. 2.  Legislative Counsel did not conduct a preemption analysis, but instead simply described the mechanics of the proposed legislation.  *Ante* Background III n.5; SAMF 88.

Similarly, the "nondifferentiation" requirement provides that group health plans "may not differentiate in the benefits [they] provide[] between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner" during the first thirty months of Medicare eligibility.  *Id.* § 1395y(b)(1)(C)(ii).  The "pertinent inquiry' is "whether the plan's provisions 'result' in *different benefits for persons with ESRD*, not whether the plan's provisions disproportionately affect persons with ESRD or otherwise 'discriminate' against persons with ESRD."  *DaVita Inc. v. Amy's Kitchen, Inc.*, 981 F.3d 664, 674-75 (9th Cir. 2020).

Plaintiffs fail to show that AB 290 requires health plans to treat patients differently based on their Medicare eligibility or their ESRD status.  Although treatments provided to HIPP recipients may be reimbursed at a lower rate, that is not a result of a patient's eligibility or non-eligibility for Medicare.  The statute makes no distinction among patients based on their Medicare eligibility; a plan can "ignore[]" this factor.  *Amy's Kitchen*, 981 F.3d at 670.  Nor does the statute require differentiation between patients based on their ESRD status; a plan can "provide[] identical benefits to someone with ESRD as to someone without ESRD" and thus "not 'differentiate' between those two classes."  *Id.* at 678.  This binding circuit precedent precludes Plaintiffs' obstacle preemption claim.[16]

## CONCLUSION

This Court should deny Plaintiffs' motion for summary judgment.

---

[16] None of the cases cited by Plaintiffs—which stand for general principles of obstacle preemption and are otherwise factually distinguishable—compels a different conclusion.  *See, e.g., Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state tort claim based on lack of airbags was an obstacle to federal regulation adopted to provide manufacturers with various options to achieve safety goals); *English v. Gen. Elec. Co.*, 496 U.S. 72, 87 (1990) (state tort claim for intentional infliction of emotional distress not barred by federal law prohibiting nuclear energy whistleblower retaliation).

1    Dated:  March 25, 2022                    Respectfully submitted,

2                                              ROB BONTA
                                               Attorney General of California
3                                              MARK R. BECKINGTON
                                               Supervising Deputy Attorney General
4                                              LISA J. PLANK
                                               S. CLINTON WOODS
5                                              Deputy Attorneys General

6                                              /s/ R. Matthew Wise

7                                              R. MATTHEW WISE
                                               Supervising Deputy Attorney General
8                                              Attorneys for Defendants Rob Bonta,
                                               et al.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     SA2019106023
25   35984249.docx

26

27

28

26

## CERTIFICATE OF SERVICE

Case Name:   ___*Jane Doe, et al v. Xavier Becerra, et al.*_____

Case No.:   ___**8:19-cv-02105-DOC-(ADSx)**_____

I hereby certify that on <u>March 25, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Provisionally Redacted Pursuant to Pending Application for Leave to File Under Seal)**

2. **DECLARATION OF S. CLINTON WOODS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (with EXHIBITS 17-25)**

3. **DEFENDANTS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

4. **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (with EXHIBITS 1-2)**

5. **[PROPOSED] ORDER GRANTING REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

6. **DEFENDANTS' STATEMENT OF GENUINE DISPUTES IN RESPONSE TO PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS**

7. **DEFENDANTS' OBJECTIONS TO EVIDENCE OFFERED IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

8. **[PROPOSED] ORDER GRANTING DEFENDANTS' OBJECTIONS TO EVIDENCE OFFERED IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the
United States of America the foregoing is true and correct.

Executed on <u>March 25, 2022</u>, at San Francisco, California.

| | |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |