JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE, *et al.*, | Case No. 8:19-cv-02105-DOC (ADS) |
| Plaintiffs, | |
| | **ORDER GRANTING MOTIONS TO** |
| vs. | **EXCLUDE [142, 144], DENYING** |
| | **MOTION TO EXCLUDE [146],** |
| | **GRANTING IN PART** |
| XAVIER BECERRA, *et al.*, | **DEFENDANTS' MOTIONS FOR** |
| Defendants. | **SUMMARY JUDGMENT [128] [152,** |
| | **8:19-cv-2130], AND GRANTING IN** |
| | **PART PLAINTIFFS' MOTIONS** |
| | **FOR SUMMARY JUDGMENT [132]** |
| | **[153, 8:19-cv-2130]** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.     BACKGROUND ..................................................................................................... 5

       A. Facts ............................................................................................................ 7

       1. ESRD Patients ............................................................................................ 7

       2. ACA of 2010 and Nationwide Concern ...................................................... 9

       B.  Procedural History ....................................................................................... 11

II.    LEGAL STANDARD ............................................................................................ 14

       A. Motions to Exclude ...................................................................................... 14

       B. Summary Judgment ...................................................................................... 15

III.      DISCUSSION ..................................................................................................... 17

       A. Motions to Exclude ...................................................................................... 17

       1.  Testimony of Laurence Freedman ................................................................ 17

       2.  Testimony of Randolph Wayne Pate ............................................................ 17

       3.  Testimony of Amy Waterman ...................................................................... 18

       B. Motions for Summary Judgment ................................................................... 19

       1.  Whether AB 290 Is Preempted by Federal Law ........................................... 20

       a.  Whether Advisory Opinion 97-1 Preempts AB 290 ..................................... 20

       b. Whether the Medicare Secondary Payer Act Preempts AB 290 ................... 24

       2.  Whether AB 290 Violates Plaintiffs' First Amendment Rights ..................... 26

       a. Whether the Steering Provision Unduly Restricts Speech .............................. 26

       b. Whether AB 290 Violates Plaintiffs' Right of Association ............................ 35

       c.  Whether Disclosure Provisions Unlawfully Compel AKF's Speech .............. 43

       d. Whether Section 7 Abridges AKF's Right to Petition .................................. 45

3. Provider Plaintiffs' Contract Clause Claim ................................................................... 47

4. Provider Plaintiffs' Due Process Clause ........................................................................ 49

5. Provider Plaintiffs' Taking Clause Claim ...................................................................... 50

6. Severability ..................................................................................................................... 52

a. The Anti-Steering Provisions—AB 290 §§ 2(a), 3(b)(4), 5(b)(4)—are Severable ....................... 53

b. The Prohibitions on Conditioning Financial Assistance on Receipt of a Transplant or Procedure—AB 290 §§ 3(b)(2), 5(b)(2)—are Severable ................................................................................ 54

c. The Requirements to Disclose Patient Names to Insurers—AB 290 §§ 3(c)(2), 5(c)(2)—are Severable .................... 55

IV.      DISPOSITION ................................................................................................................. 56

Before the Court are the three motions to exclude ("Defs.' Freedman Mot.") (Dkt. 142); ("Pls.' Pate Motion") (Dkt. 144); ("Pls.' Waterman Motion") (Dkt. 146), and the parties' cross-motions for summary judgment ("Defendants' *Doe* Motion" or "Defs.' *Doe* Mot.") (Dkt. 128); ("Defendants' *Fresenius* Motion" or "Defs.' *Fresenius* Mot.") (Dkt. 152, No. 8:19-cv-02130-DOC-ADS); ("Doe Plaintiffs' Motion" or "Doe Pls.' Mot.") (Dkt. 132); ("Provider Plaintiffs' Motion" or "Provider Pls.' Mot.") (Dkt. 153, No. 8:19-cv-02130-DOC-ADS). The Court heard oral arguments on October 28, 2022.

For the reasons described below, the Court GRANTS Defendants' Motion to Exclude the Testimony of Laurence Freedman (Dkt. 142), GRANTS Plaintiffs' Motion to Exclude the Testimony of Randolph Wayne Pate  (Dkt. 144), and DENIES Plaintiffs' Motion to Exclude the Testimony of Dr. Amy Waterman (Dkt. 146).

As to the cross-motions for summary judgment, the Court GRANTS IN PART Defendants' Motion (Dkt. 128); GRANTS IN PART Doe Plaintiffs' Motion (Dkt. 132); GRANTS IN PART Defendants' Motion as to the Complaint of Fresnius Plaintiffs (Dkt. 152, No. 8:19-cv-02130-DOC-ADS); and GRANTS IN PART Provider Plaintiffs' Motion (Dkt. 153, No. 8:19-cv-02130-DOC-ADS).  Specifically, the Court:

- GRANTS summary judgment in favor of Defendants on Plaintiffs' preemption claims;
- GRANTS summary judgment in favor of Plaintiffs on their claim that Subsections 2(a), 3(b)(4), and 5(b)(4) of AB 290 violate the First Amendment and HOLDS that those subsections are void and severable from the remainder of the statute;
- GRANTS summary judgment in favor of Defendants on Plaintiffs' claim that Subsections 3(e)(1), 3(f)(1), § 5(e)(1), 5(f)(1) of AB 290 violate Plaintiffs' First Amendment Right of Association and HOLDS that those subsections are valid and enforceable;

- GRANTS summary judgment in favor of Plaintiffs on their claim that Sections 3(b)(2) and 5(b)(2) of AB 290 violate the First Amendment and HOLDS that those subsections are void and severable from the remainder of the statute;

- GRANTS summary judgment in favor of Plaintiffs on their claim that Sections 3(c)(2) and 5(c)(2) of AB 290 violate the First Amendment and HOLDS that those subsections are void and severable from the remainder of the statute;

- GRANTS summary judgment in favor of Defendants on Plaintiffs' claim that Section 7 of AB 290 abridges Plaintiffs' First Amendment Right to Petition and HOLDS that Section 7 is valid and enforceable;

- GRANTS summary judgment in favor of Defendants on Plaintiffs' Contracts Clause claim;

- GRANTS summary judgment in favor of Defendants on Plaintiffs' Due Process Clause claim; and

- GRANTS summary judgment in favor of Defendants on Plaintiffs' Taking Clause Claim. Court GRANTS IN PART Defendants' Motions.

## I.     BACKGROUND

This action arises from the California Legislature's passage of Assembly Bill No. 290, ch. 862, 2019 Cal. Stat. ___ [hereinafter AB 290], a state law that sought to tackle what was perceived to be a nationwide concern in the dialysis industry: that dialysis providers like Plaintiffs Fresenius and DaVita were using premium assistance from Plaintiff American Kidney Fund ("AKF")—a charitable organization that receives 80% of its funding from those providers—to "steer" patients eligible for Medicaid or Medicare towards private insurance plans to collect higher reimbursements for dialysis treatments. Soon after the bill was signed into law in October 2019, two actions—later consolidated by the Court—were filed challenging the law on constitutional and preemption grounds.

The provisions of AB 290 required, among other things, that third-party payers inform applicants and recipients "of all available health coverage options," AB 290 § 3(b)(3); prohibited dialysis providers and third-party payers from "steer[ing], direct[ing], or advis[ing]" patients regarding any specific insurance options, *see id*. §§ 2(a), 3(b)(4), 5(b)(4); required AKF to disclose its beneficiaries' names to their insurance companies, *id*. §§ 3(c)(2), 5(c)(2); and limited private insurance reimbursement rates to the Medicare rate (or a rate determined through a "rate determination" process) when a patient with private insurance receives financial assistance from a third-party payer to which their dialysis provider donates, *id*. §§ 3(e)(1), 5(e)(1).

On December 30, 2019, the Court granted Plaintiffs' motion for a preliminary injunction, determining that the State lacked non-speculative evidence to support AB 290's legislative findings of the perceived harm, namely that dialysis providers were "steering" ESRD patients to insurance options that were detrimental to their best interests or that steering of ESRD patients was somehow distorting insurance risk pools. *See* Order Granting Preliminary Injunction ("Order") (Dkt. 61). The Court also found that, were AB 290 to take effect, it would inflict irreparable harm on ESRD patients—a vulnerable group that depends on at-least-thrice-weekly dialysis or a kidney transplant to survive and that requires insurance to help pay for life-saving treatment. *Id*. at 9-10. The Court noted that AB 290 portended "potentially life-threatening disruptions" in patients' access to dialysis and kidney transplants. *Id*. at 10.

Plaintiffs argue that more than two years later—and despite months of discovery—the State still cannot identify even a single patient in California steered onto an insurance plan, much less a single patient harmed by such steering. Additionally, Plaintiffs argue that the State still lacks evidence that any (non-existent) steering has distorted insurance risk pools.

**A. Facts**[1]

**1. ESRD Patients**

End-stage renal disease ("ESRD"), or kidney failure, is the last stage of chronic kidney disease. Defs.' Statement of Facts ("Defs.' Facts") (Dkt. 171-1) ¶¶ 1-2; Pls.' Statement of Facts ("Doe Facts") (Dkt. 153-5) ¶ 1. To survive with ESRD, patients must regularly undergo dialysis, which simulates the blood-filtration function of a working kidney. Doe Facts ¶ 2. Because dialysis only mitigates the effects of ESRD, patients eventually need a kidney transplant. The risks attendant on transplant surgery and the lack of available kidneys, however, render many ESRD patients either medically unsuited to a transplant or unable to receive a new kidney in a timely fashion. Doe Facts ¶¶ 8, 9. As such, while imperfect, dialysis remains the only option for many ESRD patients. Doe Facts ¶ 10.

ESRD and dialysis, unfortunately, put patients in a perverse double bind. The specialized drugs and equipment involved make dialysis an expensive treatment, which few patients could afford without insurance. Doe Facts ¶¶ 15, 65. But ESRD patients also typically require at least three dialysis treatments per week, lasting four hours each, rendering continued employment infeasible for many patients. *See* Doe Facts ¶ 12. Because of the demands of their treatment, more than 80% of dialysis patients are unemployed. Doe Facts ¶ 13. To stay alive, patients must therefore find a way to pay for expensive, long-term medical care, often without employer-provided insurance or the income to pay for insurance on their own. *See id.* Recognizing the necessity and high costs of treatment, Congress enacted the Social Security Amendments of 1972 that permitted ESRD patients, regardless of age, to obtain Medicare coverage. Defs.' Facts ¶ 3. Medicare covers a range of services to treat kidney failure, including transplant and dialysis services, along with other health care needs. Defs.' Facts ¶ 4. Some patients may

---

[1] Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motions. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

qualify for and receive coverage through both Medicare and Medi-Cal, California's Medicaid system. Defs.' Facts ¶ 5.

The majority of ESRD patients are thus on Medicare or Medicaid, but those often do not provide all the coverage that ESRD patients typically need. Doe Facts ¶¶ 51, 52. ESRD patients who are Medicare recipients have cost-sharing obligations, including a 20% coinsurance requirement, and no limit on out-of-pocket expenditures. Doe Facts ¶ 54. But even those covered by Medicare turn to private supplemental insurance, such as Medigap,[2] to afford their deductibles and co-insurance payments. Doe Facts ¶ 58. Other ESRD patients may not be eligible for Medicare due to their immigration status or their lack of work credentials. Doe Facts ¶ 55.

Enter Plaintiff American Kidney Fund, Inc. ("AKF"), a 501(c)(3) nonprofit charity that seeks to alleviate the burdens faced by dialysis patients through advocacy, education, research, and financial assistance. Doe Facts ¶ 18. Through its Health Insurance Premium Program ("HIPP"), AKF gives financial assistance to low-income ESRD patients that allows them to maintain their health insurance by paying the premiums due under their preexisting health insurance plans. Doe Facts ¶¶ 66-67.  To qualify for HIPP, a patient must prove they already have insurance coverage and demonstrate that their monthly household income does not exceed reasonable monthly expenses by more than $600. Doe Facts ¶¶ 69, 74.

In 2021, AKF's HIPP assisted 70,731 ESRD patients nationwide, including 3,174 in California. Doe Facts ¶ 76. A majority of HIPP recipients are racial or ethnic minorities. Doe Facts ¶ 77. While there is no guarantee that patients referred to HIPP will receive assistance, AKF extends HIPP assistance to patients on both public and private insurance. Doe Facts ¶ 83. Over 60% of AKF's grants nationwide, and over 56% in California, pay for Medicare-related coverage such as Medicare Part B and Medigap. Doe Facts ¶ 84.

---

[2] Medigap policies are sold by private insurance companies to pay some of the health care costs that traditional Medicare does not cover, such as copayments, coinsurance, and deductibles. Expert Report of Randolph Wayne Pate, JD, MPH ("Pate Report") (Dkt. 171-1) at 2 n. 3. Neither the federal government nor California requires insurance carriers to offer Medigap policies to ESRD patients under 65. Doe Facts ¶¶ 59-60

### 2. ACA of 2010 and Nationwide Concern

According to Defendants Xavier Becerra, Ricardo Lara, Shelly Rouillard, and Sonia Angell (sued in their official capacities, and hereinafter, collectively, "the State"), AKF's system of financial assistance is less anodyne than it might appear. After the Patient Protection and Affordable Care Act (ACA) enacted a set of reforms under which ESRD patients can no longer be denied coverage or charged higher premiums based on their health status, many more patients with ESRD were able to access commercial insurance. Defs.' Facts ¶ 6. As the State contends, the provisions of the ACA, together with the "higher reimbursement rates available through private coverage when compared to Medicare," in effect created a "financial incentive for dialysis facilities to leverage [the higher rates] by providing premium assistance to ESRD patients." Defs.' Facts ¶ 7. AKF, meanwhile, receives roughly eighty percent of its funding from Plaintiffs DaVita and Fresenius, the two largest dialysis providers in California. Defs.' Facts ¶ 70.

The U.S. Department for Health and Human Services ("HHS") soon became concerned that health care providers were "encouraging individuals to make coverage decisions based on the financial interest of the health care provider, rather than the best interests of the individual patients." Defs.' Facts ¶ 8. Based on this concern, the Centers for Medicare and Medicaid Services (CMS), a subdivision of HHS, issued a Request for Information on August 23, 2016, seeking public comment "about health care providers and provider-affiliated organizations steering people eligible for or receiving Medicare and/or Medicaid benefits to an individual market plan for the purpose of obtaining higher payment rates." Defs.' Facts ¶ 9. In response, CMS received over 800 public comments from patients, providers, and other stakeholders, which "documented a range of concerning practices, with providers and suppliers"—such as DaVita and Fresenius— "influencing enrollment decisions in ways that put the financial interest of the supplier above the needs of patients." Defs.' Facts ¶ 10.

Commenters noted that patients "are sometimes specifically discouraged from pursuing Medicare or Medicaid" and "are unaware that a dialysis facility is seeking to

enroll them in the individual market," and that facilities "retaliate against social workers who attempt to disclose additional information to consumers." Defs.' Facts ¶ 11.  HHS's data and the comments "suggest[ed] that this inappropriate steering of patients may be accelerating over time." Defs.' Facts ¶ 13.  The comments also reflected three types of possible harms to patients: "[n]egatively impacting patients 'determination of readiness for a kidney transplant, potentially exposing patients to additional costs for healthcare services, and putting individuals at significant risk of a mid-year disruption in health care coverage." Defs.' Facts ¶ 14.  In the face of such harms, CMS issued an interim final rule establishing new standards for Medicare-certified dialysis facilities that pay premiums for individual market health plans, whether directly or through another entity. Defs.' Facts ¶ 16. On January 25, 2017, Judge Amos L. Mazzant of the Eastern District of Texas issued an order preliminarily enjoining the interim final rule for failure to comply with the notice and comment procedures of the Administrative Procedures Act. *Dialysis Patients Citizens v. Burwell*, 2017 WL 365271, at *6 (E.D. Tex. Jan. 25, 2017). In addition to ruling that HHS did not have good cause to bypass the notice and comment requirement, the court found that the rule was arbitrary and capricious because "HHS failed to consider the benefits of private qualified health plans and ignored the disadvantages of the Rule."  *Id*. The court also noted that "HHS failed to consider that the Rule would leave thousands of Medicare-ineligible ESRD patients without health insurance, which is clearly an important aspect of the problem." *Id.* CMS has not sought further notice and comment.

To prevent the possibility of patient steering and its potential resultant harms, the State enacted AB 290 on October 13, 2019. *See* AB 290. The California Legislature found, consistent with mounting nationwide concern, that both AKF and dialysis providers shared an incentive to steer patients into private insurance plans—which could no longer reject patients solely because of their preexisting ESRD—thereby securing higher reimbursement payouts for providers. Defs.' Facts ¶¶ 7, 12, 27. The Legislature further identified several consequences that could result from this steering, such as

unjust enrichment of providers, higher out-of-pocket costs to patients, and the distortion of the insurance risk pool. AB 290 § 1(a)-(e); Defs.' Facts ¶¶ 15, 20. The statute's provisions address the State's concern from several angles—regulating insurance companies, dialysis providers, and third-party payers like AKF by, *inter alia*, requiring third-party payers to inform applicants and recipients "of all available health coverage options," AB 290 § 3(b)(3); prohibiting dialysis providers and third-party payers from "steer[ing], direct[ing], or advis[ing]" patients regarding any specific insurance plans, *see id.* §§ 2(a), 3(b)(4), 5(b)(4); requiring AKF to disclose its beneficiaries' names to their insurance companies, *id.* §§ 3(c)(2), 5(c)(2); and limiting private insurance reimbursement rates to the Medicare rate (or a rate determined through a "rate determination" process) when a patient with private insurance receives financial assistance from a third-party payer to which their dialysis provider donates, *id.* §§ 3(e)(1), 5(e)(1).

### B. Procedural History

On November 1, 2019, Plaintiffs Jane Doe and Stephen Albright and two nonprofit corporations, the American Kidney Fund (AKF) and Dialysis Patient Citizens, Inc., filed this action against Defendants Rob Bonta, in his Official Capacity as Attorney General of California; Ricardo Lara, in his Official Capacity as California Insurance Commissioner; Shelly Rouillard in her Official Capacity of the California Department of Managed Care; and Tomás Aragón, in his Official Capacity as Director of the California Department of Public Health (collectively, "the State" or "Defendants"). *See Jane Doe, et al v. Xavier Becerra, et al.* 8:19-cv-02105-DOC-(ADSx) (C.D. Cal.). On November 5, 2019, dialysis providers Fresenius Medical Care Orange County, Fresenius Medical Care Holdings, Inc., Davita, Inc. and U.S. Renal Care ("*Fresnius* Plaintiffs" or "Provider Plaintiffs") also filed an action against Defendants. *See Fresenius Medical Care Orange County LLC v. Xavier Becerra*, Case No. 8:19-cv-02130-DOC-ADS (C.D. Cal.). On November 8, 2019, both sets of plaintiffs moved for a preliminary injunction, which the

Court granted on December 30, 2019 ("Order") (Dkt. 58).[3] On April 26, 2022, the Court consolidated the two actions under *Doe v. Becerra*, No. 19-01205-DOC-ADS. *See* Dkt. 204, No. 8:19-cv-02130-DOC-ADS. Before the Court consolidated the two cases, the parties filed motions for summary judgments and motions to exclude certain testimony and opinions.

**Cross-Motions for Summary Judgment.** On February 25, 2022, the parties filed cross-motions for summary judgment. On March 25, 2022, the parties filed their opposition papers. On April 18, 2022, the parties filed replies in support of their respective motions for summary judgment. The parties' filings are as follows:

- Defendants' Motion for Summary Judgment as to the Complaint of Doe Plaintiffs ("Defs.' *Doe* Motion" or "Defs.' *Doe* Mot.") (Dkt. 128);

    o *Doe* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("*Doe* Opp'n") (Dkt. 156);

    o Defendants' Reply in support of *Doe* Motion ("Defs.' *Doe* Reply") (Dkt. 171);

- Doe Plaintiffs' Motion for Summary Judgment ("*Doe* Motion" or "*Doe* Pls.' Mot.") (Dkt. 132);

    o Defendants' Opposition to Doe Motion ("Defs.' *Doe* Opp'n") (Dkt. 153);

    o Plaintiffs' Reply in support of Doe Motion ("Pls.' Doe Reply") (Dkt. 167);

- Defendants' Motion for Summary Judgment as to the Complaint of Fresnius Plaintiffs ("Defs.' *Fresnius* Motion" or "Defs.' *Fresnius* Mot.") (Dkt. 152, No. 8:19-cv-02130-DOC-ADS);

    o Fresnius Plaintiffs' Opposition to Defendants' Fresnius Motion ("Provider Pls.' Opp'n") (Dkt. 176, No. 8:19-cv-02130-DOC-ADS).

---

[3] Between March 2020 and September 2021, the cases were stayed due to circumstances related to the COVID-19 pandemic. *See* Dkts. 72, 75, 77, 79, 81, 89, 91, 96, 98, 100, 102, 104, 109, 111, 115, 117, 120, 121.

o   Defendants' Reply in support of Defendants' Fresnius Motion
    ("Defs.' *Fresnius* Reply") (Dkt. 195, No. 8:19-cv-02130-DOC-
    ADS);

• Fresnius Plaintiffs' Motion for Summary Judgment ("Provider Plaintiffs'
  Motion" or "Provider Pls.' Mot.") (Dkt. 153, No. 8:19-cv-02130-DOC-
  ADS);

o   Defendants' Opposition to Fresnius Motion ("Defs.' *Fresnius*
    Opp'n") (Dkt. 173, No. 8:19-cv-02130-DOC-ADS); and

o   Plaintiffs' Reply in support of Fresnius Motion ("Provider Pls.'
    Reply") (Dkt. 190, No. 8:19-cv-02130-DOC-ADS).

**Motions to Exclude Evidence.** On March 3, 2022, Defendants filed a Motion to
Exclude Testimony of Expert Witness Laurence J. Freedman ("Defs.' Freedman Mot.")
(Dkt. 142), which Plaintiffs opposed on April 1, 2022 ("Pls.' Freedman Opp'n") (Dkt.
160). On March 4, 2022, Plaintiffs filed motions to exclude certain expert opinions and
testimony of Randolph Wayne Pate ("Pls.' Pate Motion") (Dkt. 144) and Dr. Amy
Waterman ("Pls.' Waterman Motion") (Dkt. 146) (collectively, "Motions to Exclude"),
which Plaintiffs opposed on April 1, 2022 ("Pate Opp'n") (Dkt. 159), ("Waterman
Opp'n") (Dkt. 161). On April 18, 2022, the parties filed replies in support of their
motions to exclude ("Pls.' Freedman Reply") (Dkt. 165); ("Defs.' Pate Reply") (Dkt.
169); ("Defs.' Waterman Reply") (Dkt. 170).

On October 28, 2022, the Court heard oral argument on the motions for summary
judgment and motions to exclude (Dkt. 194). At the hearing, the Court ordered
supplemental briefing on the Supreme Court's decision in *Marietta Memorial Hospital
Employee Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968 (2022), which the parties
submitted on November 17, 2022 ("*Doe* Pls.' Supp. Br.") (Dkt. 198); ("Defs.' Supp.
Br.") (Dkt. 199); ("*Fresnius* Pls.' Supp. Br.") (Dkt. 200).

For reasons set forth below, the Court GRANTS IN PART Defendants' Motion
for Summary Judgment and GRANTS IN PART Plaintiffs' Motion for Summary
Judgment.

## II.     LEGAL STANDARD

### A. Motions to Exclude

Federal Rule of Evidence 702 states: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." In accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "the district court judge must ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 589). Expert testimony must "relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (citing *Daubert*, 509 U.S. at 590). "The test for reliability, however, 'is not the correctness of the expert's conclusions but the soundness of his methodology.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995)) (footnote omitted).

"Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 564–65 (9th Cir. 2010) (citation omitted); *see ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (finding that the challengers "disagreements are with the conclusions reached by [th]e expert and the factual assumptions and considerations underlying those conclusions, not his methodology," and "[t]hese disagreements go to the weight to be afforded the testimony and not its admissibility") (citation omitted). Courts begin from a presumption that

expert testimony is admissible. *Poosh v. Philip Morris USA, Inc.*, 287 F.R.D. 543, 546 (N.D. Cal. 2012) (citing *Daubert*); *see also* Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments ("[R]ejection of expert testimony is the exception rather than the rule.").

*Daubert* set forth a non-exclusive list of factors that courts can consider in assessing the reliability of expert testimony: "(1) whether the theory or technique can be and has been tested; whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Id*. However, depending on the type of testimony offered, the Daubert factors "may not be appropriate to assess reliability." *Poosh*, 247 F.R.D. at 546 (citing *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 150 (1999)).

The Advisory Committee's Notes on Rule 702 state that courts have found the additional following factors relevant in assessing the reliability of expert testimony: (1) whether experts are proposing to testify about matters growing directly out of research they have conducted independent of the litigation or whether the opinion was developed expressly for the purposes of testifying; (2) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) whether the expert has adequately accounted for obvious alternative explanations; (4) whether the expert is being as careful as he would be in his regular professional work; and (5) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion offered. Fed. R. Evid. 702 Advisory Committee Notes. The proponent of the expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Id*.

### B. Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect

for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

### III.    DISCUSSION

#### A. Motions to Exclude

##### 1. Testimony of Laurence Freedman

Plaintiffs have disclosed Laurence J. Freedman, an attorney in private practice, to offer the opinion that "the requirements of AB 290 will take AKF out of AO 97-1's safe harbor and subject AKF to a 'substantial risk' of facing enforcement from federal agencies." *See* Pls.' Freedman Opp'n at 8. Mr. Freedman's opinion relies on statutes, certain pleadings in this matter, and discussions with another senior associate at his law firm. Defendants argue that these matters are legal opinions and thus should be excluded. The Court agrees.

"Each courtroom comes equipped with a 'legal expert,' called a judge." *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) (noting "the danger in allowing experts to testify as to their understanding of the law"). The obligations and potential liability of Plaintiff Providers under AB290 is a question of law, not a question of fact. Permitting this testimony would usurp the role of the Court in determining the relevant law and the legal consequences it entails for providers like Plaintiffs.

Accordingly, Defendants' motion to exclude the testimony of Laurence J. Freedman is granted.

##### 2. Testimony of Randolph Wayne Pate

Plaintiffs argue that Mr. Pate's opinions are improper under Federal Rule of Civil Procedure 26, Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). First, Plaintiffs argue that some of Mr. Pate's opinions are outside the scope of proper rebuttal testimony. Second, Plaintiffs argue thar Mr. Pate's opinions regarding "qualified health plans" constitute improper legal conclusions under Federal Rule of Evidence 702. Third, Plaintiffs argue that Mr. Pate impermissibly purports to interpret the state of mind of dialysis providers when he opines that these dialysis providers are motivated to support the American Kidney Fund's

("AKF") Health Insurance Premium Program (HIPP) as "to some extent, a business strategy rather than a form of charity." Ex. A to Pls.' Pate Mot. (Dkt. 144-1) (Pate Expert Report) ¶ 39.

Defendants respond that Mr. Pate's report "are a direct response to the core opinions offered by Mr. McAnaney and Mr. Freedman." Defs.' *Pate* Opp'n at 8. Specifically, Defendants contend that Mr. Pate's report concerns the same subject addressed in the reports of Mr. Freedman and Mr. McAnaney: the application of Advisory Opinion 97-1 to AB 290. To adequately respond to these opinions, according to Defendants, Mr. Pate's report provides essential "context for the complex healthcare dynamics at play." *Id.*

For the same reasons that the Court excludes Dr. Freedman's testimony, the Court grants Plaintiffs' motion to exclude Mr. Pate's testimony.

### 3. Testimony of Amy Waterman

Plaintiffs seek to exclude the testimony of Dr. Amy Waterman on the basis that her opinion is not reliable and that she has "no experience working at dialysis centers, no knowledge regarding the financial aspects of dialysis centers, no knowledge of their policies and practices related to education about insurance options." Pls.' Mot. to Exclude Opinions and Testimony of Amy Waterman ("Pls.' Waterman Mot.") (Dkt. 146, No. 8:19-cv-02130). Specifically, Plaintiffs ask the Court to exclude all of Dr. Waterman's expert opinions on the grounds that they are not based on "reliable methodologies" or "established facts and evidence" and "bear no logical relationship to AB 290." Pls.' Waterman Mot. at 1.

Defendants argue that Dr. Waterman's education, experience, and knowledge related to ESRD, treatment options for ESRD patients, and patient education is evident from her expert reports and curriculum vitae. Defs.' Opp'n to Pls.' Waterman Mot. (Dkt. 161, No. 8:19-cv-02130) ("Defs.' Waterman Opp'n"), 5-6. The Court agrees.

Expert opinion testimony is reliable under Daubert "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Elosu v.*

*Middlefork Ranch Incorporated*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks omitted). Standards of scientific reliability, such as testability and peer review, do not apply to all forms of expert testimony. *Kumho Tire Co . v. Carmichael*, 56 U.S. 137, 150-151 (1999). "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592; *see also Pyramid Technologies, Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). Here, Dr. Waterman's conclusions are reliable because they are properly founded on her background, experience, and analysis of the dialysis industry based on available evidence. *See Daubert*, 509 U.S. at 592 (courts must assess an expert's knowledge and experience of the relevant discipline, not whether the opinion is based on firsthand knowledge or observation).

Contrary to Plaintiffs' assertions, Dr. Waterman's testimony is also relevant. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Elosu*, 26 F.4th at 1024 (quotation marks omitted). Dr. Waterman's opinions elaborate on the background of ESRD, patient access to kidney transplants, and optimal kidney care. Because these issues have a "valid connection" to the underlying purpose of AB 290, as alleged by Defendants, Dr. Waterman's opinions are relevant.

Accordingly, Plaintiffs' motion to exclude Dr. Waterman's opinions is denied.

### B.  Motions for Summary Judgment

Defendants seek summary judgment on the basis that there is no genuine issue of material fact as to whether AB 290 violates the Supremacy Clause of the United States Constitution or the First and Fourteenth Amendments to the United States Constitution. They contend that neither Advisory Opinion 97-1 nor the Medicare Secondary Payer Act preempt AB 290. Defendants also argue that AB 290's patient steering prohibition, reimbursement cap, disclosure requirements, and the provision allowing financially interested entities time to seek an updated advisory opinion do not violate Plaintiffs' First Amendment rights.

### 1.  Whether AB 290 Is Preempted by Federal Law

The Supremacy Clause of the Constitution makes evident that "state laws that conflict with federal law are 'without effect,' " *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (citation omitted).   There are three types of preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. Id. at 76–77; *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).  The parties discuss only conflict preemption.  Conflict preemption is implicit preemption of state law that occurs where "there is an actual conflict between state and federal law." *Altria Grp.*, 555 U.S. at 76–77. Conflict preemption "arises when [1] 'compliance with both federal and state regulations is a physical impossibility,' ... or [2] when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillsborough Cnty.*, 471 U.S. at 713 (citations omitted). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Id.* (citation omitted); *Wyeth*, 555 U.S. at 565 n. 3.

Plaintiffs here argue that AB 290 is preempted by federal law in two ways. First, they argue that AB 290 conflicts with the Beneficiary Inducement Statute, as construed by Advisory Opinion 97-1. Second, they argue that AB 290 is preempted by the Medicare Secondary Payer Act ("MSPA") because it undermines Congress' goal of ensuring that ESRD patients are not treated differently from other classes of patients. The Court addresses each argument in turn.

#### a.  Whether Advisory Opinion 97-1 Preempts AB 290

Central to the preemption issues raised by Plaintiffs are the Beneficiary Inducement Statute, its accompanying advisory opinion process, and Advisory Opinion 97-1. Congress enacted the Beneficiary Inducement Statute to combat fraud and abuse in connection with Medicare and Medicaid. *See* HIPAA § 231(h), codified at 42 U.S.C. § 1320a-7a. In relevant part, the statute imposes a civil penalty on any entity that "offers to or transfers remuneration to any individual eligible for benefits under [a federal or state

healthcare program] . . . that such person knows or should know is likely to influence" that person's choice of a healthcare provider. 42 U.S.C. § 1320a-7a(a)(5). Because the threat of sanctions and criminal charges for violations of the Beneficiary Inducement Statute are severe, Congress also enacted a process by which entities can seek advisory opinions from the U.S. Department of Health & Human Services ("HHS") Office of Inspector General ("OIG") about whether an anticipated program or course of action would violate the statute. 42 U.S.C. 1320a-7d(b). Any resulting advisory opinion is a binding administrative action on both the government and the requesting party. 42 U.S.C. § 1320a-7d(b)(4)(A).

Concerned that AKF's payment of premiums could be misconstrued as a prohibited offering of "remuneration", AKF and six dialysis provider donors sought an HHS OIG advisory opinion in 1997 asking whether receiving donations by dialysis providers violates the Beneficiary Inducement Statute. *See* Doe Facts ¶ 88. In Advisory Opinion 97-1, the OIG considered the proposed arrangement by AKF "to expand significantly its patient assistance grants to financially needy ESRD patients for payment of medical insurance premiums through HIPP" whereby additional funding will be donated primarily by the dialysis provider companies. AO 97-1. The OIG concluded that such donations to AKF do not constitute impermissible "remuneration" because "the interposition of AKF, a bona fide, independent, charitable organization, and its administration of HIPP provides sufficient insulation so that the premium payments should not be attributed to the [dialysis provider] Companies." Doe Facts ¶ 91. Moreover, because HIPP beneficiaries will likely have already selected a provider before applying for assistance, the OIG anticipated that "AKF's payment of premiums will expand, rather than limit, beneficiaries' freedom of choice." Doe Facts ¶ 92.

Under the arrangement proposed to OIG, the dialysis providers would not "advertise the availability of possible financial assistance to the public and will not disclose directly or indirectly to individual patients they refer that such members have contributed to AKF to fund the grants." AO 97-1. Additionally, "AKF staff involved in

awarding patient grants will not take the identity of the referring facility or the amount of any provider's donation into consideration when assessing patient applications or making grant determinations." *Id.*; *see* Ex. to Doe Pls.' Mot. (Dkt. 132-19) (Declaration of LaVarne Burton, President and CEO of AKF) ("Burton 2022 Decl.") ¶¶ 33–34 Because "[a]ssistance is available to all eligible patients on an equal basis," and the applying "patient will often have already selected a provider prior to submitting his or her application for assistance," AKF's payments are "not likely to influence patients to order or receive services from particular providers." AO 97-1.  "To the contrary," as the OIG noted, "the insurance coverage purchased by AKF will follow a patient regardless of which provider the patient selects, thereby enhancing patient freedom of choice in health care providers." *Id.* Advisory Opinion 97-1 provided a safe harbor for AKF's HIPP so long as "the arrangement in practice comports with the information provided" to the OIG. Doe Facts ¶ 96.

Plaintiffs contend that AB 290 "forces AKF to venture outside the safe harbor provided by Advisory Opinion 97-1 . . . and [] risk[s] a violation of the federal Beneficiary Inducement Statute." Doe Pls.' Mot. (Dkt. 132) at 9. Specifically, Plaintiffs take issue with AB 290's requirement to inform insurers of patients for whom it provides premium assistance, so that the insurers can reduce reimbursement rates to providers for those patients. *See* AB 290 §§ 3(c)(2), 3(e),5(c)(2), 5(e). According to Plaintiffs, this would result in "HIPP patients finding out whether their providers donate to AKF, as their billing statements will reflect this change." Pls.' Doe Opp'n (Dkt. 156) at 24. They explain that once a patient starts receiving assistance for AKF, the patient will see whether their co-insurance amounts decrease or not. Doe Pls.' Mot. (Dkt. 132) at 28. A patient whose current provider donates to AKF will see a decrease in co-insurance payments "and thus know that, by virtue of AB 290 those reductions come because that patient's provider gives to AKF." Doe Pls.' Mot. (Dkt. 132) at 28. Because this creates a "mechanism by which patients will be informed whether their dialysis provider donated to AKF," Doe Pls.' Mot. (Dkt. 132) at 28, Plaintiffs argue that AB 290 undermines a key

factual underpinning on which Advisory Opinion 97-1 is based: that the AKF's administration of HIPP "provides sufficient insulation so that the premium payments should not be attributed to the Companies." Pls.' Doe Opp'n (Dkt. 156) at 24 (quoting AO 97-1).

Plaintiffs offer no evidence to support their argument that patients will connect a lower reimbursement rate appearing on their billing statements with donations to AKF made by their provider. But even if this speculative chain of events were to come to fruition, a HIPP recipient—as required by Advisory Opinion 97-1—would already have chosen a provider without undue influence. As the State points out, the HIPP recipient would only potentially learn that their provider is a donor after (1) picking a provider, (2) applying for and receiving HIPP, (3) obtaining dialysis, and (4) receiving a benefits statement. By then, the HIPP recipient has already picked a provider without being influenced by AKF, as contemplated by Advisory Opinion 97-1.

Plaintiffs point to Section 7 of AB 290 in support of their argument that the State itself "recogniz[es] that AB 290 cannot be squared with the Beneficiary Inducement Statute." Doe Pls.' Opp'n (Dkt. 156) at 25. Section 7 provides that "[f]or financially interested entities covered by Advisory Opinion No. 97-1," AB 290 will become operative in July 2020 "unless one or more parties to Advisory Opinion 97-1 requests an updated opinion from [HHS OIG]." AB 290 § 7. According to Plaintiffs, "[t]here would be no need for such a provision unless California itself saw a conflict between AB 290 and how the Beneficiary Inducement Statute applies to HIPP." Doe Pls.' Mot. (Dkt. 132) at 29. The provision's mere existence alone, however, is insufficient to demonstrate that "compliance with both federal and state regulations is a physical impossibility." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotation marks and citation omitted).

The Court thus does not find that the Beneficiary Inducement Statute, as construed by Advisory Opinion 97-1, preempts AB 290.

**b. Whether the Medicare Secondary Payer Act Preempts AB 290**

Plaintiffs also argue that AB 290 is preempted by the Medicare Secondary Payer
Act ("MSPA"), 42 U.S.C.§ 1395y(b) because it "stands as an obstacle to the
accomplishment and execution of the full purposes and objectives of Congress." Doe
Pls.' Mot. (Dkt. 132) at 9.  *See* Doe Supp. Br. (Dkt. 198) at 4-5.

The MSPA makes Medicare the secondary, rather than primary, payer for services
provided to Medicare beneficiaries who are covered by private insurers for the same
services. *Id.* Prior to 1980, a private insurer could simply decline to pay Medicare-
covered healthcare expenses until Medicare had paid first, and then pick up the tab for
any remaining costs that were covered by the private insurance. *DaVita Inc. v. Virginia
Mason Mem'l Hosp.*, 981 F.3d 679, 685 (9th Cir. 2020). Congress responded to that
costly arrangement beginning in 1980 and expanded the reach of the Medicare as
Secondary Payer Act. In 1981, for example, Congress designated Medicare as the
secondary payer with respect to group health plans, but only for persons eligible to enroll
in Medicare solely because of ESRD. Pub. L. No. 97-35, 95 Stat. 357 (Aug. 13, 1981);
42 U.S.C. § 1395y(b)(2) (Aug. 1981).

Under the original MSPA structure, "insurers were free to craft plan provisions
that accounted for Medicare eligibility or that offered differing treatment to, for
example, seniors or those diagnosed with ESRD." *DaVita Inc.*, 981 F.3d at 685. In 1981,
Congress enacted provisions that prohibited group health plans from "tak[ing] into
account" a person's Medicare enrollment or eligibility and from offering differing
benefits to working seniors or ESRD patients. *See id.* At 686 (citing Pub. L. No. 101-
239, 103 Stat. 2106 (Dec. 19, 1989); Pub. L. No. 99-509, 100 Stat. 1874 (October 21,
1986)). Specifically, Section 1395y(b) of the MSPA prohibits group health plans from
"tak[ing] into account that an individual [with ESRD] is entitled to or eligible for
[Medicare] benefits" for the first thirty months of eligibility. 42 U.S.C.§
1395y(b)(1)(C)(i). It also provides that group health plans "may not differentiate in the
benefits [they] provide[] between individuals having end stage renal disease and other

individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner" during the first thirty months of Medicare eligibility, *id*. § 1395y(b)(1)(C)(ii). Prohibited "differentiation" includes "[i]mposing on persons who have ESRD, but not on others enrolled in the plan, benefit limitations" and "[p]aying providers and suppliers less for services furnished to individuals who have ESRD than for the same services furnished to those who do not have ESRD . . . ." 42 C.F.R. §§ 411.161(b)(ii), (iv).

Doe Plaintiffs argue that under AB 290, dialysis providers donating to AKF become "financially interested" and thus subject to reduced reimbursement rates for ESRD patients receiving financial assistance through AKF's HIPP program. Doe Pls.' Mot. (Dkt. 132) at 31 (citing AB 290, §§ 3(h)(2)(A), 5(h)(1)(A), 3(e), 5(e)). They argue that this, in turn, "creates two different classes of ESRD patients: HIPP patients treated at facilities owned by donors to AKF, and all other ESRD patients." Doe Pls.' Reply (Dkt. 167) at 21. Plaintiffs contend that because AB 290's reimbursement scheme "necessarily differentiates" between ESRD patients who are receiving HIPP and those who are not, it is preempted by the MSPA. Doe Pls.' Mot. at 24. Separately, Plaintiffs also proffer an "obstacle preemption" theory, arguing that AB 290 is preempted because it restricts ESRD patients' choice in health insurance and thus frustrates the purpose and objective of the MSPA. *See* Provider Pls.' Supp. Br. (Dkt. 199) at 3. According to Plaintiffs, the MSPA "was designed to protect the public fisc" by "preventing certain private insurers from shifting costs onto the government for Medicare-eligible patients who are already covered by another plan." *See* Provider Pls.' Supp. Br. (Dkt. 199) at 5.

Although treatments provided to HIPP recipients may be reimbursed at a lower rate, Plaintiffs have not shown that AB 290 requires health plans to differentiate between patients based on their ESRD status or to take into account their Medicare-eligibility so as to conflict with the MSPA. Plaintiffs' argument that AB 290 conflicts with Congress's objective of safeguarding ESRD patient choice rests on a concern that AB 290 may prompt patients to shift from private to public insurance. *See* Provider Pls.'

Opp'n (Dkt. 176, No. 8:19-cv-02130) at 26-27. But Plaintiffs do not explain which provisions of AB 290 necessarily compel that result. AB 290 requires that applicants and recipients be informed "of all available health coverage options," AB 290 § 3(b)(3); prohibits dialysis providers and third-party payers from "steer[ing], direct[ing], or advis[ing]" patients towards particular insurance plans, *see id.* §§ 2(a), 3(b)(4), 5(b)(4); requires AKF to disclose its beneficiaries' names to their insurance companies, *id.* §§ 3(c)(2), 5(c)(2), and limits private insurance reimbursement rates to the Medicare rate (or a rate determined through a "rate determination" process) for certain patients, *id.* §§ 3(e)(1), 5(e)(1). None of those provisions seek to "force" patients from private to public insurance so as to frustrate the policy goals of MSPA as articulated by Plaintiffs.

Because AB 290 does not conflict with the Beneficiary Inducement Statute as construed by Advisory Opinion 97-1, and Plaintiffs have not shown that AB 290 frustrates the objectives of the MSPA, the Court finds that AB 290 is not preempted.

### 2.   Whether AB 290 Violates Plaintiffs' First Amendment Rights

Both sets of Plaintiffs challenge the "Steering Provision" of AB 290, which prohibits chronic dialysis clinics and financial interested entities from "steer[ing], direct[ing], or advis[ing]" patients regarding a specific coverage program option or health coverage. *See* AB 290 §§ 2(a), 3(b)(4), 5(b)(4). The State does not dispute that violating this provision risks criminal liability, Cal. Health & Safety Code §§ 1235-1238, as well as clinic closure, *id.* §§ 1240-1245. Provider Plaintiffs argue that the restriction is unconstitutionally vague under the Fourteenth Amendment's Due Process Clause and violate the First Amendment. Because the Court concludes that the Steering Provision violates the First Amendment, it does not address Plaintiffs' void-for-vagueness argument.

### a. Whether the Steering Provision Unduly Restricts Speech

The parties dispute which standard governs the Steering Provision's restriction of Plaintiffs' speech. Defendants argue that the anti-steering provision regulates "a commercial transaction between patients and providers" and thus intermediate scrutiny

applies. *See* Defs.' *Doe* Mot. (Dkt. 128-1) at 20-21. Plaintiffs argue that the restrictions are content- and speaker- based and thus subject to strict scrutiny, because the provision restricts speech about a particular topic ("coverage program option[s] [and] health care service plan[s]") and applies only to certain speakers ("chronic dialysis clinic[s]" and financially interested entities like AKF). Provider Pls.' Mot. (Dkt. 153-1, No. 8:19-cv-2130) at 17; Doe Pls.' Mot. (Dkt. 132) at 15-16. Even under the intermediate scrutiny applicable to commercial speech, Plaintiffs argue that AB 290 does not advance a substantial government interest.

### i.    The Steering Provision Regulates Commercial Speech

The Court must first determine whether the speech at issue constitutes nonexpressive commercial or economic conduct. If the speech is commercial in nature, the State must show that the provisions directly advance a substantial governmental interest and that the measure is drawn to achieve that interest. *See Fox*, 492 U.S. at 480–81; *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980). There must be a "fit between the legislature's ends and the means chosen to accomplish those ends." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571–72. Restrictions of non-commercial speech, on the other hand, are evaluated under strict scrutiny, which requires that any restriction on speech be narrowly tailored to serve a compelling governmental interest. *Nixon v. Shrink Missouri Government PAC,* 120 S.Ct. 897, 926 (2000).

As the Ninth Circuit explained, "[c]ommercial speech is 'defined as speech that does no more than propose a commercial transaction.'" *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) (stating the commercial transaction test is "the test for identifying commercial speech"). The commercial speech analysis is "fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (citation and internal

quotation marks omitted). "Where the facts present a close question, speech may be "characterized as commercial when (1) the speech is admittedly advertising, (2) the speech references a specific product, and (3) the speaker has an economic motive for engaging in the speech." *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d1099, 1106 (9th Cir. 2004) (citing *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66-67 (1983)). For the speech at issue to be "properly characterized as commercial speech," it is not necessary for "each of the characteristics" to be present. *Bolger*, 463 U.S. at 67 n.14.

Here, Subsections 2(a), 3(b)(4), and 5(b)(4) of AB 290 meet the last two prongs: they regulate speech that references coverage program options and health care service plans, and they target entities that have an economic motive in engaging in that speech, namely chronic dialysis centers and financially interested entities like AKF. As the State explains, the anti-steering provisions regulate patient interactions with dialysis social workers and insurance counselors, who are employed by Plaintiffs and who "may recommend insurance options that help patients remain on dialysis and maximize profits for the dialysis centers in which they work." *See* Defs.' Facts ¶ 23. The State cites the reimbursement rates for commercial insurance, which "are many times the cost associated with providing care," as evidence of the powerful economic motive that dialysis providers have in "steering" patients onto commercial insurance. AB 290, § 1(g). The State also references documents in the legislative record, including research reports and providers' communications with shareholders, that emphasize the importance of commercial patients to the providers' bottom line. One report, for example, indicates that commercial patients for the providers get $600 to $800 more per treatment; losing those commercially insured patients would result in a loss of $180 to $240 million. Defs.' Facts ¶ 24 (citing report describing the increase in "[i]nvestor concern regarding [DaVita's] commercial mix and earning power" in light of the probability that DaVita was "receiving more than its marketshare" of HIPP-supported commercial patients).

Because the anti-steering provision regulates speech related to commercial

insurance, and the State has shown that the entities have an economic motive to engage

in speech that persuades patients to obtain commercial insurance, the Court agrees that

AB 290 regulates commercial speech.

### i. The Steering Provision Does Not Survive First Amendment Scrutiny

Even when regulating commercial speech, the State's burden of justifying the

restriction "is not satisfied by mere speculation or conjecture; rather, a governmental

body seeking to sustain a restriction on commercial speech must demonstrate that the

harms it recites are real and that its restriction will in fact alleviate them to a material

degree." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (citations omitted); see Los

Angeles v. Preferred Communications, Inc., 476 U.S., at 496 ("This Court may not

simply assume that the ordinance will always advance the asserted state interests

sufficiently to justify its abridgment of expressive activity") (internal quotation marks

omitted); *ConsequenHome Box Off., Inc. v. F.C.C.*, 567 F.2d 9, 14 (D.C. Cir. 1977)

("[A] 'regulation perfectly reasonable and appropriate in the face of a given problem

may be highly capricious if that problem does not exist'") (citation omitted). The

Supreme Court, in *Central Hudson*, identified several factors that courts should consider

in determining whether a regulation of commercial speech survives First Amendment

scrutiny:

> For commercial speech to come within [the First Amendment], it at
> least must concern lawful activity and not be misleading. Next, we ask
> whether the asserted governmental interest is substantial. If both
> inquiries yield positive answers, we must determine whether the
> regulation directly advances the governmental interest asserted, and
> whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson*, 447 U.S. at 566. A statute is more extensive than necessary if the State

has other options that could advance its asserted interest in a manner less intrusive on

First Amendment rights. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 491 (1995). at 491.

"If the Government can achieve its interests in a manner that does not restrict

commercial speech, or that restricts less speech, the Government must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 358 (2002).

On the record developed so far, the Court finds that the State has not identified any real patient or public harm from any purported steering to support its asserted interest, and it has not shown that the Steering Provision is no more extensive than necessary to address those harms.

### iii. The State fails to demonstrate that the Steering Provision directly advances its asserted interest in protecting patients.

In justifying the Steering Provision, the State contends that it seeks to "shield patients from potential harm caused by being steered into coverage options that may not be in their best interest." *See* AB 290 § 1(i). According to the State, "patient steering" by Plaintiff Providers has been the subject of federal rulemaking, state regulatory efforts, and numerous lawsuits. For example, the CMS record "documented a range of concerning practices, with providers and suppliers"—such as DaVita and Fresenius— "influencing enrollment decisions in ways that put the financial interest of the supplier above the needs of patients." Defs.' *Fresenius* Mot. (Dkt. 152, No. 8:19-cv-2130) at 11. The State further points out, based on comments made in the CMS record, that patients "are sometimes specifically discouraged from pursuing Medicare or Medicaid" and "are unaware that a dialysis facility is seeking to enroll them in the individual market," and that facilities "retaliate against social workers who attempt to disclose additional information to consumers." Defs.' Facts ¶ 11. Commenters agreed that these practices are fueled by a powerful incentive—the considerably higher rates that commercial coverage reimburses dialysis providers as compared to public coverage. Defs.' Facts ¶ 12. HHS had also "suggest[ed] that this inappropriate steering of patients may be accelerating over time." Defs.' Facts ¶ 13.

In addition to the CMS record, the State points to a Washington Office of the Insurance Commissioner (OIC) order requiring DaVita "to immediately stop engaging in the business of unauthorized insurance via steering dialysis patients into higher

reimbursing plans by offering to pay premiums." Defs.' Facts ¶ 27. Washington OIC took enforcement action after learning that DaVita insurance coordinator had attempted "to sign up approximately 30 kidney dialysis patients, most of whom [we]re receiving Medicaid," onto commercial insurance. *Id.* ¶ 28. The order was rescinded by stipulation of the parties on the condition, among other requirements, that DaVita counselors "not ask or urge dialysis patients to enroll in any particular kind of insurance from any particular insurer" for a period of two years. Defs.' Facts ¶ 29. That investigation also uncovered evidence provided by a former DaVita social worker of a DaVita PowerPoint presentation directing insurance counselors and social workers "to 'target' Medicaid eligible patients to get them to purchase commercial insurance." Defs.' Facts ¶ 30. Known as the "Medicaid Opportunity," this program, which began in 2015, was designed to increase the number of Medicaid patients enrolled in an individual market plan (paid for with HIPP assistance) as primary coverage. Defs.' Facts ¶ 31.

A number of courts have observed this troubling trend among dialysis providers. One federal court concluded that there was a "strong inference" that DaVita made misleading "statements about steering and the source of [its] financial success." *See Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1155 (D. Colo. 2019). Another determined that it was "reasonable to infer . . . that the Medicaid Opportunity initiative was part of a larger, systematic plan by DaVita's management to drive revenues and profitability through [DaVita's] AKF donations." *In re DaVita Inc. v. Stockholder Derivative Litig.*, No. 17-152-MPT, 2019 WL 1855445, *14 (D. Del. Apr. 25,2019); *id.* at *1, *12 (denying DaVita's motion to dismiss stockholder derivative action challenging specific Board decisions related to the Medicaid Opportunity initiative).

Although the record supports the State's position that a significant economic incentive exists to steer dialysis patients into private insurance, the State has not met its burden of showing patient harm that has resulted from this supposed steering. For one, the State almost exclusively relies on the CMS rulemaking record to establish the real

harm that AB 290's Steering Provision aims to tackle. *See e.g.*, Defs.' *Fresnius* Opp'n (Dkt. 173) at 10 (noting that the "[l]egislature [] embraced CMS's findings that 'patients . . . may face higher out-of-pocket costs and mid-year disruptions in coverage, and may have a more difficult time obtaining critical care such as kidney transplants'") (quoting AB 290 § 1(d)); *id.* at 20 ("Steering is thus a real problem—and it causes real harm. As described in the CMS record and the legislative findings . . . steering injures patients in at least three ways."). But the HHS rule resulting from the CMS record was enjoined by a federal court particularly because the agency failed to assemble a complete record through proper notice-and-comment process. *See Dialysis Patients Citizens v. Burwell*, No. 17-cv-16, 2017 WL 365271, at *5-6 (E.D. Tex. Jan. 25, 2017).

Even assuming the CMS rulemaking record is reliable, the State offers little more than "mere speculation or conjecture" regarding harm resulting from the purported steering. *Edenfield*, 507 U.S. at 770 – 71. The State argues, for example, that "patients steered into commercial insurance who would have been eligible for a kidney transplant under Medicare *may* be unable to demonstrate the financial means to care for a new kidney." *See* Defs.' *Fresnius* Mot. (Dkt. 152) at 18 (emphasis added) (internal quotation marks omitted); *see also id.* at 19 (the "threat of cessation of health insurance benefits . . . *may* induce some patients to remain on dialysis and never pursue transplant") (emphasis added) (internal quotation marks omitted); *id.* ("patients steered into commercial insurance have higher out-of-pocket expenses post-transplant when HIPP assistance ends, which *may* lead them to stop taking their immunosuppressant drugs, causing their transplant to fail"). AB 290's legislative findings use similarly hypothetical language. *See* AB 290 § 1(c) ("[e]ncouraging patients to enroll in commercial insurance coverage for the financial benefit of the provider *may* result in an unjust enrichment ... [which] *can* expose patients to direct harm") (emphasis added)); *id.* § 1(d) ("patients caught up in these schemes *may* face higher out-of-pocket costs and mid-year disruptions, and *may* have a more difficult time obtaining critical care") (emphasis

added); *id.* § 1(i) (patients face "*potential* harm caused by being steered into coverage
options that *may* not be in their best interest") (emphasis added).

As the Court previously explained, such "hypothetical phrasing calls into question
whether these recited harms are real." Order at 8. Because the State still cannot "identify
a single California patient steered into a private insurance plan by a dialysis provider or
third-party payer," *id.*, the supposed patient harm is too speculative and conjectural to
support the State's professed interest of protecting patients.

### iv. The State fails to demonstrate that the Steering Provision directly advances its asserted interest in remedying distortions in California's insurance risk pools.

Aside from patient harm, the State argues that steering raises health insurance
premiums for a wide swath of the population because it "distort[s] [] the insurance risk
pool." AB 290, § 1(e). At the preliminary-injunction stage, the Court deemed this
finding "anemic," reasoning that "if these  harms were real, rather than speculative or
conjectural, the State … would already understand and be able to demonstrate these
economic effects." Order at 5. The evidence in the record still fails to establish that, as a
result of dialysis providers purportedly steering patients onto particular insurance plans,
California consumers will pay, or have paid, higher insurance premiums. The State notes
merely the "potential scope of the problem" and relies on the opinion of its expert, John
Bertko, who projects that individual-market plans in California would experience a 5.3%
premium increase "due to [an] increase in ESRD enrollees." Defs.' Mot. at 19. Using
data from Covered California's 11-plan database, Mr. Bertko bases his opinions on his
observation that 3,000 additional ESRD patients joined Covered California plans
between 2015 and 2016. But neither Mr. Bertko nor the State's other sources isolated the
effect of ESRD patients who were supposedly steered by dialysis providers or entities
like AKF—as opposed to ESRD patients who obtained private insurance for other
reasons. The State's expert also testified that small changes in the risk mix of the
insurance pool would not necessarily lead to higher insurance premiums. *See* Ex. 21 to
Defs.' *Fresnius* Opp'n (Dkt. 173-1) at 39 (testifying if "risk mix" "just changed [a] little

bit" then that "would … not necessarily have an impact on premiums" or would have "an impact maybe that wasn't very visible"). He further opined that since 2014, California has "successfully . . . ke[pt] the health 'risk mix' of enrolled consumers [in individual plans] to a level that has been consistent," making California "among the lowest five states in the country with the lowest average measured health risk" for individual plans. *See* Ex. 9 to Defs.' Mot. (Expert Report of John Bertko) at 7; Provider Pls.' Facts ¶ 94 ("According to Mr. Bertko, Covered California has had 'very low premium increases over the last three or four years," with the one exception (in 2018), which was never "determine[d to be] caused by ESRD enrollees.'").

Because the record lacks sufficient evidence that any purported steering has distorted, or will distort, California's risk pools, the anti-steering provisions do not directly advance the State's interest. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 477 (1995) ("Even if the Government possessed the authority to facilitate state powers, the Government has offered nothing to suggest that States are in need of federal assistance in this regard.").

### v. The State has not shown that the Steering Provision is "no more extensive than necessary" to further its interests.

Even if the Steering Provision seeks to remedy a real harm, the State has not shown that the Steering Provision "is no more extensive than necessary to further" the Government's interests. *Cent. Hudson*, 447 U.S. at 569–70.

The State here has "various other laws at its disposal that would allow it to achieve its stated interests while burdening little or no speech." *Valle Del Sol*, 709 F.3d at 826 (quoting *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 949 (9th Cir. 2011) ). The State could prohibit false or misleading statements by providers to patients about insurance options, *see e.g.*, *Riley*, 487 U.S. at 795; require providers to disclose any financial interest in insurance choices, *see e.g.*, *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985); or engage in its own efforts to educate ESRD patients about insurance options, *see e.g., NIFLA*, 138

S. Ct. at 2376; *Nat'l Ass'n of Wheat Growers v. Becerra*, 468 F. Supp.3d 1247, 1265 (E.D. Cal. 2020) ("advertising campaigns or posting information on the Internet" are less burdensome alternatives).

Because the State's evidence fails to demonstrate a real harm resulting from any steering, the Court grants summary judgment in favor of Plaintiffs on their First Amendment claim.

### b. Whether AB 290 Violates Plaintiffs' Right of Association

The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). The First Amendment protects the freedom of association in two distinct senses. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987). First, it protects against unjustified government interference with an individual's choice to enter into and maintain intimate or private relationships. *Id*. Second, it protects an individual's right to associate for the purpose of engaging in protected speech or religious activities. *Id*. Such protected association furthers "a wide variety of political, social, economic, educational, religious, and cultural ends," and "is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority." *Id.*, 468 U.S. at 622. "Government infringement of this freedom can take a number of forms." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (internal quotation marks and citations omitted). For example, government action may unconstitutionally infringe on the right to associate by (1) seeking "to impose penalties or withhold benefits from individuals because of their membership in a disfavored group," (2) attempting "to require disclosure of the fact of membership in a group seeking anonymity," or (3) attempting "to interfere with the internal organization or affairs of the group." *See Jaycees*, 468 U.S. at 622 (citations omitted); *see also Americans for Prosperity Found.*, 141 S. Ct. at 2382 ("[F]reedom of association may be violated where a group is required to take in members it does not want, . . . where

individuals are punished for their political affiliation, . . . or where members of an

organization are denied benefits based on the organization's message." (internal citations

omitted)).

Not all groups, however, are entitled to this First Amendment protection; it can be

invoked only by those groups actually engaged in expressive association. *See Boy Scouts

of Am. v. Dale*, 530 U.S. 640, 648 (2000); *see also City of Dallas v. Stanglin*, 490 U.S.

19, 24 (1989) (recognizing that not every group is engaged in "the sort of 'expressive

association' that the First Amendment has been held to protect"). Individuals engage in

expressive association when they join with others to pursue "a wide variety of political,

religious, cultural, or social purposes," *Jaycees*, 468 U.S. at 630, including the advocacy

of both public and private points of view, the advancement of beliefs and ideas, and the

transmission of "a system of values," *Boy Scouts of Am.*, 530 U.S. at 650. Members

involved in such endeavors are generally protected in expressing the "views that brought

them together." *Jaycees*, 468 U.S. at 623.

Both sets of Plaintiffs argue that the Reimbursement Cap, AB 290 §§ 3(e)(1),

3(f)(1), 5(e)(1), 5(f)(1), burdens their First Amendment right to association by capping

the reimbursement rates negotiated between insurers and dialysis providers. *See* Provider

Pls.' Mot. (Dkt. 153, No. 8:19-cv-02130) at 23; Doe Pls.' Mot. (Dkt. 132) at 24 (arguing

that the Reimbursement Cap  imposes a heavy "'financial burden" on giving to dialysis

providers, so that it 'operate[s] as [a] disincentive[] to speak' and associate with AKF")

(quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S.

105, 117 (1991)). Doe Plaintiffs advance two additional arguments that AB 290 intrudes

on their right to associate. They argue that AB 290's requirement that AKF "not []

condition financial assistance on eligibility for, or receipt of, any . . . transplant [or]

procedure," AB 290 §§ 3(b)(2), 5(b)(2), "would undermine the core of AKF's mission,

which consists of providing premium assistance to ESRD patients who are undergoing

dialysis or who have received a kidney transplant within the past year." Doe Pls.' Mot.

(Dkt. 132) at 24. They also argue that the Disclosure Provisions, AB 290 §§ 3(c)(2),

5(c)(2), "burden[] AKF's relationship with patients, forcing AKF to disclose patient
details in a manner it would not agree to . . . and exposing information that patients may
not want revealed to their insurers." Doe Pls.' Mot. (Dkt. 132) at 24. The Court
addresses each argument in turn.

### i. Whether the Reimbursement Cap Violates Plaintiffs' Right to Associate

Under AB 290's Reimbursement Cap, if a dialysis provider donates to AKF and
AKF helps a patient with that provider pay for private insurance, the provider's
reimbursement for that patient will be limited to the Medicare rate or an independent
dispute resolution rate. See AB 290 §§ 3(e)(1), 3(f)(1), 5(e)(1), 5(f)(1). Specifically, AB
290 provides that if "a contracted financially interested provider . . . has a financial
relationship with the entity making the third-party premium payment, the amount of
reimbursement for covered services . . . shall be the higher of the Medicare
reimbursement rate or the rate determined pursuant to" an "independent dispute
resolution process" to be established by the State. *See* AB 290 § 3(e)(1), 3(f)(1); *see also*
AB 290 §§ 5(e)(1), (f)(1) (providing that "the amount of reimbursement for covered
services . . . shall be governed by the higher of the Medicare reimbursement or the rate
determined pursuant to" the "independent dispute resolution process").

As the Court recognized at the preliminary injunction stage, the question of
"whether the providers' system of contributions is actually under the aegis of the First
Amendment"  turns on whether the dialysis providers' donations to AKF are "an
expressive avenue by which providers join and support AKF's mission," or whether the
purpose of the donations is "to secure a later return on investment in the form of higher
private insurance reimbursements" such that it is "essentially economic or
nonexpressive."  *See* Order at 11. If the "contributions constitute only an elaborate
system of financial self-dealing," *id.*, the conduct is not "inherently expressive . . . to
merit constitutional protection." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879,
895 (9th Cir. 2018) (internal quotation marks and citations omitted).

The State argues that the Reimbursement Cap is "a restriction on economic activity or nonexpressive conduct" subject to intermediate scrutiny because Provider Plaintiffs' donations are not an "expressive avenue by which providers join and support AKF's mission," but a quid pro quo arrangement that "secure[s] a later 'return on investment' in the form of higher private insurance reimbursements." Defs.' *Fresnius* Mot. (Dkt. 152-1, No. 8:19-cv-2130) at 14 (citing Order at 10-11). The Court agrees.

The evidence in the record sheds light on the elaborate financial relationship between AKF and dialysis providers. Because a host of laws, regulations, and other authorities prohibit providers from paying their own patients' premiums, the evidence suggests that dialysis providers like DaVita work with AKF as a financial intermediary through which the provider effectively pays its patients' premiums. *See* Ex. 26 to Defs.' Doe Reply (Dkt. 171) (Enrolled Bill Report, Senate Bill 1156) ("Since providers are prohibited from directly paying premiums on behalf of enrollees, providers have donated funds to charitable organizations that offer premium payment assistance to enroll patients into commercial coverage."). Plaintiffs "[s]upport[] premium payments to facilitate enrollment of their patients in individual market coverage," Defs.' Facts ¶ 48, and the "only way" in which AKF can afford to pay the premiums of commercially-insured patients is for providers to pay their "fair share." Defs.' Facts ¶ 49. In effect, the scheme works in the following way: The dialysis provider makes substantial donations to AKF, calibrated to cover the amounts in premiums provider patients would require for commercial insurance premiums. Dialysis providers and AKF proceed to operate under an understanding that AKF will route (or allow Providers' employees to route) much of the "donations" back to the providers' patients in amounts calculated to cover their premiums. By funneling money through AKF and back to its patients, the providers are essentially paying their patients to enroll in, or remain enrolled in, commercial insurance plans to reap the reimbursement rates for commercial coverage, which are considerably higher than for public coverage. *See* Defs.' Facts ¶ 47 (estimating that dialysis facilities generally receive about $100,000 more per year per patient for patients enrolled in

commercial coverage). The record supports the State's argument that dialysis providers
"therefore have much to gain financially (on the order of tens or even hundreds of
thousands of dollars per patient) by making a relatively small outlay to pay an
individual's premium to enroll in commercial coverage so as to receive a much larger
payment for providing an identical set of health care services." *Id.* For a time, AKF even
made the transactional nature of this arrangement even more explicit by "request[ing]
that [an] organization not refer [] patients to the HIPP program" "if [the] company
[could] not make fair share contributions." *Id.* ¶ 50. AKF admits, moreover, that over
80% of its funding comes from DaVita and Fresenius. Defs.' Facts ¶ 70.
Given the transactional nature of the relationship between AKF and Provider Plaintiffs,
the Court finds that the Reimbursement Cap does not implicate Plaintiffs' right to
associate with AKF; rather, it targets economic activity that does not "communicate[] a
message" or "contain an expressive element." *Interpipe Contracting*, 898 F.3d at 895.
Accordingly, to pass constitutional muster, the State must show that the Reimbursement
Cap directly advances a substantial State interest.

Courts have long recognized a state's interest in regulating its health and
insurance markets. *See Conway v. United States*, 997 F.3d 1198, 1208 (Fed. Cir. 2021)
(noting a "'historic primacy of state regulation of matters of health and safety'"
including "health insurance regulations") (quoting *Medtronic, Inc. v. Lohr*, 518 U.S.
470, 485 (1996)); *Operating Engineers Health & Welfare Tr. Fund v. JWJ Contracting
Co.*, 135 F.3d 671, 677 (9th Cir. 1998) (observing that "areas traditionally left to state
regulation" include the state's "regulation of health, safety, banking, securities, and
insurance matters"). The State further contends the Reimbursement Cap is constitutional
because it advances its substantial interest in "eliminat[ing] preferentially high
reimbursement rates for privately insured dialysis patients" and "providing needed
protections for kidney patients." *Id.* (citations and internal quotation marks omitted). AB
290's legislative findings recognize that "third-party payment arrangements have
proliferated in recent years," that Plaintiffs "systematically exert their market dominance

to command commercial reimbursement rates that are many times the cost associated with providing care," that AKF "generates hundreds of millions of dollars for large dialysis organizations by artificially increasing the number of their patients who have commercial insurance coverage," and that the intent of the Legislature is, in part, "to correct a market failure that has allowed large dialysis organizations"—such as Plaintiffs—"to use their oligopoly power to inflate commercial reimbursement rates and unjustly drive up the cost of care." AB 290, §§ 1(b), (g), (h), (i).

Because the Reimbursement Cap directly advances the State's interest in neutralizing the reimbursement rates for commercial insurance, and does so without restricting the dialogue between patients and providers, the Reimbursement Cap does not violate Plaintiffs' First Amendment rights.

### ii. Whether Prohibiting AKF from Conditioning Financial Assistance on Receipt of a Transplant or Procedure Violates AKF's Right to Associate

Plaintiffs also argue that AB 290 violates their right to associate because Sections 3(b)(2) and 5(b)(2) prohibit entities like AKF from "condition[ing] financial assistance on eligibility for, or receipt of, any . . . transplant [or] procedure." *See* AB 290 §§ 3(b), 5(b)(2). AKF contends that because its mission "consists of providing premium assistance to ESRD patients who are undergoing dialysis or who have received a kidney transplant within the past year," complying with this requirement "would undermine the core of AKF's mission." *See* Doe Pls.' Mot. (Dkt. 132) at 23. The State disagrees, arguing that this provision "would merely require entities such as AKF that offer premium assistance not to discriminate against an ESRD patient who chooses the best course of treatment—even if that treatment is not dialysis." Defs.' *Doe* Opp'n (Dkt. 153) at 24. In support, the State cites the following legislative findings articulated in Section 1 of AB 290:

> (c) Encouraging patients to enroll in commercial insurance coverage for the financial benefit of the provider may result in an unjust enrichment of the financially interested provider at the expense of consumers purchasing health insurance. This practice can also expose patients to direct harm.

-40-

> (d) According to the federal Centers for Medicare and Medicaid
> Services, patients caught up in these schemes may face higher out-
> of-pocket costs and mid-year disruptions in coverage, and may
> have a more difficult time obtaining critical care such as kidney
> transplants.

AB 290 §§ 1(c), (d). According to the State, AB 290's prohibition on "condition[ing] financial assistance on eligibility for, or receipt of, any . . . transplant [or] procedure" seeks to limit only those "certain practices noted in the CMS record that are harmful to patients, such as the withdrawal of premium assistance when a patient receives a kidney transplant." Defs.' *Doe* Opp'n (Dkt. 153) at 24.

To determine the meaning of AB 290 §§ 3(b) and 5(b)(2), the Court "look[s] to the intent of the Legislature in enacting the law, being careful to give the statute's words their plain, commonsense meaning." *See In re Jennings*, 34 Cal. 4th 254, 263, 95 P.3d 906, 910 (2004) (internal quotation marks and citation omitted). The Court also interprets the provisions "in context with the entire statute and the statutory scheme." *Renee J. v. Superior Ct.*, 26 Cal. 4th 735, 743, 28 P.3d 876, 880 (2001) "If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary." *Kavanaugh v. W. Sonoma Cnty. Union High Sch. Dist.*, 29 Cal. 4th 911, 919, 62 P.3d 54, 59 (2003). And "[w]here the words of the statute are clear," the Court "may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." *Burden v. Snowden*, 2 Cal. 4th 556, 562, 828 P.2d 672, 676 (1992).

Even assuming that the California Legislature was legitimately concerned with the practice of withdrawing financial assistance from patients after they received a kidney transplant, the State's proffered limitations—that the provisions only apply to those "certain practices"—are found nowhere in the language of sections 3(b)(2) and 5(b)(2). The Legislature's references to "mid-year disruptions in coverage" and difficulty in obtaining kidney transplants in Section 1 are insufficient to alter the plain meaning of the operative provisions in Sections 3 and 5. *Cf. Kingdomware Techs., Inc. v. United States*,

579 U.S. 162, 172–73 (2016) ("The [prefatory] clause announces an objective that Congress hoped that the Department would achieve . . . but it does not change the plain meaning of the operative clause." (citation omitted)). If the Legislature sought to eliminate only certain practices like the State contends, it could have written the provisions that way. *See Ramos v. Superior Court*, 146 Cal.App.4th 719, 727, 53 Cal.Rptr.3d 189 (2007) ("We presume the Legislature knew what it was saying and meant what it said." (citation omitted)).

Not permitting AKF to take into account a patient's "eligibility for, or receipt of, any surgery, transplant, procedure, drug, or device," *see* AB 290 §§ 3(b), 5(b)(2), when making financial assistance determinations constitutes unjustified government interference with AKF's choice to enter into and maintain relationships with certain patients based on its organizational mission. It attempts "to interfere with the internal organization or affairs of the group," *see Jaycees*, 468 U.S. at 622 (citations omitted), by essentially requiring AKF to service individuals it may otherwise choose not to. *See Americans for Prosperity Found.*, 141 S. Ct. at 2382 ("[F]reedom of association may be violated where a group is required to take in members it does not want . . . .).

The Court thus concludes that AB 290 §§ 3(b)(2) and 5(b)(2) violate Plaintiffs' First Amendment right to freedom of association. Accordingly, those provisions are void and severable from the remainder of that statute.

### iii. Whether the Disclosure Provisions Violate AKF's Right to Associate

Plaintiffs also challenge the provisions in AB 290 that prohibit a financially interested entity like AKF from making a third-party premium payment unless it "[d]iscloses to the health care service plan, prior to making the initial payment, the name of the enrollee for each health care service plan contract on whose behalf a third-party premium payment . . . will be made." *See* AB 290 §§ 3(c)(2), 5(c)(2). Plaintiffs argue that these disclosure provisions "burden[] AKF's relationship with patients, forcing AKF to disclose patient details in a manner it would not agree to, . . . , and exposing

information that patients may not want revealed to their insurers." Doe Pls.' Mot. (Dkt. 132) at 24. The State does not respond to this argument in opposition.

In *Americans for Prosperity Foundation v. Bonta*, the Supreme Court recognized "the importance of California's interest in preventing charitable fraud and self-dealing." 141 S. Ct. at 2376. It nonetheless ruled that a California regulation requiring tax-exempt charities to disclose to the Attorney General's Office "an enormous amount of sensitive information" about a charity's top donors, including the donors' names, the total contributions they made, and their addresses violated the donors' association rights where the information the Attorney General sought did "not form an integral part of California's fraud detection efforts." *Id*. Given that "the prime objective of the First Amendment is not efficiency" and the State's interest in seeking the information was "[m]ere administrative convenience," the Supreme Court held that the disclosure requirement "[did] not remotely 'reflect the seriousness of the actual burden'" imposed on donors' association rights. *Id*. (quoting *Am John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

The State here does not explain how the disclosure of patient names to their respective insurers advances a substantial state interest. Even if such a requirement would meaningfully assist the State in regulating insurance markets, protecting patient health, and preventing charitable fraud and self-dealing, the provisions are not sufficiently tailored. *See Americans for Prosperity Found.*, 141 S. Ct. at 2384 ("a substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored.").

Accordingly, the Court finds sections 3(c)(2) and 5(c)(2) violate Plaintiffs' First Amendment right to freedom of association. Accordingly, those provisions are void and severable from the remainder of that statute.

### c. Whether Disclosure Provisions Unlawfully Compel AKF's Speech

AB 290 requires a financially interested entity like AKF to inform HIPP recipients of "all available health coverage options, including but not limited to, Medicare,

Medicaid, individual market plans, and employer plans." AB 290, §§ 3(b)(3) & 5(b)(3). It also prohibits a financially interested entity from making a third-party premium payment unless it discloses to a health insurer the name of each insured patient who will receive premium assistance. *Id.* § 3(c). The State argues that because these provisions require disclosure of "factual and uncontroversial information" regarding a commercial product, they are constitutional under the Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985). Plaintiffs, on the other hand, contend that AB 290 does not regulate commercial speech and is thus subject to strict scrutiny. *See* Doe Pls.' Opp'n at 11. They also argue that requiring AKF to disclose HIPP patients' names to health insurers "burdens AKF's relationship with patients, forcing AKF to disclose patient details in a manner it would not agree to and exposing information that patients may not want revealed to their insurers." Doe Pls.' Mot. at 24.

As explained above, the Court finds that AB 290 regulates commercial speech. In *Zauderer*, the Supreme Court held that requirements to disclose "factual and uncontroversial information" to a consumer do not implicate First Amendment concerns so long as they "are reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. The Supreme Court's decision in *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) further affirmed that any compelled disclosure must involve "purely factual and uncontroversial" information and that the government's interest in the disclosure must be "substantial." *Id*. at 2372, 2375; *see also CTIA—The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019) (holding that "the governmental interest in furthering public health and safety is sufficient under *Zauderer* so long as it is substantial"). In determining whether a disclosure requirement regulates "purely factual and uncontroversial information," the Ninth Circuit has noted that it must "relate to the product or service that is provided by an entity subject to the requirement" and not take "sides in a political controversy." *CTIA*, 928 F.3d at 845 (citing *NIFLA*, 138 S. Ct. at 2372).

The Court finds that the disclosure requirements here regulate "purely factual and uncontroversial information" regarding health insurance options which the record demonstrates that providers have an economic motive to promote. By requiring a financially interested entity like AKF to inform a patient of all their health coverage options "including, but not limited to, Medicare, Medicaid, individual market plans, and employer plans, if applicable," *see* AB 290 §§ 3(b)(3), 5(b)(3), these requirements reasonably relate to the State's interest in increasing consumer transparency, regulating health insurance, and protecting patient choice. *See Conway*, 997 F.3d at 1208 (noting a "'historic primacy of state regulation of matters of health and safety'" including "health insurance regulations") (quoting *Medtronic*, 518 U.S. at 485); *Operating Engineers Health*, 135 F.3d at 677 (observing that "areas traditionally left to state regulation" include the state's "regulation of health, safety, banking, securities, and insurance matters").

The disclosures do not "t[ake] sides in a heated political controversy" and relate directly to the HIPP assistance that AKF offers patients. *See CTIA*, 928 F.3d at 845. Under *Zauderer*, such compelled disclosure—of purely factual and uncontroversial commercial speech that is reasonably related to a substantial governmental interest— complies with the First Amendment. *Id*.

Accordingly, the disclosure requirements in AB 290 §§ 3(b)(3) and 5(b)(3) are constitutional.

### d. Whether Section 7 Abridges AKF's Right to Petition

Plaintiffs challenge Section 7 of AB 290, which provides that AB 290 will become operative in July 2020 "unless one or more parties to Advisory Opinion 97-1 requests an updated opinion from [HHS OIG]." AB 290 § 7. According to Plaintiffs, Section 7 unconstitutionally compels Plaintiffs to "exercise their petitioning rights and to do so in a particular manner." Compl. ¶ 120. The State argues that AB 290 does not violate Plaintiffs' First Amendment right to petition because it does not "mandate" that AKF petition the government. Defs.' Mot. at 23. According to the State, Section 7

merely provides "the *option* to request an updated advisory opinion." *Id*. The Court agrees with the State.

The First Amendment's Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. This provision applies to the states through the Fourteenth Amendment. *See Edwards v. South Carolina*, 372 U.S. 229, 235 (1963). "[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011). Nevertheless, the "basis of the constitutional right of access to courts" is "unsettled." *Christopher v. Harbury*, 536 U.S. 403, 415 & n.12 (2002); *Duryea*, 564 U.S. at 387. And "the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher*, 536 U.S. at 415.

Although Section 7 provides that enforcement of AB 290 would be delayed pending a party's request for an updated OIG opinion, nothing in the provision curtails Plaintiffs' access to courts, as they are plainly litigating their claims in this action. The cases Plaintiffs rely on are also inapposite. *See Agency for Int'l Dev. v. Alliance for Open Soc'y*, 570 U.S. 205, 221 (2013) (holding, in a Spending Clause case, that a policy compelling as a condition of federal funding the affirmation of a certain belief violated the First Amendment); *Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding that police officers under investigation for obstructing justice who were forced to choose between incriminating themselves or forfeiting their jobs suffered a violation of their Fourteenth Amendment rights).

Accordingly, the Court enters summary judgment in favor of Defendants on Plaintiffs' Right to Petition claim.

### 3. Provider Plaintiffs' Contract Clause Claim

Provider Plaintiffs allege that AB 290 substantially impairs Plaintiffs' existing contractual relationships in violation of the Contract Clause of the U.S. Constitution because, among other things:

a)  The reimbursement terms in existing contracts are critical contractual terms, and they are heavily negotiated.
b)  When negotiating with private insurers, providers have reached agreements on rates higher than the Medicare rate.
c)  AB 290 does not advance, but frustrates, the clear intent of the contracting parties.
d)  AB 290 does not supply a default rule, but rather imposes mandatory terms that displace those in existing contracts.

Compl. ¶ 140. Plaintiffs further allege that "the state law is [not] drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *See id.* ¶ 139 (quoting *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018)). Defendants argue that Plaintiffs' Contracts Clause claim fails, because "Plaintiffs have not shown impairment of any specific contractual right held by the providers that would not under normal circumstances be subject to regulation by the State." Defs.' Mot. at 28. According to the State, the fact that "the insurance market is already heavily regulated by state and federal law also weighs against any finding of impairment." *Id.* Plaintiffs respond that the State "admits that commercial insurers' reimbursement rates are significantly higher than Medicare rates—thereby effectively conceding that the law will necessarily impair contract terms." Pls.' Opp'n at 31. They also counter that AB 290's restriction of reimbursement rates "invade[s] an area never before subject to regulation by the State." *Id.* at 32 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 250 (1978)).

The Contracts Clause of the U.S. Constitution provides that "[n]o State shall [pass any] Law impairing the Obligation of Contracts." U.S. Const. art. 1, § 10, cl. 1. The California Constitution similarly provides that no "law impairing the obligation of contracts" may be passed. Cal. Const. art. 1, § 9. In considering a challenge to a statute

under the Contracts Clause, courts apply a "two-step test." *Sveen*, 138 S. Ct. at 1821. The first step is determining "whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Id.* at 1821–22 (quoting *Spannaus*, 438 U.S. at 244). To answer that question, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822 (citations omitted). If such factors show a substantial impairment, the inquiry turns to "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–412 (1983)).

Even assuming there is a specific term that AB 290 impairs, Plaintiffs fail to meet their burden of disproving any legitimate purpose behind the Reimbursement Cap. *See Energy Reserves Group, Inc.*, 459 U.S. at 410 ("Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'"); *State of Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 108-09 (1938) ("[E]very contract is made subject to the implied condition that its fulfillment may be frustrated by a proper exercise of the police power"). The Supreme Court in *Energy Reserves* instructed that "[u]nless the State itself is a contracting party . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412–13 (internal quotation and citation omitted); *see Seltzer v. Cochrane*, 104 F.3d 234, 236 (9th Cir. 1996) ("The burden is placed on the party asserting the benefit of the statute only when that party is the state.").

As the Court highlighted above, the evidence in the record underscores the societal concern the State was addressing in neutralizing the reimbursement rates for commercially-insured patients. Bearing in mind that whether legislation violates the Contracts Clause does not turn on "[w]hether [it] is wise or unwise as a matter of policy," *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 231, 447-48 (1934), a rational

factfinder would conclude that the Reimbursement Cap was reasonable and necessary to address the State's legitimate public purpose.

As such, even if there was a contractual obligation that AB 290 substantially impaired, Defendants are still entitled to summary judgment as to the Contracts Clause claim.

### 4. Provider Plaintiffs' Due Process Claim

Plaintiffs assert on behalf of their patients that AB 290 interferes with those patients' "fundamental right to lifesaving medical treatment." Compl. ¶ 149. They allege it does so by compelling AKF to cease operations in California, which will cause patients to lose their preferred health insurance, or to become uninsured, unable to cover their out of pocket costs, or unable to access treatment, and that with no privately-insured patients, dialysis clinics will close. *Id*. ¶¶ 106, 147-148. The State argues that Plaintiffs cannot establish standing or that a fundamental right is at issue. The Court agrees.

Article III standing requires a party to show that (1) it has suffered a concrete and particularized "injury in fact" that is "actual or imminent" and not hypothetical; (2) the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) it is likely the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("possible future injuries that depend on a speculative chain of possibilities that may not occur are not sufficient").

Plaintiffs' allegations are insufficient to show actual, concrete harm, or harm resulting from AB 290 rather than AKF's actions, as required for Article III standing. Plaintiffs' alleged injury stems from third-party AKF's threatened cessation of operations in California—not AB 290's provisions. Because the alleged injuries are contingent on AKF's threatened departure from the state, they depend on a "speculative chain of possibilities," and thus do not confer standing. *See Clapper*, 568 U.S. at 411-12.

Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' due process claim.

### 5. Provider Plaintiffs' Taking Clause Claim

Plaintiffs allege that the reimbursement cap violates the Takings Clause because it denies dialysis providers all economically beneficial or productive use of certain clinics, requires providers to return certain funds, and interferes with investment-backed expectations of reimbursement amounts for dialysis treatment. Compl. ¶ 154. Defendants argue that Plaintiffs' claim rests on speculative possibilities that do not rise to the level of a taking. *See* Defs.' Mot. at 24-25. Plaintiffs respond in a footnote that AB 290 "will inflict substantial economic harm . . . and interfere with their investment-backed expectations." *See* Pls.' Opp'n at 32 n. 9. In support of their argument, Plaintiffs cite propositions that "[p]rivate insurance reimbursement rates are typically higher than public reimbursement rates," and "Plaintiffs' dialysis facilities generally must have patients with private insurance in order to remain economically viable." *Id.*

The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without just compensation." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019) (alterations in original). By its terms, the clause "does not prohibit the taking of private property," but instead requires "compensation in the event of [an] otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314, 315 (1987). A classic taking occurs when the "government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Beyond a classic taking, a regulation that "goes too far" can be recognized as a taking. *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). As the Ninth Circuit has observed, there are three types of regulatory action, "each of which 'aims to identify regulatory actions that are functionally equivalent to the classic taking.'" *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 530–31 (9th Cir. 2019) (quoting *Lingle*, 544 U.S. at 539). Two types of regulatory actions are *per se* takings: when an owner is deprived of

"all economically beneficial uses" of the property, *Lucas v. S.C. Coastal Council*, 505
U.S. 1003, 1019 (1992), and when "a regulation results in a physical appropriation of
property," *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). "Anything less
than a 'complete elimination of value,' or a 'total loss' . . . would require the kind of
analysis applied in *Penn Central*." *Bridge Aina Le'a, LLC v. Land Use Comm'n*, 950
F.3d 610, 627 (9th Cir. 2020) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l
Planning Agency*, 535 U.S. 302, 330 (2002)). *Penn Central* requires courts to consider:
(1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which
the regulation has interfered with distinct investment-backed expectations," and (3) "the
character of the governmental action." *Penn Central Transp. Co. v. City of New York*,
438 U.S. 104, 124 (1978); *Bridge Aina Le'a*, 950 F.3d at 630.

Plaintiffs' contention that the reimbursement cap would subject them to
substantial economic harm is subject to the *Penn Central* framework, because it is not
the sort of "'extraordinary case' in which a regulation permanently deprives property of
all use," *Tahoe-Sierra*, 535 U.S. at 303, and it does not "seize a sum of money from a
specific fund," *Ballinger v. City of Oakland*, 24 F. 4th 1287, 1294 (9th Cir. 2022). In
considering the *Penn Central* factors, the Court aims "to determine whether a regulatory
action is functionally equivalent to the classic taking." *Guggenheim v. City of Goleta*,
638 F.3d 1111, 1120 (9th Cir. 2010) (en banc) (internal quotation marks omitted). "The
first and second *Penn Central* factors are the primary factors." *Bridge Aina Le'a*, 950
F.3d at 630.

Applying the *Penn Central* factors to the evidence, the Court finds that Plaintiffs
fail to establish the first factor—the challenged regulation's economic impact on the
property owner. *See Lingle*, 544 U.S. at 528. Courts analyzing this factor "'compare the
value that has been taken from the property with the value that remains in the property.'"
*Bridge Aina Le'a*, 950 F.3d at 630–31 (quoting *Colony Cove Props., LLC v. City of
Carson*, 888 F.3d 445, 450 (9th Cir. 2018)). "Although there is 'no litmus test,'" *id*.
(quoting *Colony Cove Props.*, 888 F.3d at 541), the Court's "value comparison again

aims 'to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owners from his domain,'" *id.* (quoting *Lingle*, 544 U.S. at 539). Plaintiffs here fail to present evidence demonstrating the economic impact of AB 290 through, for example, any valuation testimony or testimony regarding the alleged disruption of contracts. *Cf. Bridge Aina Le'a*, 950 F.3d at 630–31. This claim thus rests on "speculative possibilities" that do not rise to the level of a taking. *Bridge Aina Le'a*, 950 F.3d at 634.

Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' takings clause claim.

**6. Severability**

California law dictates that "[i]n considering the constitutionality of a legislative act, [the reviewing court] presume[s] its validity, resolving all doubts in favor of the Act. Unless conflict with a provision of the state or federal Constitution is clear and unquestionable, [the reviewing court] must uphold the Act." *County of Sonoma v. State Energy Res. Conservation etc. Com.*, 40 Cal.3d 361, 368 (1985) (citation omitted). Even in the absence of a severability clause, courts "have the power to reform a statute to preserve its constitutionality." *River Garden Retirement Home v. Franchise Tax Bd.*, 186 Cal.App.4th 922, 113 Cal. Rptr. 3d 62, 70–71 (2010) (quotations marks and citation omitted). A court "may rewrite a statute to cure constitutional invalidity when [it] can assert confidently that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute." *Id.*

The California Supreme Court has established a two-step test to guide whether portions of a law are severable. First, the reviewing court must look to any severability clause, the presence of which "establishes a presumption in favor of severance." *Cal. Redevelopment Ass'n v. Matosantos*, 53 Cal. 4th 231, 271 (2011) (citing *Santa Barbara Sch. Dist. v. Superior Court*, 13 Cal. 3d 315, 331 (1975)). If a statute does not contain a

severability clause, the reviewing court proceeds to analyze whether the provision is "grammatically, functionally, and volitionally separable." *Matosantos*, 53 Cal. 4th at 271 (citing *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 821 (1989)).

"Grammatical separability" considers whether the invalid portion of the statute can be stricken "'without affecting the wording' or coherence of what remains." *Id.* (quoting *Calfarm*, 48 Cal. 3d at 822). "An enactment passes the grammatical test . . . where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase, or even single words." *Barlow v. Davis*, 72 Cal. App. 4th 1258, 1264–65, 85 Cal. Rptr. 2d 752 (1999), *as modified* (July 12, 1999) (internal citations and quotation marks omitted). "Functional separability" turns on whether the rest of the statute "is complete in itself." *Id.* (quoting *Sonoma Cty. Org. of Pub. Emps. v. County of Sonoma*, 23 Cal. 3d 296, 320 (1979)). To be functionally severable, "[t]he remaining provisions must stand on their own, unaided by the invalid provisions nor rendered vague by their absence nor inextricably connected to them by policy considerations. They must be capable of separate enforcement." *People's Advocate, Inc. v. Superior Court*, 181 Cal.App.3d 316, 226 Cal.Rptr. 640, 649 (1986). Finally, "volitional separability" obtains when the statute "would have been adopted" even if the legislative body had "foreseen the partial invalidation of the statute." *Id.* (citations omitted).

Because AB 290 does not contain a severability clause, the Court proceeds to the second step of the analysis, that is, to determine whether the unconstitutional provisions—Sections 2(a), 3(b)(2), 3(b)(4), 3(c)(2), 5(b)(2), 5(b)(4), and 5(c)(2)—are "grammatically, functionally, and volitionally separable" from AB 290. *Matosantos*, 53 Cal. 4th at 271.

### a. The Anti-Steering Provisions—AB 290 §§ 2(a), 3(b)(4), 5(b)(4)—are Severable

In its Order granting a preliminary injunction of AB 290 on December 30, 2019 (Dkt. 61), the Court found that although the Steering and Reimbursement Cap provisions taken together were not severable from the rest of the statute, either provision taken alone

likely would be severable. *See* Order at 13-14 ("Taken separately, either of these provisions likely would be severable; if only one were enjoined, the other would still be working to realize AB 290's goal of preventing patient steering, much like redundant systems in engineering."). The Court reaches the same conclusion here and finds that the language of the Steering Provision is clearly mechanically severable. As one standalone provision, it is grammatically distinct such that striking it from the law would create no incoherence in the remaining language of the statute. Additionally, for the same reasons discussed in the Court's Order granting the preliminary injunction, the Court finds the Steering Provision is functionally and volitionally separable. The Steering Ban and Reimbursement Cap are alternate means for achieving the same main stated purpose of AB 290: to prevent patient steering and protect the risk pools. *See* Order at 13; AB 290 § 1(c)-(e), (i). As the Court explained in its Order, "the Steering Ban directly prohibits patient steering, while the Reimbursement Cap negates the financial incentive to steer patients into private insurance." Order at 13. Thus, separate and apart from the Steering Provision, the Reimbursement Cap functions independently to achieve the stated purpose of AB 290. The Court finds this statutory design indicates the legislative body would have adopted AB 290 even had they foreseen invalidation of the anti-steering provisions.

Accordingly, the anti-steering provisions—AB 290 §§ 2(a), 3(b)(4), 5(b)(4)—are severable.

### b. The Prohibitions on Conditioning Financial Assistance on Receipt of a Transplant or Procedure—AB 290 §§ 3(b)(2), 5(b)(2)—are Severable

The provision restricting financial interested entities from "condition[ing] financial assistance on eligibility for, or receipt of, any surgery, transplant, procedure, drug, or device" is also grammatically distinct, such that striking it from the law would create no incoherence in the remaining language of the statute. *See* AB 290 §§ 3(b)(2), 5(b)(2). Like the Steering Ban, the prohibition on conditioning financial assistance is one of six requirements imposed on financial interested entities. *See* AB 290 §§ 3(b)(1)–(6), 5(b)(1)–(6). The remaining provisions still stand on their own and are capable of separate

enforcement, rendering the prohibition on conditioning financial assistance functionally severable. The Court is also persuaded that the legislative body would have adopted AB 290 even if they had foreseen that the restriction on conditioning financial assistance would be invalidated.

Accordingly, the prohibitions on conditioning financial assistance on receipt of a transplant or procedure—AB 290 §§ 3(b)(2), 5(b)(2)—are severable.

### c. The Requirements to Disclose Patient Names to Insurers— AB 290 §§ 3(c)(2), 5(c)(2)—are Severable

The same is true for the provisions that require financially interested entities to disclose to health insurers "the name of the insured for each policy on whose behalf a third-party premium payment . . . will be made" before making a third-party payment premium. *See* AB 290 §§ 3(c)(2), 5(c)(2). Each provision is grammatically severable, because it stands alone and could be removed as a whole without affecting the wording of any other provision. The removal of AB 290 §§ 3(c)(2), 5(c)(2) also does not affect the enforceability of the remaining statute, rendering the provisions functionally severable. Finally, the provisions are volitionally severable, because even if the Legislature had foreseen that the disclosure requirements in AB 290 §§ 3(c)(2), 5(c)(2) would be invalidated, nothing suggests that they would not have still adopted AB 290.

Accordingly, the requirements to disclose patient names to insurers—AB 290 §§ 3(c)(2), 5(c)(2)—are severable.

Because the anti-steering provisions, the prohibitions on conditioning financial assistance on receipt of a transplant or procedure, and the requirements to disclose patient names to insurers meet all the criteria for severability, they may be stricken without affecting the remainder of the law. The Court thus holds that Subsections 2(a), 3(b)(2), 3(b)(4), 3(c)(2), 5(b)(2), 5(b)(4), and 5(c)(2) are void and severable from the remainder of AB 290.

## IV.   DISPOSITION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Exclude the Testimony of Laurence Freedman (Dkt. 142), **GRANTS** Plaintiffs' Motion to Exclude the Testimony of Randolph Wayne Pate  (Dkt. 144), and **DENIES** Plaintiffs' Motion to Exclude the Testimony of Dr. Amy Waterman (Dkt. 146). The Court **GRANTS IN PART** Defendants' Motion for Summary Judgment (Dkt. 128); **GRANTS IN PART** Doe Plaintiffs' Motion for Summary Judgment (Dkt. 132); **GRANTS IN PART** Defendants' Motion for Summary Judgment as to the Complaint of Fresnius Plaintiffs (Dkt. 152, No. 8:19-cv-02130-DOC-ADS); and **GRANTS IN PART** Provider Plaintiffs' Motion for Summary Judgment (Dkt. 153, No. 8:19-cv-02130-DOC-ADS). Specifically, the Court:

- **GRANTS** summary judgment in favor of Defendants on Plaintiffs' preemption claims;

- **GRANTS** summary judgment in favor of Plaintiffs on their claim that  Subsections 2(a), 3(b)(4), and 5(b)(4) of AB 290 violate the First Amendment and **HOLDS** that those subsections are void and severable from the remainder of the statute;

- **GRANTS** summary judgment in favor of Defendants on Plaintiffs' claim that Subsections 3(e)(1), 3(f)(1), § 5(e)(1), 5(f)(1) of AB 290 violate Plaintiffs' First Amendment Right of Association and **HOLDS** that those subsections are valid and enforceable;

- **GRANTS** summary judgment in favor of Plaintiffs on their claim that Sections 3(b)(2) and 5(b)(2) of AB 290 violate the First Amendment and **HOLDS** that those subsections are void and severable from the remainder of the statute;

- **GRANTS** summary judgment in favor of Plaintiffs on their claim that Sections 3(c)(2) and 5(c)(2) of AB 290 violate the First Amendment and **HOLDS** that those subsections are void and severable from the remainder of the statute;

- **GRANTS** summary judgment in favor of Defendants on Plaintiffs' claim that Section 7 of AB 290 abridges Plaintiffs' First Amendment Right to Petition and **HOLDS** that Section 7 is valid and enforceable;

- **GRANTS** summary judgment in favor of Defendants on Plaintiffs' Contracts Clause claim;

- **GRANTS** summary judgment in favor of Defendants on Plaintiffs' Due Process Clause claim; and

- **GRANTS** summary judgment in favor of Defendants on Plaintiffs' Taking Clause Claim.

IT IS SO ORDERED.

DATED: January 9, 2024

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE